# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York

Jessica Denson, Individually and on
behalf of All Others Similarly Situated

                                    Plaintiff(s),

                    -against-

Donald J. Trump for President, Inc.

                                    Defendant(s).

Index No.

**Summons**

Date Index No. Purchased: June 1, 2020

To the above named Defendant(s)

Donald J. Trump for President, Inc.
725 Fifth Avenue
New York, New York 10022

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is N.Y. CPLR §§ 503, 509
which is Defendant's principal office is located in the county and plaintiff designates this county.

Dated: New York, NY

June 1, 2020

Bowles & Johnson PLLC

by_____
David K. Bowles
**Attorneys for Plaintiff**

Jessica Denson

David K. Bowles, Bowles & Johnson PLLC
14 Wall Street, 20th Floor, New York, NY 10005
(212) 390-8842 I David@BoJo.Law

John Langford, United to Protect Democracy, Inc.
555 W. 5th St., Los Angeles, CA 90013
(202) 579-4582 I john.langford@protectdemocracy.org

David A. Schulz, Ballard Spahr LLP
1675 Broadway, 19th Floor, New York, NY 10019
(212) 850-6103 I schulzd@ballardspahr.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JESSICA DENSON, Individually and on Behalf of All Others Similarly Situated, | Index No. _____ |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP FOR PRESIDENT, INC., Defendant. | **CLASS-ACTION COMPLAINT** |

Plaintiff, by and through her undersigned counsel, in support of this class action alleges as follows:

## INTRODUCTION

1.     Plaintiff Jessica Denson, on behalf of herself and all others similarly situated, brings this class-action complaint against Defendant Donald J. Trump for President, Inc. (the "Campaign"). This class action seeks a judgment declaring a form contract the Campaign routinely required employees, contractors, and volunteers to sign during the 2016 election cycle (the "Form NDA") to be null, void, and unenforceable. The Form NDA contains two ill-defined and vastly overreaching provisions. One provision, the non-disclosure clause, prohibits individuals like Ms. Denson from ever disclosing any information "that Mr. Trump insists remain private." The second provision, the non-disparagement clause, prevents them from ever "demean[ing] or disparag[ing] publicly" President Trump, any member of his family, and any of his or his family's companies. These provisions, taken together, constitute the main objective of the Form NDA and render it unlawful under both state and federal law.

2.      Many private employers ask employees to sign NDAs, and there is nothing unlawful in the abstract about the use of NDAs, including by political campaigns.

3.      The Form NDA drafted and imposed by the Campaign, however, is wildly broad, prohibiting a vast array of speech about a candidate for the highest office and the current President of the United States—*forever*. And the Campaign has repeatedly invoked its prohibitions in an effort to chill truthful political speech it dislikes.

4.      New York has never condoned such extraordinary restrictions on the speech of former employees, let alone independent contractors or third-party volunteers.

5.      NDAs that indefinitely and broadly ban speech about candidates for office and public officials violate both the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. These constitutional protections of speech and press reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" (*New York Times Co. v Sullivan*, 376 US 254, 270 [1964]). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government'" (*Snyder v Phelps*, 562 US 443, 452 [2011] (quoting *Garrison v Louisiana*, 379 US 64, 74-75 [1964])), and "occupies the highest rung of the hierarchy of First Amendment values" (*id.* (quoting *Connick v Myers*, 461 US 138, 145 [1983])). Unlimited nondisclosure and non-disparagement clauses like those in the Form NDA are anathema to our constitutionally protected rights of free speech and press and to the functioning of our democracy.

6.      Candidates for public office and public officials cannot silence former campaign workers forever. Former campaign workers have a right to criticize public officials and to

2

contribute to the public debate. That right can be limited only to protect truly sensitive information for reasonable time periods; it cannot be stripped away entirely by contract.

## PARTIES

7.   Plaintiff Jessica Denson, the class representative, is a *summa cum laude* graduate of The George Washington University, an award-winning journalist, and a member of the Screen Actors Guild – American Federation of Television and Radio Artists with film and TV credits.

8.   As a journalism undergraduate in Washington, D.C., Ms. Denson was highly involved in political reporting. She created, anchored, and produced a weekly newsmagazine from the White House, interned at CNN's "The Situation Room" and the D.C. bureau for Cox Communications, and interviewed numerous political figures.

9.   Ms. Denson is a resident of California.

10.   Defendant (referred to herein as the "Campaign," as defined above) is the campaign organization that worked successfully for the election of Donald J. Trump as President of the United States in 2016, and on information and belief is the same organization currently campaigning for the reelection of President Trump.

11.   The Campaign is incorporated in the Commonwealth of Virginia, and has its principal place of business at 725 Fifth Avenue, New York, New York.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction pursuant to N.Y. C.P.L.R. § 301.

13.   Venue is proper in this county pursuant to N.Y. C.P.L.R. § 503 and § 509.

## FACTUAL ALLEGATIONS

14.   On June 16, 2015, Donald Trump announced that he would run for President of the United States.

15.     The Campaign formally launched a little less than two weeks later, filing its Statement of Organization with the Federal Election Commission on June 29, 2015.

16.     The Campaign successfully navigated the Republican primaries and, on July 16, 2016, the Republican National Convention nominated Trump for President.

**A.     The Campaign Hired Ms. Denson As A National Phone Bank Administrator**

17.     In the summer of 2016, Ms. Denson was working as an actress, a career that predated her college education and which continued after college. She was a registered Republican who had supported Mitt Romney for President in 2012.

18.     After Donald Trump was nominated as the GOP's candidate for President, Ms. Denson applied to work for the Campaign.

19.     On August 18, 2016, she was hired by the Campaign as a national phone bank administrator.

20.     Ms. Denson's initial role was to manage the national phone bank via its online platform; draft voter surveys; support and coordinate with local field offices and volunteers; and manage other tasks in the data department.

21.     As a national phone bank administrator, Ms. Denson had no direct access to candidate Trump, strategic campaign documents, or generally to any other sensitive campaign information, other than a national supporter database.

22.     On September 16, 2016, Ms. Denson was promoted to the role of Hispanic Engagement Director. In that role, she developed the Campaign's Spanish-language digital ad campaign, advocated for certain human rights stances, created the Campaign's Spanish campaign slogan, developed bilingual campaign literature, launched an official Spanish-

4

language Twitter account, supported Hispanic engagement events in target states, and liaised between the national campaign and ground efforts for Hispanic engagement.

### B. The Campaign Required Ms. Denson to Execute an Indefinite and Broad Form NDA

23.     Despite initially hiring Ms. Denson to fill a relatively low-level role, the Campaign required her to execute a form contract (the "Form NDA") containing ill-defined, expansive, and perpetual nondisclosure and non-disparagement clauses on August 18, 2016, four days prior to when she started work on August 22, 2016. A true and correct copy of the contract Ms. Denson was required to sign is attached as exhibit A.

#### *The Nondisclosure Clause*

24.     The nondisclosure clause provides that, "[d]uring the time of [her] service *and at all times thereafter*," Ms. Denson may not disclose or assist others in disclosing "Confidential Information," or use that information in any way detrimental to Mr. Trump, his family, or any of Mr. Trump's or his family's businesses (exhibit A, ¶ 1 (emphasis added)).

25.     The nondisclosure clause defines "Confidential Information" to include, without limitation:

> any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

(*Id.* ¶ 6(a).)

5

26.     The definition of "Confidential Information" does not stop there. It also includes

"*all information* . . . of a private, proprietary or confidential nature that Mr. Trump insists remain

private or confidential" (*Id.* (emphasis added)).

27.     The breadth and open-endedness of the nondisclosure clause leaves Ms. Denson

with no way of knowing what qualifies as Confidential Information and what does not.

### *The Non-Disparagement Clause*

28.     The non-disparagement clause provides that "[d]uring the term of [her] service

*and at all times thereafter*," Ms. Denson may not "demean or disparage publicly the Company,

Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any

asset any of the foregoing own, or product or service any of the foregoing offer" (*Id.* ¶ 2

(emphasis added)).

29.     The contract defines "Family Member" as:

> any member of Mr. Trump's family, including, but not limited to,
> Mr. Trump's spouse, each of Mr. Trump's children and
> grandchildren and their respective spouses, including but not limited
> to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump,
> Tiffany Trump, and Barron Trump, and their respective spouses,
> children and grandchildren, if any, and Mr. Trump's siblings and
> their respective spouses and children, if any.

(*Id.* ¶ 6(b).)

30.     The contract defines "Trump Company" as "any entity, partnership, trust or

organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is

controlled or owned by Mr. Trump," and "Family Member Company" as "any entity,

partnership, trust or organization that, in whole or in part, was created by or for the benefit of any

Family Member or is controlled or owned by any Family Member" (*Id.* ¶¶ 6(c), 6(f)).

6

FILED: NEW YORK COUNTY CLERK 06/01/2020 09:48 AM
NYSCEF DOC. NO. 1   Case 1:20-cv-04737-PGG   Document 1-1   Filed 06/19/20   Page 9 of 60   RECEIVED NYSCEF: 06/01/2020

INDEX NO. 652131/2020

31.     On information and belief, the terms "Trump Company" and "Family Member Company" encompass over 500 individual companies, only approximately half of which use the "Trump" branded name and none of which are specifically identified in the Campaign's form contract.

### *Arbitration and Choice-of-Law Clauses*

32.     The Campaign's Form NDA also provides that "any dispute arising under or relating to this agreement *may, at the sole discretion of each Trump Person*, be submitted to binding arbitration" (*Id.* ¶ 8(b) (emphasis added)).

33.     "Trump Person" is defined as "each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company" (*Id.* ¶ 6(g)).

34.     The contract specifies that the "laws of the State of New York" are to govern any disputes related to the contract (*Id.* ¶ 8(a)).

### C.     The Campaign Routinely Required Others to Execute the Form NDA

35.     Ms. Denson was not alone in executing a Form NDA.

36.     On information and belief, beginning in or about June 2015, the Campaign required all employees, contractors, and volunteers to sign the Form NDA or a version thereof. A true and correct copy of the Campaign's standard Form NDA containing the nondisclosure and non-disparagement clauses is attached as exhibit B hereto.

37.     On information and belief, the Form NDA contracts required by the Campaign are substantially similar, if not identical, for the majority of the Campaign's employees, contractors, and volunteers during the 2016 election cycle.

38.     During the 2016 campaign, on information and belief, the Campaign had over one hundred employees and contractors on its payroll and hundreds more volunteers who each executed contracts containing the same restrictions as in the Form NDA signed by Ms. Denson.

**D.     The Form NDA Continues to Restrict the Speech of Ms. Denson and Other Former Campaign Employees, Contractors, and Volunteers On Matters of Public Concern**

39.     On November 8, 2016, Donald Trump was elected President of the United States.

40.     Ms. Denson's tenure with the Campaign ended two days later on November 10, 2016.

41.     Although Ms. Denson's employment with the Campaign ended over three years ago, the Campaign's indefinite and broad Form NDA purports to bind her to this day.

42.     Other former employees, contractors, and volunteers from the 2016 campaign likewise remain bound by the Campaign's Form NDA.

43.     Under the non-disparagement clause, Ms. Denson and other former Campaign employees, contractors, and volunteers have been and remain prohibited from criticizing the current President of the United States.

44.     They are also prohibited from criticizing the President's daughter and Advisor to the President, Ivanka Trump; the President's son-in-law and Director of the White House Office of American Innovation, Jared Kushner; any of the President's other family members; and any of the over 500 companies affiliated with the President and his family.

45.     Under the nondisclosure clause, Ms. Denson and other former Campaign employees, contractors, and volunteers have been and remain prohibited from disclosing any information President Trump may unilaterally and retroactively deem private.

8

**E.      The Campaign Routinely Threatens to Enforce and Takes Steps to Enforce Its Unlawful Form NDA**

46.      The Campaign has routinely threatened to enforce and/or initiated arbitration to enforce its Form NDA to stop former Campaign workers from engaging in speech related to matters of public concern, including their views on the President's time in office.

47.      For example, when former Campaign staffer Omarosa Manigault Newman published a book about her time in the Trump White House (*Unhinged: An Insider's Account of the Trump White House*) in August 2018, the Campaign sought to enforce its Form NDA against Newman in arbitration.[1]

48.      When former Campaign staffer Cliff Sims published a book about his experiences in the Trump White House (*Team of Vipers*) in January 2019, the Campaign's Executive Director Michael Glassner threatened to enforce its Form NDA against Sims.[2]

49.      When former Campaign staffer Alva Johnson dropped her lawsuit alleging that President Trump forcibly kissed her in September 2019, the Campaign threatened legal action to enforce its Form NDA against Johnson.[3]

---

[1] Scott Horsley, *Trump Campaign Targets Omarosa Manigault Newman Over Tell-All Book*, NPR [Aug. 14, 2018], https://www.npr.org/2018/08/14/638551941/trump-campaign-targets-omarosa-manigault-newman-over-tell-all-book.

[2] Michael Glassner (@michaelglassner), Twitter [Jan. 29, 2019, 9:03 a.m.], https://twitter.com/michaelglassner/status/1090249001746747392; David Jackson, *Donald Trump: Aide-Turned-Author Cliff Sims Violated Non-Disclosure Agreement*, USA Today [Jan. 29, 2019], https://www.usatoday.com/story/news/politics/2019/01/29/donald-trump-cliff-sims-team-of-vipers/2708590002/.

[3] Veronica Stracqualursi, *Former Trump Campaign Staffer Drops Lawsuit but Stands by Claims He Forcibly Kissed Her*, CNN [Sep. 5, 2019], https://www.cnn.com/2019/09/05/politics/alva-johnson-trump-lawsuit-sexual-assault-allegations/index.html.

### F.   The Campaign Attempted to Enforce Its Unlawful Form NDA Against Ms. Denson

50.     The Campaign also attempted to enforce the Form NDA against Ms. Denson to stop her from speaking about working conditions at the Campaign, and specifically about her experience of sex discrimination as a campaign staffer.

51.     The issue of workplace conditions for political staffers is a matter of public concern that may bear on a candidate's fitness for office. In the 2020 presidential campaign, news organizations have already covered allegations of harassment and other mistreatment of political staffers by at least four presidential candidates and their campaigns.[4]

52.     On November 9, 2017, Ms. Denson filed a *pro se* lawsuit against the Campaign in the New York Supreme Court, County of New York, captioned *Jessica Denson v Donald J. Trump for President, Inc.*, Index No. 101616-17 (the "State Court Action"). In that still-pending lawsuit, Ms. Denson is asserting (now with counsel) claims of sex-discrimination and slander against the Campaign.

53.     On December 20, 2017, in response to the State Court Action, the Campaign filed an arbitration demand. The Campaign asserted that Ms. Denson breached the Form NDA's "confidentiality and non-disparagement obligations" "by publishing certain confidential information and disparaging statements . . . in connection with [the] lawsuit she filed against [the Campaign] in New York Supreme Court."

---

[4] Matt Flegenheimer & Sydney Ember, *How Amy Klobuchar Treats Her Staff*, NY Times [Feb. 22, 2019], https://www.nytimes.com/2019/02/22/us/politics/amy-klobuchar-staff.html (Klobuchar); Alex Thompson, *Warren Campaign Fires Senior Staffer for 'Inappropriate Behavior'*, Politico [Oct. 4, 2019], https://www.politico.com/news/2019/10/04/warren-staffer-inappropriate-behavior-campaign-2020-028583 (Warren); Michael Cranish, *Mike Bloomberg For Years Has Battled Women's Allegations of Profane, Sexist Comments*, Wash Post [updated Feb. 15, 2020], https://www.washingtonpost.com/graphics/2020/politics/michael-bloomberg-women/ (Bloomberg); Sydney Ember and Katie Benner, *Sexism Claims From Bernie Sanders's 2016 Run: Paid Less, Treated Worse*, NY Times [Jan. 2, 2019], https://www.nytimes.com/2019/01/02/us/politics/bernie-sanders-campaign-sexism.html (Sanders).

Case 1:20-cv-04737-PGG   Document 1-1   Filed 06/19/20   Page 13 of 60

54.     In March 2018, the Campaign moved the state court to compel arbitration of Ms. Denson's claims, citing its unilateral authority to compel arbitration of disputes arising out of the contract.

55.     Ms. Denson did not participate in the arbitration demanded by the Campaign, on the ground that her contract did not govern her claims against the Campaign.

56.     In June 2018, Ms. Denson created a GoFundMe page so that she could find and finance legal representation. On her homepage, Ms. Denson summarized the allegations of her discrimination claim and the Campaign's use of the Form NDA to retaliate against her, and asked for help paying for her legal efforts. She shared the GoFundMe page on a Twitter feed she had created for this purpose.

57.     On August 9, 2018, the state court denied the Campaign's motion to compel arbitration of Ms. Denson's state claims, holding that all of Ms. Denson's claims, including her sex-discrimination, harassment, and common-law claims, were outside the scope of the Form NDA.

58.     In the midst of her State Court Action, Ms. Denson commenced another *pro se* lawsuit, this time in federal court in the Southern District of New York (*Denson v Donald J. Trump for President, Inc.* [SD NY, No. 18-CV-2690 (JMF)]). Through the federal lawsuit, Ms. Denson sought to have her contract declared void and unenforceable.

59.     The Campaign moved to compel arbitration of Ms. Denson's federal claims, and on August 30, 2018, the federal court granted the Campaign's motion (*Id.*, 2018 WL 4568430, *2 [Aug. 8, 2018]). The federal court dismissed Ms. Denson's federal lawsuit and later denied Ms. Denson's Rule 60 motion for reconsideration.

11

60.     During this time, the Campaign continued to press forward in the arbitration it had initiated on December 20, 2017, without Ms. Denson's participation.

61.     No party in the arbitration ever argued or put at issue the validity of the Campaign's Form NDA.

62.     Despite the fact that Ms. Denson never participated in that arbitration, the arbitrator issued a partial award to the Campaign on October 19, 2018, followed by a final award on December 12, 2018 (collectively, "the award"), totaling $49,507.64. A true and correct copy of the October 19, 2018, partial award is attached as exhibit C, and a true and correct copy of the December 12, 2018, final award is attached as exhibit D.

63.     The arbitrator concluded that Ms. Denson breached the contract "by disclosing, disseminating and publishing confidential information in the Federal Action, and by making disparaging statements about Claimant and the Agreement on the Internet on her GoFundMe page and on her Twitter account" (exhibit C at 4).

64.     The Campaign moved to have the award confirmed by the state and federal courts.

65.     On July 8, 2019, the state court confirmed the award, and on July 23, 2019, the federal court subsequently held that the state court's affirmance was preclusive on the issue (Denson, 2019 WL 3302608, *2 [July 23, 2019]).

66.     Ms. Denson promptly appealed the state court's affirmation.

67.     On February 6, 2020, the Appellate Division, First Department ("First Department") unanimously reversed the decision affirming the Arbitration award and vacated the Arbitration award in its entirety. It declared the Arbitration award to have been against public policy and the arbitrator to have exceeded his authority (Denson v Donald J. Trump For

*President, Inc.*, 180 AD3d 446, 454, 116 NYS3d 267, 276 [App Div 2020]). The Court further held that, "[b]y concluding that the allegations in the federal action are tantamount to disclosure of confidential information violative of the NDA, the arbitrator improperly punished plaintiff for availing herself of a judicial forum" (*Id.*).

68.     From the time the Campaign filed its Arbitration in December of 2017, Ms. Denson was forced into a defensive posture for having the temerity to challenge the Campaign's conduct toward her. Until the arbitration award was reversed over two years later, she withstood constant financial threat and pressure to withdraw her claims due to the Campaign's incessant pursuit and expansion of the Arbitration. During Ms. Denson's appeal of the state court's decision affirming the arbitration award, the Campaign attempted to execute on the award, serving subpoenas and restraining notices on Ms. Denson, her bank accounts, and sources of funding for her lawsuit. The Campaign even attempted to restrain Ms. Denson's counsels' escrow account.

69.     During the entire period from December 2017 to February 2020, Ms. Denson perforce avoided or moderated any public comments regarding the Campaign and the President because of the threat caused by the Arbitration award and the Campaign's aggressive efforts to enforce it. The Campaign used its litigation to enforce the Form NDA to restrain Ms. Denson's freedom of speech during a period in which the public could have significantly benefited from her knowledge.[5]

---

[5] For example, the primary subject of Ms. Denson's harassment and sexual discrimination claims in her State Action is Camilo Sandoval, with whom Ms. Denson is all too familiar. Sandoval served as the Director of Data Operations for the Trump Campaign, and he was subsequently appointed as acting Chief Information Officer at the U.S. Department of Veterans Affairs (the "VA") (*see* Letter from Sen. Richard Blumenthal, et al. to Thomas Bowman, Deputy Sec'y US Dept. of Veterans Affairs [May 5, 2018], https://www.blumenthal.senate.gov/imo/media/doc/05.15.18%20-%20VA%20-%20IT%20Systems.pdf). Sandoval's work on the Campaign raised concerns, when it was revealed that he served as the Director of Data Operations during the period when the Campaign contracted with Cambridge Analytica (*Id.*). His stint as CIO at the VA was likewise marked by controversy, as the VA failed to timely deliver electronic housing allowance payments to more

### G.    Ms. Denson's Class Arbitration Demand and The Campaign's Consent to this Litigation

70.    On February 20, 2019, after the federal court determined that Ms. Denson was required to challenge the Form NDA in Arbitration and before the state court ruled on the Campaign's motion to affirm the arbitration award, Plaintiff submitted a class action arbitration demand (the "Class Arbitration") before the American Arbitration Association ("AAA") to arbitrate the validity of the Form NDA.

71.    The Campaign sought to delay the Class Arbitration by arguing *res judicata* and collateral estoppel from the Arbitration, and also by reserving decision on whether the claim should be arbitrated or litigated.

72.    On March 29, 2019, the Campaign applied to the original arbitrator, Judge Kehoe, to rule the new class action arbitration invalid on *res judicata* and collateral estoppel grounds, referring to the earlier Arbitration.

73.    The Campaign argued that vacatur of the original arbitration award, which Ms. Denson had not yet obtained, would be the only circumstance under which *res judicata* and collateral estoppel would not apply.

74.    On May 20, 2019, Judge Kehoe issued a decision determining that he had no jurisdiction to hear the Campaign's application.

75.    On May 22, 2019, counsel for the Campaign cited the "sole discretion" clause in paragraph 8B of the Form NDA and "reserved its contractual right to not consent to the AAA's

---

than 10,000 veterans and experienced significant delays in digitizing health records (*Id.*; *see also* Christopher Jones, *Farewell to the Trump Political Appointee Who Brought IT Chaos to the Department of Veterans Affairs*, Pacific Standard [Feb. 19, 2019], https://psmag.com/social-justice/farewell-to-the-trump-political-appointee-who-brought-it-chaos-to-the-dept-of-veterans-affairs). Ms. Denson could have contributed significantly to the public debate around Sandoval's work on the Campaign and his time in government.

jurisdiction" over the Class Arbitration. A true and correct copy of the email from counsel for the Campaign is attached as exhibit E.

76.     The following week, on May 29, 2019, counsel for the Campaign advised the AAA that "the Campaign d[id] **not** consent to the AAA's jurisdiction over the [Class] Arbitration." A true and correct copy of the email from counsel for the Campaign is included in exhibit E.

77.     On June 3, the Campaign filed a brief in the Federal Court litigation confirming its decision to exercise its unilateral right not to arbitrate Ms. Denson's class claims. A true and correct copy of the Campaign's brief is attached as exhibit F.

78.     Specifically, the Campaign explained,

> Under the terms of the parties' written agreement, . . . the Campaign is afforded the discretionary right to arbitrate (or not arbitrate) that class action before the AAA. The Campaign simply exercised its election rights in this regard and notified the AAA. . . . *[I]f plaintiff wants to proceed with a class action lawsuit, she must file her purported claims in court*, rather than with the AAA (exhibit F at 2 (emphasis added)).

79.     By refusing to consent to arbitrate Ms. Denson's Class Arbitration Demand, the Campaign waived any right to arbitrate the current dispute, and Ms. Denson now proceeds before this Court, seeking a declaration that the Form NDA is invalid as a matter of law.

**H.     The Campaign's Form NDA Violates State and Federal Law**

80.     Despite the Campaign's strenuous efforts to enforce its Form NDA against Ms. Denson and others, the Form NDA's broad and indefinite restrictions on Ms. Denson's and others' speech are unlawful under state and federal law.

*Violation of the Constitutional Protections for Speech and Press*

81.     The First Amendment to the United States Constitution and Article I, Section 8 of the New York Constitution protect the freedoms of speech and the press.

15

82.　A major purpose of the First Amendment is "to protect the free discussion of governmental affairs," including "discussions of candidates, . . . the manner in which government is operated or should be operated, and all such matters relating to political processes" (*Mills v State of Alabama*, 384 US 214, 218–19 [1966]).

83.　Speech concerning such public affairs "is the essence of self-government" and "occupies the highest rung of the hierarchy of First Amendment values" (*Snyder v Phelps*, 562 US 443, 452 [2011] (quoting *Garrison v Louisiana*, 379 US 64, 74–75 [1964]; *Connick v Myers*, 461 US 138, 145 [1983]).

84.　The constitutional protections of speech and the press accordingly limit states' power to sanction or enforce contracts of silence that restrict speech about public officials and candidates for office (s*ee New York Times Co. v Sullivan*, 376 US 254, 265 [1964] ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.")).

85.　That is particularly true where, as here, contracts of silence are enforced by the political campaign of a current public official in conjunction with, and for the benefit of, the public official (s*ee Manhattan Cmty. Access Corp. v Halleck*, 587 US —, —, 139 S Ct 1921, 1928 [2019] ("Under this Court's cases, a private entity can qualify as a state actor . . . when the government acts jointly with the private entity.")).

86.　Although campaign workers may waive their free speech rights by signing contracts containing nondisclosure and non-disparagement clauses, such a waiver is only enforceable if, under the circumstances, "the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement" (*Overbey v Mayor of Baltimore*, 930 F3d 215, 223 [4th Cir 2019]).

87.     Any interest of the Campaign in enforcing its Form NDA is substantially outweighed by the public interest in the speech of Ms. Denson and other Campaign workers on matters of legitimate public concern.

88.     The Campaign has yet to demonstrate *any* legitimate reason for imposing on staff its broad, sweeping Form NDA with ill-defined and unlimited confidentiality and non-disparagement obligations.

89.     By contrast, the benefit to the public in allowing former campaign workers to speak about—and perhaps speak *against*—a candidate for the highest public office in the land is obvious and compelling. The First Amendment and Article I, Section 8 of the New York Constitution render the Form NDA unenforceable.

### The Form NDA Is An Unreasonable Post-Employment Restrictive Covenant

90.     The Form NDA violates New York's prohibition on unreasonable post-employment restrictive covenants.

91.     Post-employment restrictive covenants must be "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee" (*Ashland Mgmt. Inc. v Altair Investments NA, LLC*, 59 AD3d 97, 101, 869 NYS2d 465 [App Div 2008] (quoting *BDO Seidman v Hirshberg*, 93 NY2d 382, 388-89, 712 NE2d 1220 [Ct App 1999]), *aff'd as modified*, 14 NY3d 774, 925 NE2d 581 [Ct App 2010]).

92.     Neither the nondisclosure clause nor the non-disparagement clause is reasonable in duration, as both purport to last forever (exhibit A, ¶¶ 1–2).

93.     Neither the nondisclosure clause or the non-disparagement clause is reasonable in scope. The nondisclosure clause expansively prohibits the disclosure of "all information . . . that

17

Mr. Trump insists remain private or confidential" (*Id.* ¶¶ 1, 6(a)). The non-disparagement clause prohibits signers in perpetuity from "demean[ing] or disparag[ing] publicly" President Trump, his family, or any of his and his family's companies and assets (*Id.* ¶ 2).

94.    The Form NDA, as written, is not necessary to protect the Campaign's legitimate interests.

95.    Regarding the nondisclosure clause, the Campaign may have had a legitimate interest in protecting confidential information that is akin to trade secrets, such as confidential "contact lists," "notes," and certain "financial statements" (*Id.* ¶ 6(a)). It does not have a legitimate interest in protecting "all information" that President Trump unilaterally "insists remain private or confidential," for any reason or for no reason (*Id.*).

96.    Regarding the non-disparagement clause, the Campaign may have a legitimate interest in current employees not disparaging President Trump. It does not have a legitimate interest in prohibiting former employees from ever "demean[ing] or disparag[ing] publicly" President Trump, his family, or any of his and his family's companies or assets (*Id.* ¶ 2).

97.    Both the nondisclosure clause and the non-disparagement clause are unreasonably burdensome on former campaign workers, as they severely restrict their ability to contribute to public debate on matters concerning the current President of the United States and various family members who serve as key advisors.

98.    The Campaign's Form NDA also injures the public, as it prevents those with relevant information and informed opinions about the current President of the United States from sharing their experiences and views now, during this year's presidential election, or ever.

### *The Form NDA Lacks the Requisite Definiteness Under New York Law*

99.    The Form NDA is invalid due to the lack of sufficiently definite terms.

FILED: NEW YORK COUNTY CLERK 06/01/2020 09:48 AM
NYSCEF DOC. NO.   Case 1:20-cv-04737-PGG   Document 1-1   Filed 06/19/20   Page 21 of 60   NYSCEF: 06/01/2020

INDEX NO. 652131/2020

100.    For a contract to be binding, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (*e.g.*, *Matter of Express Indus. & Terminal Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589 [1999]). "Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." (*Cobble Hill Nursing Home, Inc. v Henry & Warren Corp.*, 74 NY2d 475, 482, 548 NE2d 203 [Ct App 1989].)

101.    The nondisclosure clause prohibits signers from disclosing "Confidential Information," defined to include "all information of a private, proprietary or confidential nature that Mr. Trump insists remain private or confidential" (*Id.* ¶ 6(a)).

102.    The non-disparagement clause, for its part, purports to protect over 500 individual companies, only approximately half of which use the "Trump" branded name and none of which are specifically identified in the Form NDA.

103.    It is impossible for any signatory to know what information may not be disclosed and which companies and persons the non-disparagement clause purports to protect.

104.    The Form NDA lacks the sufficient definiteness required of binding contracts.

### The Form NDA Is Unconscionable Under New York Law

105.    The Form NDA is unconscionable on its face and therefore invalid.

106.    Contracts are unconscionable when there is a lack of a meaningful choice by one party and contractual terms that unreasonably favor the other party.

107.    Campaign workers in this case lacked a meaningful choice: if they wished to work for the Campaign, they were required to sign its Form NDA as written and imposed by the Campaign.

19

Case 1:20-cv-04737-PGG   Document 1-1   Filed 06/19/20   Page 22 of 60

108.    The one-sided terms of the Form NDA unreasonably favor the Campaign.

109.    The worker is forbidden from ever disparaging the Campaign, President Trump, his family, or any of President Trump and his family's businesses, but the Campaign and the Trump entities are not forbidden from disparaging the worker (exhibit A, ¶ 2).

110.    The worker is forbidden from disclosing "Confidential Information," which includes any information President Trump unilaterally deems private, but the Campaign is not forbidden from disclosing information about the worker (*Id.* ¶¶ 1, 6(a)).

111.    As described above in Paragraphs 50 through 79, the Campaign has gamed this unilateral, discretionary Form NDA by compelling Plaintiff to arbitrate when she sues, and refusing to arbitrate when she demands arbitration.

112.    In sum, the Form NDA is so one-sided in favor of the Campaign as to be unconscionable.

### *The Form NDA Is Otherwise Against Public Policy Under New York Law*

113.    The Form NDA is invalid because it is otherwise against public policy.

114.    An otherwise valid contract is unenforceable when "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement" (Restatement [Second] of Contracts § 178).

115.    The non-disparagement and nondisclosure clauses are against public policy as unreasonable restrictions of Class members' speech.

116.    New York maintains a deep and abiding commitment to robust public debate.

> This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas. That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that "[e]very citizen may freely speak, write and publish . . . sentiments on all subjects." (N.Y. Const., art. I, § 8.) Those words, unchanged since

20

FILED: NEW YORK COUNTY CLERK 06/01/2020 09:48 AM
NYSCEF DOC. NO.

INDEX NO. 652131/2020

RECEIVED NYSCEF: 06/01/2020

> the adoption of the constitutional provision in 1821, reflect the
> deliberate choice of the New York State Constitutional Convention
> not to follow the language of the First Amendment, ratified 30
> years earlier, but instead to set forth our basic democratic ideal of
> liberty of the press in strong affirmative terms.

(*Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 249 [1991]).

117.    The non-disparagement and nondisclosure clauses are also against public policy because the Campaign uses them to threaten to impose and actually to impose significant retaliatory financial penalties on individuals for asserting their statutory rights and disclosing wrongdoing.

118.    Federal, state, and local law prohibit employers from retaliating against employees for asserting statutory employment claims in court or before an administrative agency (s*ee, e.g.*, 42 USC § 2000e–3(a); NY Exec. Law § 296(7); NYC Admin Code § 8–107(7)).

119.    As the First Department held in invalidating the Campaign's arbitration award against Ms. Denson, "[t]here is a deep-rooted, long-standing public policy in favor of a person's right to make statements during the course of court proceedings without penalty" (*Denson*, 116 NYS3d at 276).

120.    In addition, contracts prohibiting employees from disclosing misconduct or wrongdoing to authorities are generally unenforceable (*see* Restatement [First] of Contracts § 548; 7 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 15.8 [4th ed 2016]; 6A Arthur Linton Corbin, Corbin on Contracts § 1430 [1962]; *see also* NY Lab Law § 740; *cf.* Restatement [Third] Of Agency § 8.05, Comment *c* [2006]).

121.    The Form NDA, however, contains no exception allowing Campaign workers to vindicate their statutory employment rights in court or disclose misconduct or wrongdoing.

122.    The non-disparagement clause contains no carveout at all (exhibit A, ¶ 2).

123.    The non-disclosure clause contains a narrow carveout that permits Campaign workers to disclose Confidential Information only when they have a "legal obligation" to do so and, even then, only after obtaining the Campaign's consent (*Id.* ¶ 1(e)).

124.    Instead, the Campaign uses the Form NDA in an effort to prevent former Campaign workers from vindicating their rights or reporting wrongdoing.

125.    On February 27, 2019, Michael Cohen testified before Congress that the Campaign's use of the Form NDA, along with President Trump's efforts to enforce it, is specifically intended to prevent people from coming forward with claims of wrongdoing.

126.    For example, as set forth above, the Campaign threatened to enforce its Form NDA against former staffer Alva Johnson after she dropped her lawsuit alleging that President Trump forcibly kissed her in September 2019.

127.    The Campaign has also actually used, and will continue to use, the Form NDA to prevent former Campaign workers from vindicating their rights or reporting wrongdoing.

128.    For example, as set forth above, the Campaign used its Form NDA to retaliate against Ms. Denson for bringing the State Court Action to enforce her rights to be free of a discriminatory and hostile workplace.

129.    The Form NDA is invalid as a matter of law both because it unreasonably burdens Class members' speech, and because it allows the Campaign to threaten to impose and actually impose significant financial penalties on individuals in retaliation for the assertion of their statutory rights and the disclosure of wrongdoing.

## CLASS ACTION ALLEGATIONS

130.    This action meets all of the requirements of a class action under CPLR § 901.

131.    The putative Class consists of all Campaign employees, contractors, and volunteers who executed a Form NDA, or any contract containing similar nondisclosure and non-disparagement clauses, during the 2016 election cycle. This class is too numerous to allow joinder of all Class members to be practicable.

132.    Excluded from the Class is Defendant.

133.    While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes that there are over one hundred members in the Class and likely several hundreds of members.

134.    The legal validity or invalidity of the Form NDA constitutes questions common to the Class, and predominates over any question affecting only individual members.

135.    The claim for a declaration of invalidity by the Plaintiff, as the Class representative, is typical of the claims of members of the Class. Plaintiff and all members of the Class are similarly affected by Defendant's invalid and unlawful Form NDA.

136.    Plaintiff, as a class representative, will fairly and adequately protect the interests of the Class, as demonstrated by her tenacity in fighting this dispute in various forums over the last several years. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of First Amendment and New York constitutional and contract claims.

137.    A class action is superior to any other method for the resolution of this dispute, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the

23

unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

138.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## FIRST CAUSE OF ACTION
### Declaratory Judgment that the Campaign's
### Form NDA Violates New York Contract Law

139.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

140.     New York law provides for declaratory judgment of the validity or invalidity of an agreement (CPLR § 3001).

141.     The Form NDA is unlawful under New York contract law for several reasons.

142.     The nondisclosure and non-disparagement clauses are unreasonable post-employment restrictive covenants. They are unreasonable in duration and scope. They are not necessary to protect the Campaign's legitimate interests. They are unreasonably burdensome on Class members as they severely restrict their Class members' state and federal constitutional rights to contribute to public debate on matters concerning the current President of the United States and various family members who serve as key advisors. And the nondisclosure and non-disparagement clauses injure the public, as they prevent Class members with relevant

information and informed opinions about the current President of the United States from sharing their experiences and views now, during this year's presidential election, or ever.

143.   The nondisclosure and non-disparagement clauses lack sufficient definiteness, as it is impossible for any signatory to know what information may not be disclosed and which companies and persons the non-disparagement clause purports to protect.

144.   The nondisclosure and non-disparagement clauses are unconscionable, as Class members had no meaningful choice but to sign the contracts and the nondisclosure and non-disparagement clauses that unreasonably favor the Campaign.

145.   The nondisclosure and non-disparagement clauses are otherwise against public policy under New York contract law both because they unreasonably restrict Class members' speech, and because they allow the Campaign to threaten to impose and actually impose significant financial penalties on individuals in retaliation for the assertion of their statutory rights and the disclosure of wrongdoing.

146.   Ms. Denson and members of the putative class are harmed by the unlawful Form NDA, as they are currently unlawfully prohibited from exercising their free speech rights, as well as from reporting misconduct or asserting employment claims against the Campaign.

147.   Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

### SECOND CAUSE OF ACTION

**Declaratory Judgment that the Campaign's Form NDA**
**<u>Violates Article I, Section 8 of the New York Constitution</u>**

148.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

149.    New York law provides for declaratory judgment of the validity or invalidity of an agreement (CPLR § 3001).

150.    Article I, Section 8 of the New York Constitution provides that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

151.    The non-disparagement clause of the Campaign's Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining them from ever again criticizing the current President of the United States, his family, and any of his and his family's businesses.

152.    The nondisclosure clause of the Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining their ability to share information on matters of legitimate public concern.

153.    The public interest in uninhibited, robust, and wide-open debate on matters of public concern, as well as the prohibition on government-sanctioned censorship of speech, outweighs any legitimate interest the Campaign has in enforcing the Form NDA.

154.    Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

### THIRD CAUSE OF ACTION

### Declaratory Judgment that the Campaign's Form NDA
### <u>Violates the First Amendment to the U.S. Constitution</u>

155.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

156.    New York law provides for declaratory judgment of the validity or invalidity of an agreement (CPLR § 3001).

157.    The First Amendment to the United States prohibits abridgments of "the freedom of speech, or of the press."

158.    The non-disparagement clause of the Campaign's Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining them from ever again criticizing the current President of the United States, his family, and any of his and his family's businesses.

159.    The nondisclosure clause of the Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining their ability to share information on matters of legitimate public concern.

160.    The public interest in uninhibited, robust, and wide-open debate on matters of public concern, as well as the prohibition on government-sanctioned censorship of speech, outweighs any legitimate interest the Campaign has in enforcing the Form NDA.

161.    Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A.       Designation of this action as a class action;

B.       Designation of Plaintiff as a representative Plaintiff of all employees, independent contractors, and volunteers for the Campaign who have signed the Form NDA or any contract containing similar nondisclosure and non-disparagement clauses;

C.       Declaratory judgment that the Campaign's Form NDA, including the one signed by Plaintiff, and any similar contracts the Campaign required any member of the class to sign, are invalid and therefore unenforceable;

D.       Assessment of Plaintiff's reasonable costs and attorneys' fees, along with any notice costs and forum fees against the Campaign in their entirety; and

E.       Such other relief as the Court deems just and equitable.

Dated: New York, New York
      June 1, 2020              Respectfully Submitted,

By:_____
David K. Bowles
BOWLES & JOHNSON PLLC
14 Wall Street, 20th Floor
New York, New York 10005
Tel. (212) 390-8842
Fax (866) 844-8305
Email: David@BoJo.Law

John Langford
UNITED TO PROTECT DEMOCRACY, INC.
555 W. 5th St.
Los Angeles, CA 90013
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: john.langford@protectdemocracy.org

Brittany Williams
UNITED TO PROTECT DEMOCRACY, INC.
1900 Market St., 8th Fl.
Philadelphia, PA 19103
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: brittany.williams@protectdemocracy.org

Anne Tindall
UNITED TO PROTECT DEMOCRACY, INC.
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: anne.tindall@protectdemocracy.org[*]

David A. Schulz
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6103
Fax: (212) 223-1942
Email: schulzd@ballardspahr.com

---

[*] Harvard Law Student Graham Provost, '21, helped prepare this complaint. The complaint does not purport to represent the institutional views, if any, of Harvard Law School.

29

Case 1:20-cv-04737-PGG   Document 1-1   Filed 06/19/20   Page 32 of 60

# EXHIBIT A

# AGREEMENT

You have requested that the entity signing below (the "**Company**") engage you (as an employee or an independent contractor, as applicable) to perform services, or an independent contractor that employs you has requested to be engaged by Company to perform services and you desire in your capacity as an employee of such independent contractor to perform all or a part of such services. You have made the promises and agreements set forth below in order to induce the Company to accept your or your employer's, as applicable, offer of engagement and to permit you, in the applicable capacity, to perform all or a portion of the subject services. Those promises and agreements are part of what the Company is receiving in exchange for agreeing to engage you or your employer, and to permit you to perform all or a portion of the subject services, and the Company is relying on your fulfillment of these promises and agreements.

Any initially capitalized terms that are not defined when used in this agreement are defined in paragraph 6 below.

    1.    <u>No Disclosure of Confidential Information</u>. During the term of your service and at all times thereafter you hereby promise and agree:

    a.  not to disclose, disseminate or publish, or cause to be disclosed, disseminated or published, any Confidential Information;

    b.  not to assist others in obtaining, disclosing, disseminating, or publishing Confidential Information;

    c.  not to use any Confidential Information in any way detrimental to the Company, Mr. Trump, any Family Member, any Trump Company or any Family Member Company;

    d.  not to save, store or memorialize any Confidential Information (including, without limitation, incorporating it into any storage device, server, Internet site or retrieval system, whether electronic, cloud based, mechanical or otherwise) except as may be expressly required in connection with the performance of services to the Company;

    e.  to (i) provide the Company with written notice of any legal obligation to disclose any Confidential Information as soon as you become aware of such obligation, (ii) not make any disclosure notwithstanding such obligation until the Company (or the appropriate Trump Person) has had a reasonable opportunity to seek an appropriate protective order or similar relief, (iii) fully cooperate and join with the Company (and the appropriate Trump Person) in any request for a protective order or similar relief, (iv) exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information in the event no such protective order or similar relief is obtained, whether because it has been denied or because the Company (or the appropriate Trump Person) has elected not to seek it, and (iv) under all circumstances, not furnish any greater portion of the Confidential Information than you are advised by counsel is absolutely legally required to be disclosed by you or furnish any Confidential Information to any individual, company or governmental entity other than the one to whom or to which you are absolutely legally required to disclose it; and

f.  promptly upon the request, whenever made, of the Company, (i) return to the Company all Confidential Information furnished to you, together with all copies, abstracts, notes, reports, or other materials furnished to, or otherwise obtained by, you or prepared by you or on your behalf, without retaining copies, extracts or other reproductions, whether physical, electronic, cloud based or otherwise, in whole or in part, (ii) destroy all documents, memoranda, notes or other writings prepared by you or anyone on your behalf that are based upon the Confidential Information, and (iii) acknowledge such destruction in writing to Company.

The foregoing provisions each apply to Confidential Information and disclosure, dissemination, publication, use and effort to help others obtain, saving, storing and memorializing of Confidential Information, as applicable, (i) by any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized, (iv) in any language, or (v) in any country or other jurisdiction (collectively, the "**Restricted Means and Contexts**").

2.  <u>No Disparagement</u>.  During the term of your service and at all times thereafter you hereby promise and agree not to demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer, in each case by or in any of the Restricted Means and Contexts and to prevent your employees from doing so.

3.  <u>No Competitive Services</u>.  Until the Non-Compete Cutoff Date you promise and agree not to assist or counsel, directly or indirectly, for compensation or as a volunteer, any person that is a candidate or exploring candidacy for President of the United States other than Mr. Trump and to prevent your employees from doing so.

4.  <u>No Competitive Solicitation</u>.  Until the Non-Solicitation Cutoff Date you promise and agree not to hire or solicit for hiring, or assist any other person, entity or organization to hire or solicit for hiring, any person that is an independent contractor of, employee of an independent contractor of, or employee of Company or any other Trump Person and who at any time provides services for the project or objective for which you or your employer, as applicable, are being engaged.

5.  <u>No Competitive Intellectual Property Claims</u>. During the term of your service and at all times thereafter you promise and agree never to assert any rights to any intellectual property that (a) includes the name "Trump," (b) is owned by or associated with the Company, Mr. Trump, any Trump Company, any Family Member or any Family Member Company, for example, without limitation, any name, likeness, voice, or image of Mr. Trump or any Family Member, or any logo, motto or phrase created, developed or commonly associated with any of them, or (c) is developed in connection with the project or objective for which your services are

being engaged (all of which will be deemed a "work made for hire" or will be assigned by you to us).

6.  <u>Definitions</u>.  As used in this agreement, the following definitions apply:

a.  **"Confidential Information"** means all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

b.  **"Family Member"** means any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

c.  **"Family Member Company"** means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member.

d.  **"Non-Compete Cut Off Date"** means the date the current U.S presidential election cycle is over or, if earlier, the date Mr. Trump announces that he will not run or will no longer run for the Presidency of the United States of America in the current U.S. presidential election cycle.

e.  **"Non-Solicitation Cutoff Date"** means the Non-Compete Cut Off Date.

f.  **"Trump Company"** means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump.

g.  **"Trump Person"** means each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company.

7.  <u>Remedies for Breach of this Agreement</u>.

a.  <u>Consent to Injunction</u>.  A breach of any of your promises or agreements under this agreement will cause the Company, Mr. Trump and each other Trump Person irreparable harm. Accordingly, to the extent permitted by law, and without waiving any other rights or remedies against you at law or in equity, you hereby consent to the entry of any order, without prior notice

to you, temporarily or permanently enjoining you from violating any of the terms, covenants, agreements or provisions of this agreement on your part to be performed or observed. Such consent is intended to apply to an injunction of any breach or threatened breach.

b. Agreement to Indemnify. You hereby agree to indemnify, defend (with counsel acceptable to the Trump Person you are defending) and hold harmless each Trump Person from and against any claim, demand, suit, proceeding, damages, cost, loss or expense of any kind or nature, including but not limited to reasonable attorneys' fees and disbursements, incurred by any Trump Person as a consequence of your breach of any of your promises or agreements in this agreement.

c. Damages and Other Remedies. Notwithstanding anything to the contrary, each Trump Person will be entitled to all remedies available at law and equity, including but not limited to monetary damages, in the event of your breach of this agreement. Nothing contained in this agreement will constitute a waiver of any Trump Person's remedies at law or in equity, all of which are expressly reserved.

d. Third Party Beneficiaries. Mr. Trump and each Family Member, Trump Company and Family Member Company is an intended third party beneficiary of this agreement. Without limiting the preceding sentence, Mr. Trump, each Family Member, Trump Company and Family Member Company, in addition to the Company, will be entitled to the benefit of this agreement and to enforce this agreement.

8.    Resolution of Disputes.

a. Governing Law; Jurisdiction and Venue. This Agreement is deemed to have been made in the State of New York, and any and all performance hereunder, breach hereof, or claims with respect to the enforceability of this agreement must be interpreted and construed pursuant to the laws of the State of New York without regard to conflict of laws or rules applied in the State of New York. You hereby consent to exclusive personal jurisdiction and venue in the State of New York with respect to any action or proceeding brought with respect to this agreement.

b. Arbitration. Without limiting the Company's or any other Trump Person's right to commence a lawsuit in a court of competent jurisdiction in the State of New York, any dispute arising under or relating to this agreement may, at the sole discretion of each Trump Person, be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association, and you hereby agree to and will not contest such submissions. Judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction.

c. Prevailing Party Fees. Any court judgment or arbitration award shall include an award of reasonable legal fees and costs to the prevailing party.

d. Interpretation and Representation by Counsel. This agreement has been drafted on behalf of the undersigned only as a convenience and may not, by reason of such action, be construed against the undersigned. Each of the parties (i) has had the opportunity to be and/or

has elected not to be, represented by counsel, (ii) has reviewed each of the provisions in this agreement carefully and (iii) has negotiated or has had full opportunity to negotiate the terms of this agreement, specifically including, but not limited to Paragraph 7 hereof.  You waive any claims that may be available at law or in equity to the effect that you did not have the opportunity to so consult with counsel.

       e.  <u>No Waiver</u>.  Neither the failure or delay to exercise one or more rights under this agreement nor the partial exercise of any such right, will be deemed a renunciation or waiver of such rights or any part thereof or affect, in any way, this agreement or any part hereof or the right to exercise or further exercise any right under this agreement or at law or in equity.

       9.    <u>Miscellaneous</u>.  **Modifications**. No change or waiver of the terms, covenants and provisions of this agreement will be valid unless made in writing and signed by the undersigned. **Relationship**.  Nothing herein contained is intended to, nor shall it be construed as, reflecting any employer-employee or independent contractor relationship between you and the undersigned or any other individual or entity.  **Counterparts**.  This agreement may be executed in any number of counterparts, all of which taken together will constitute one and same instrument.  Delivery of an executed signature page of this this agreement by facsimile transmission or .pdf, .jpeg, .TIFF, or other electronic format or electronic mail attachment will be effective as delivery of an original executed counterparty hereof.

       10.    <u>Survival</u>.  This agreement will survive the expiration, cancellation or termination of any employment or independent contractor relationship that you may have with the Company or with any individual, entity, partnership, trust or organization that the Company has engaged.

                Donald J. Trump for President

                _____

                Name: LUCIA CASTELLANO
                Title:  HR DIRECTOR

       JESSICA MARIE DENSON **ACKNOWLEDGES THAT SHE HAS READ AND UNDERSTOOD THIS AGREEMENT, AND AGREES TO COMPLY WITH THE FOREGOING WHICH CREATES A VALID AND BINDING LEGAL OBLIGATION ON HER.**

Jessica Marie Denson

Signature: _____
Name: Jessica Marie Denson
Address:  8306 Wilshire Blvd. #310
         Beverly Hills, CA 90211

# EXHIBIT B

## AGREEMENT

You have requested that the entity signing below (the "**Company**") engage you (as an employee, independent contractor, volunteer, or otherwise) to perform services, or an independent contractor that employs you has requested to be engaged by Company to perform services and you desire in your capacity as an employee of such independent contractor to perform all or a part of such services. You have made the promises and agreements set forth below in order to induce the Company to accept your or your employer's, as applicable, offer of engagement and to permit you, in the applicable capacity, to perform all or a portion of the subject services. Those promises and agreements are part of what the Company is receiving in exchange for agreeing to engage you or your employer, and to permit you to perform all or a portion of the subject services, and the Company is relying on your fulfillment of these promises and agreements.

Any initially capitalized terms that are not defined when used in this agreement are defined in paragraph 6 below.

    1.   <u>No Disclosure of Confidential Information</u>. During the term of your service and at all times thereafter you hereby promise and agree:

        a. not to disclose, disseminate or publish, or cause to be disclosed, disseminated or published, any Confidential Information;

        b. not to assist others in obtaining, disclosing, disseminating, or publishing Confidential Information;

        c. not to use any Confidential Information in any way detrimental to the Company, Mr. Trump, any Family Member, any Trump Company or any Family Member Company**;**

        d. not to save, store or memorialize any Confidential Information (including, without limitation, incorporating it into any storage device, server, Internet site or retrieval system, whether electronic, cloud based, mechanical or otherwise) except as may be expressly required in connection with the performance of services to the Company;

        e. to (i) provide the Company with written notice of any legal obligation to disclose any Confidential Information as soon as you become aware of such obligation, (ii) not make any disclosure notwithstanding such obligation until the Company (or the appropriate Trump Person) has had a reasonable opportunity to seek an appropriate protective order or similar relief, (iii) fully cooperate and join with the Company (and the appropriate Trump Person) in any request for a protective order or similar relief, (iv) exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information in the event no such protective order or similar relief is obtained, whether because it has been denied or because the Company (or the appropriate Trump Person) has elected not to seek it, and (iv) under all circumstances, not furnish any greater portion of the Confidential Information than you are advised by counsel is absolutely legally required to be disclosed by you or furnish any

Confidential Information to any individual, company or governmental entity other than the one to whom or to which you are absolutely legally required to disclose it; and

   f. promptly upon the request, whenever made, of the Company, (i) return to the Company all Confidential Information furnished to you, together with all copies, abstracts, notes, reports, or other materials furnished to, or otherwise obtained by, you or prepared by you or on your behalf, without retaining copies, extracts or other reproductions, whether physical, electronic, cloud based or otherwise, in whole or in part, (ii) destroy all documents, memoranda, notes or other writings prepared by you or anyone on your behalf that are based upon the Confidential Information, and (iii) acknowledge such destruction in writing to Company.

The foregoing provisions each apply to Confidential Information and disclosure, dissemination, publication, use and effort to help others obtain, saving, storing and memorializing of Confidential Information, as applicable, (i) by any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized, (iv) in any language, or (v) in any country or other jurisdiction (collectively, the "**Restricted Means and Contexts**").

   2. <u>No Disparagement</u>.  During the term of your service and at all times thereafter you hereby promise and agree not to demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer, in each case by or in any of the Restricted Means and Contexts and to prevent your employees from doing so.

   3. <u>No Competitive Services</u>.  Until the Non-Compete Cutoff Date you promise and agree not to assist or counsel, directly or indirectly, for compensation or as a volunteer, any person that is a candidate or exploring candidacy for President of the United States other than Mr. Trump and to prevent your employees from doing so.

   4. <u>No Competitive Solicitation</u>.  Until the Non-Solicitation Cutoff Date you promise and agree not to hire or solicit for hiring, or assist any other person, entity or organization to hire or solicit for hiring, any person that is an independent contractor of, employee of an independent contractor of, or employee of Company or any other Trump Person and who at any time provides services for the project or objective for which you or your employer, as applicable, are being engaged.

   5. <u>No Competitive Intellectual Property Claims</u>. During the term of your service and at all times thereafter you promise and agree never to assert any rights to any intellectual property that (a) includes the name "Trump," (b) is owned by or associated with the Company, Mr. Trump, any Trump Company, any Family Member or any Family Member Company, for example, without limitation, any name, likeness, voice, or image of Mr. Trump or any Family

Member, or any logo, motto or phrase created, developed or commonly associated with any of them, or (c) is developed in connection with the project or objective for which your services are being engaged (all of which will be deemed a "work made for hire" or will be assigned by you to us).

      6.     <u>Definitions</u>.  As used in this agreement, the following definitions apply:

      a.    "**Confidential Information**" means all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

      b.    "**Family Member**" means any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

      c.    "**Family Member Company**" means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member.

      d.    "**Non-Compete Cut Off Date**" means the date the current U.S presidential election cycle is over or, if earlier, the date Mr. Trump announces that he will not run or will no longer run for the Presidency of the United States of America in the current U.S. presidential election cycle.

      e.    "**Non-Solicitation Cutoff Date**" means the Non-Compete Cut Off Date.

      f.    "**Trump Company**" means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump.

      g.    "**Trump Person**" means each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company.

      7.     <u>Remedies for Breach of this Agreement</u>.

      a.    <u>Consent to Injunction</u>.  A breach of any of your promises or agreements under this agreement will cause the Company, Mr. Trump and each other Trump Person irreparable harm.

Accordingly, to the extent permitted by law, and without waiving any other rights or remedies against you at law or in equity, you hereby consent to the entry of any order, without prior notice to you, temporarily or permanently enjoining you from violating any of the terms, covenants, agreements or provisions of this agreement on your part to be performed or observed. Such consent is intended to apply to an injunction of any breach or threatened breach.

b. <u>Agreement to Indemnify</u>. You hereby agree to indemnify, defend (with counsel acceptable to the Trump Person you are defending) and hold harmless each Trump Person from and against any claim, demand, suit, proceeding, damages, cost, loss or expense of any kind or nature, including but not limited to reasonable attorneys' fees and disbursements, incurred by any Trump Person as a consequence of your breach of any of your promises or agreements in this agreement.

c. <u>Damages and Other Remedies</u>. Notwithstanding anything to the contrary, each Trump Person will be entitled to all remedies available at law and equity, including but not limited to monetary damages, in the event of your breach of this agreement. Nothing contained in this agreement will constitute a waiver of any Trump Person's remedies at law or in equity, all of which are expressly reserved.

d. <u>Third Party Beneficiaries</u>. Mr. Trump and each Family Member, Trump Company and Family Member Company is an intended third party beneficiary of this agreement. Without limiting the preceding sentence, Mr. Trump, each Family Member, Trump Company and Family Member Company, in addition to the Company, will be entitled to the benefit of this agreement and to enforce this agreement.

8. <u>Resolution of Disputes</u>.

a. <u>Governing Law; Jurisdiction and Venue</u>. This Agreement is deemed to have been made in the State of New York, and any and all performance hereunder, breach hereof, or claims with respect to the enforceability of this agreement must be interpreted and construed pursuant to the laws of the State of New York without regard to conflict of laws or rules applied in the State of New York. You hereby consent to exclusive personal jurisdiction and venue in the State of New York with respect to any action or proceeding brought with respect to this agreement.

b. <u>Arbitration</u>. Without limiting the Company's or any other Trump Person's right to commence a lawsuit in a court of competent jurisdiction in the State of New York, any dispute arising under or relating to this agreement may, at the sole discretion of each Trump Person, be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association, and you hereby agree to and will not contest such submissions. Judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction.

c. <u>Prevailing Party Fees</u>. Any court judgment or arbitration award shall include an award of reasonable legal fees and costs to the prevailing party.

    d.  <u>Interpretation and Representation by Counsel</u>.  This agreement has been drafted on behalf of the undersigned only as a convenience and may not, by reason of such action, be construed against the undersigned.  Each of the parties (i) has had the opportunity to be and/or has elected not to be, represented by counsel, (ii) has reviewed each of the provisions in this agreement carefully and (iii) has negotiated or has had full opportunity to negotiate the terms of this agreement, specifically including, but not limited to Paragraph 7 hereof.  You waive any claims that may be available at law or in equity to the effect that you did not have the opportunity to so consult with counsel.

    e.  <u>No Waiver</u>.  Neither the failure or delay to exercise one or more rights under this agreement nor the partial exercise of any such right, will be deemed a renunciation or waiver of such rights or any part thereof or affect, in any way, this agreement or any part hereof or the right to exercise or further exercise any right under this agreement or at law or in equity.

    9.  <u>Miscellaneous</u>.  **Modifications**.  No change or waiver of the terms, covenants and provisions of this agreement will be valid unless made in writing and signed by the undersigned. **Relationship**.  Nothing herein contained is intended to, nor shall it be construed as, reflecting any employer-employee or independent contractor relationship between you and the undersigned or any other individual or entity. **Counterparts**.  This agreement may be executed in any number of counterparts, all of which taken together will constitute one and same instrument.  Delivery of an executed signature page of this agreement by facsimile transmission or .pdf, .jpeg, .TIFF, or other electronic format or electronic mail attachment will be effective as delivery of an original executed counterparty hereof.

    10.  <u>Survival</u>.  This agreement will survive the expiration, cancellation or termination of any employment or independent contractor relationship that you may have with the Company or with any individual, entity, partnership, trust or organization that the Company has engaged.

Donald J. Trump for President

_____
Name:
Title:

_____ **ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD THIS AGREEMENT, AND AGREES TO COMPLY WITH THE FOREGOING WHICH CREATES A VALID AND BINDING LEGAL OBLIGATION ON HIM.**

_____
Printed Name

Signature:_____
Name:  _____
Address:  _____

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

---

**In the Matter of Arbitration Between:**

DONALD J. TRUMP FOR PRESIDENT,

CLAIMANT

v.

JESSICA DENSON,

RESPONDENT

Case No. 01-17-0007-6454

---

### PARTIAL AWARD

**I, the Undersigned Arbitrator**, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly read and consider the documents submitted by the parties, do hereby, **Find** and **Award**, as follows:

### 1. All Procedural History

This arbitration arises from a written agreement (the "Agreement") between Claimant, as employer, and Respondent, as employee. The Agreement provides that it is deemed to have been made in the State of New York and that all claims with respect to the enforceability of the Agreement must be interpreted and construed pursuant to the laws of the State of New York without regard to conflict of laws. The Agreement further provides that the employee consents to exclusive personal jurisdiction and venue in the State of New York with respect to any action or proceeding brought with respect to the Agreement, and that any dispute arising under the Agreement may, at the sole discretion of named parties, including Claimant, be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association.

Claimant commenced this arbitration by a Demand for Arbitration filed with the American Arbitration Association on December 20, 2017. Respondent was served with the Demand for Arbitration pursuant to AAA rules. She Has not submitted an answering statement.

FILED: NEW YORK COUNTY CLERK 06/01/2020 09:48 AM
NYSCEF DOC. NO.

INDEX NO. 652131/2020
RECEIVED NYSCEF: 06/01/2020

Case 1:20-cv-04737-PGG    Document 1-1    Filed 06/19/20    Page 46 of 60

Consequently, she is deemed to have denied the claim.

A scheduling conference was held by telephone on May 22, 2018. Claimant appeared by counsel. Respondent did not appear although she had been notified of the conference call pursuant to AAA rules. At the conference call the following rulings were made by the undersigned:

> "the parties shall submit in writing to the Association any documents pertaining to the arbitration, including a statement of facts together with any briefs, written arguments or other evidence you wish to submit by July 23, 2018."
> "Each party may file one written reply to the initial submission within 23 days from the date of transmittal of the statements and proofs by the other party(s)."
> "Failure of any party to make such a reply within a specified period of time is deemed to be a waiver of its right to reply."
> "When all the statements, proofs, and answers (if any) have been received by the Association, they will be transmitted to the arbitrator."
> "The arbitrator shall then examine the documents and request further evidence from the party (s), if necessary. Otherwise, the arbitration will be declared closed, and the time. For rendering the award begins on that date."
> "This is a reminder the arbitration may proceed in the absence of any party who fails to participate or fails to obtain a postponement."

Respondent was notified of the above rulings by letter from the Association dated May 22, 2018.

A second conference call by was held on August 20, 2018. Claimant appeared by counsel. Respondent did not appear although she had been notified of the conference call pursuant to AAA rules. Following the conference call, the undersigned issued an order which provides as follows:

> "**Ordered**, that AAA shall immediately serve the Application for an Award on Respondent by regular and certified mail (signature not required); and
> **Ordered**, that the parties are required to keep all documents and proceedings in this arbitration confidential pursuant to the rules of the American Arbitration Association; and
> **Ordered**, that Respondent shall have 23 days from the date of mailing to submit a response in opposition to the Application for an Award."

The Order was served upon Respondent by the Association with a letter dated August 20, 2018.

Respondent's first appearance in this matter was by a letter dated September 7, 2018 and filed with AAA on September 10, 2018, in response to claimant's Application for an

Award. The return address on Respondent's letter of September 7, 2018 is the address to which all notices and correspondence to her have been sent by AAA since the undersigned's appointment as arbitrator in this matter. Respondents letter does not contradict any of the factual allegations in the Application for an Award. Respondent's letter simply recites "ongoing litigation" and encloses a copy of Justice Bluth's Decision & Order of August 7, 2018 (hereinafter described in detail).

Respondent has commenced actions relating to her employment by Claimant in the Supreme Court of the State of New York, New York County (the "State Action"), and the U.S. District Court for the Southern District of New York (the "Federal Action").

Claimant moved in the State Action to compel arbitration. By Decision & Order dated August 7, 2018, Hon. Arlene P. Bluth, J.S.C., denied the motion, holding that the arbitration clause in the Agreement confines arbitration to "any dispute arising under or relating to this agreement" and that it does not require arbitration for any "dispute between the parties" or "any dispute arising out of plaintiff's employment." Justice Bluth further held that the agreement requires arbitration on claims relating to a specific list of five prohibited acts on Respondent's part: no disclosure of confidential information; no disparagement; no competitive services; no competitive solicitation; and no competitive intellectual property claims. Justice Bluth held that neither the Agreement nor its arbitration provision has any application to the affirmative claims asserted by Respondent in the State Action. The Decision in the State Action took no position on the enforceability of any provisions of the Agreement insofar as it relates to the five prohibited activities specifically listed above. No stay of this arbitration was granted in the State Action.

In the Federal Action Respondent sought a declaration that the Agreement "is void and unenforceable." Claimant moved to compel arbitration. The District Court held by Order dated August 30, 2018, that Respondent's claim that "the agreement is void and unenforceable" is a "dispute that arises out of the agreement," and is covered by the arbitration clause of the Agreement. Claimants motion to compel arbitration was granted and the Federal Action was dismissed.

DISCUSSISON

Although it does not expressly do so, I will consider Respondent's letter of September 7, 2018 as raising the the claim that she asserted in the Federal Action, *i.e.*, that the Agreement "is void and unenforceable." The District Court held that the validity of the agreement was an issue to be decided in this arbitration. Respondent has not submitted any law or argument which would support a finding by me that the Agreement "is void and unenforceable." I find that the Agreement is valid and enforceable.

Claimant's application requests an award: (1) finding that Respondent has breached her confidentiality, non-disparagement, and arbitration obligations under the agreement; (2) granting Claimant damages in the amount of $84,575.71 representing indemnification for the reasonable attorneys' fees and costs Claimant incurred in the state and federal court actions; (3) ordering Respondent to account for and disgorge to Claimant the total sum of all profits from her GoFundMe page; (4) granting Claimant an award of reasonable attorney's fees and costs incurred in this arbitration in an amount to be determined by the arbitrator upon a separate application by Claimant; and(5) granting Claimant all such further relief as the arbitrator deems proper and necessary. Respondent has had due notice of this arbitration and of the Application for an Award. Respondents only submissions in this matter are her letter of September 7, 2018 which enclosed a copy of Justice Bluth's Decision and Order of August 7, 2018, and a letter dated October 15, 2018 which challenges the Agreement as "*irrelevant and invalid.*" The letters do not assert facts contradicting the allegations relied upon by Claimant in its Application for an Award.

## AWARD

I find that the evidence submitted by Claimant on its Application for an Award is sufficient for an understanding and determination of the dispute in this arbitration. I find that Respondent has breached the Agreement by disclosing, disseminating and publishing confidential information in the Federal Action, and by making disparaging statements about Claimant and the Agreement on the Internet on her GoFundMe page and on her Twitter account. Claimant has been damaged by Respondent's breach in the amount of $24,808.20 which I find it reasonably expended to defend the Federal Action commenced by Respondent. Claimant is awarded the sum of $24,808.20.

Claimants demand for damages for legal services in connection with the State Action, in the amount of $44,744.71 is denied based upon Justice Bluth's decision holding that the issues in that action are not subject to arbitration under the Agreement.

Claimant's request to disgorge any monies received by Respondent from a GoFundMe page is not authorized by New York law or the Agreement and is denied.

Claimant's request for an award of reasonable attorney's fees and costs incurred in this arbitration is authorized by paragraphs 7 (b) and 8 (c) of the Agreement. That request is granted in an amount to be determined by the undersigned upon a separate application by Claimant. Claimant shall submit its written application within 20 days of the date of this Award. Respondent shall have 20 days after service of the application to submit a written

4

response.

The parties are reminded that all documents and proceedings in this arbitration are confidential pursuant to AAA rules.

Dated: October 19, 2018

L. Paul Kehoe      Arbitrator

# EXHIBIT D

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

| | |
|---|---|
| **In the Matter of Arbitration Between:** | : |
| | : |
| | : |
| DONALD J. TRUMP FOR PRESIDENT, INC. | :   Case No. 01-17-0007-6454 |
| | : |
| CLAIMANT | : |
| | : |
| v. | : |
| JESSICA DENSON, | |
| RESPONDENT | |

### FINAL AWARD

**I, the Undersigned Arbitrator,** having been designated in accordance with the agreement entered into by the above named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated October 19, 2018 do hereby, AWARD, as follows:

### Procedural History

By Partial Award dated October 19, 2018, I awarded Claimant, represented by LaRocca Hornik Rosen Greenberg & Blaha, LLP, the sum of $24,808.20 for legal fees incurred in defending an action brought by Respondent, self-represented, in the U. S. District Court for the Southern District of New York (the "Federal Action"). The Partial Award also granted Claimant an award of attorney's fees and costs incurred in this arbitration in an amount to be determined by the undersigned upon a separate application by Claimant. Claimant has now submitted an application for attorneys' fees and costs in this arbitration as well as a request for a supplemental award for attorneys' fees incurred in the Federal Action after July 23, 2018, and legal fees it expects to incur in connection with filing a petition in federal court to confirm the final award in this arbitration.   Respondent's response to the application for attorneys' fees was due by November 28, 2018. Respondent has not submitted a substantive response to Claimant's application for attorneys' fees and costs.

By letter to the undersigned dated November 27, 2018 Maury B. Josephson, Esq., on

1

behalf of Respondent, requested a stay of further proceedings in this arbitration pending the outcome of an action he commenced on behalf of Respondent in New York State Supreme Court, New York County (the "State Action"). In the State Action Respondent requested a preliminary injunction staying all further proceedings in this arbitration. On November 29, 2018, Hon. Arlene P. Bluth, J.S.C., denied Respondent's request for a preliminary injunction staying proceedings in this arbitration.

Attorney Josephson has not appeared generally for Respondent in this arbitration. Rather, he has limited his appearance to notifying me of the State Action and requesting that I stay all further proceedings in this Arbitration. The request for a stay in this Arbitration is denied.

## DISCUSSION

In determining the amount to be awarded to Claimant as reasonable attorneys' fees I have reviewed the contemporaneous time records submitted and accept them as accurately stating the time spent on this arbitration. I also find that the time spent was reasonable under the circumstances of this arbitration and that the rates charged are commensurate with those generally charged in New York City, where Claimant's attorneys have their offices. An adjustment in the total amount claimed is required by the fact that Claimant did not prevail on all claims. The amount requested for attorneys' fees, totaling $23,866.20 will be reduced by 15 % to reflect the fact that fewer attorney hours would have been required had the claims been limited to those on which Claimant was ultimately successful.

## AWARD

Claimant is granted a supplemental award of attorneys' fees and costs incurred or to be incurred in the Federal Action subsequent to July 23, 2018 in the amount of $4,291.85.

Claimant is granted an award in the amount of $20,286.27 as reasonable attorneys' fees in this arbitration, together with expenses in the amount of $121.32, for a total of $20,407.59.

The administrative fees of the American Arbitration Association totaling $2,950.00 and the compensation of the arbitrator totaling $8,050.00 shall be borne as incurred. These fees are not subject to reallocation by the arbitrator. (See footnote, Commercial Arbitration Rules, p. 10)

This Final Award, including amounts awarded in the Partial Award, shall accrue interest from the date hereof at 9% per annum.

2

The parties are reminded that all documents and proceedings in this arbitration are confidential pursuant to AAA rules.          .

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Dated: December 11, 2018, 2018

L. Paul Kehoe      Arbitrator

# EXHIBIT E

**From:** **Patrick Mcpartland** pmcpartland@lhrgb.com 📎
**Subject:** RE: Donald J. Trump for President, Inc./Jessica Denson, AAA Case No. 01-19-0000-5505 (the "Second Arbitration")
**Date:** May 29, 2019 at 1:44 PM
**To:** jonathanweed@adr.org
**Cc:** Lawrence Rosen lrosen@lhrgb.com, David Bowles david@lawdkb.com, Maury Josephson mbjlaw@verizon.net



Good afternoon Mr. Weed,

In accordance with paragraph 8B of the parties' arbitration agreement (courtesy copy attached), we write to advise that the Campaign does **not** consent to the AAA's jurisdiction over the Second Arbitration.

Very truly yours,


Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM

 Please, don't print if you don't have to.

-----------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout thereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

---

**From:** Patrick Mcpartland
**Sent:** Wednesday, May 22, 2019 3:07 PM
**To:** jonathanweed@adr.org
**Cc:** Lawrence Rosen <lrosen@lhrgb.com>; 'David Bowles' <david@lawdkb.com>; Maury Josephson <mbjlaw@verizon.net>
**Subject:** Donald J. Trump for President, Inc./Jessica Denson, AAA Case No. 01-19-0000-5505 (the "Second Arbitration")

Good afternoon Mr. Weed,

We write in furtherance of our March 18, 2019 correspondence (courtesy copy attached) wherein the Campaign expressly reserved its contractual right to not consent to the AAA's jurisdiction over the Second Arbitration. This right, which is in the "sole discretion" of the Campaign, is set forth in paragraph 8B of the subject Agreement (courtesy copy attached).

We are aware of Judge Kehoe's recent decision and order concerning the Campaign's application to dismiss the Second Arbitration.  We intend to discuss this with our client and expect to be able to notify the AAA by next Wednesday or Thursday whether the Campaign will or will not consent to the AAA's jurisdiction over the Second Arbitration.

Thank you,

Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM

 **Please, don't print if you don't have to.**

-----------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited.  If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout thereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses.  The company accepts no liability for any damage caused by any virus transmitted by this email.



Jessica Denson
NDA –...ted.pdf

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JESSICA DENSON,

                          Plaintiff,

        -against-

DONALD J. TRUMP FOR PRESIDENT, INC.,

                        Defendant.
------------------------------------------------------------------X

Civil Action No.
18-cv-2690 (JMF)


### DEFENDANT'S MEMORANDUM IN RESPONSE
### TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM


**LAROCCA HORNIK ROSEN**
**& GREENBERG LLP**
40 Wall Street, 32nd Floor
New York, New York 10005
T: (212) 530-4822
E: LROSEN@LHRGB.COM
*Attorneys for defendant*

In accordance with Your Honor's May 29, 2019 Order (the "May 29th Order"), defendant Donald J. Trump for President, Inc. (the "Campaign"), by its attorneys LaRocca Hornik Rosen & Greenberg LLP, respectfully submits this memorandum in response to the supplemental memorandum filed by plaintiff on May 30, 2019 (the "Supplemental Memorandum") and the letter filed by plaintiff on May 31, 2019 (the "May 31st Letter").

## PRELIMINARY STATEMENT

In its May 29th Order, this Court granted plaintiff leave to file a limited supplemental memorandum, but stated that it would "consider the supplemental filing only to the extent that it addresses factual developments that post-date the prior briefing." ECF Doc. 46. Because plaintiff's Supplemental Memorandum fails to identify or address any new factual developments bearing on the parties' *sub judice* motions, it should be disregarded in its entirety. ECF Doc. 48.

As for the May 31st Letter, plaintiff never requested, nor was she granted, leave to make this additional filing and, for this reason alone, it should be disregarded. ECF Doc. 49. Regardless, the May 31st Letter likewise fails to raise any new facts that are germane to the parties' motions.

## ARGUMENT

### PLAINTIFF'S SUPPLEMENTAL
### FILINGS SHOULD BE DISREGARDED

Plaintiff's Supplemental Memorandum raises only additional legal arguments that plaintiff could have asserted in her underlying cross-motion (which was fully briefed and submitted to this Court for determination more than four months ago). ECF Doc. 48. The Supplemental Memorandum fails to raise any new facts and should be disregarded in its entirety.[1]

---

[1] Plaintiff makes a cryptic reference to a book published by Cliff Sims, but fails to articulate how this book, or any response to it, correlates to the parties' pending motions.

1

Having disregarded this Court's May 29 Order by failing to assert any new facts in her Supplemental Memorandum, on May 31 plaintiff took the liberty of filing an additional letter—without first seeking leave of the Court—in which she purports to advise the Court of a "factual development" concerning a separate "class action" lawsuit that plaintiff filed against the Campaign with the AAA. ECF Doc. 49. Under the terms of the parties' written agreement, however, the Campaign is afforded the discretionary right to arbitrate (or not arbitrate) that class action before the AAA. The Campaign simply exercised its election rights in this regard and notified the AAA that it was declining to arbitrate that claim. In any event, the permitted exercise of this discretion by the Campaign has absolutely no bearing on the parties' pending motions. Indeed, it simply means that if plaintiff wants to proceed with a class action lawsuit, she must file her purported claims in court, rather than with the AAA.

## CONCLUSION

For these reasons (and the reasons set forth in the Campaign's underlying motion papers), the Campaign respectfully requests that the Court grant its motion to confirm the arbitral awards that Judge Kehoe of the AAA issued in its favor.

Dated: New York, New York
June 3, 2019

LAROCCA HORNIK ROSEN
& GREENBERG LLP

By: _____
Lawrence S. Rosen
40 Wall Street, 32nd Floor
New York, New York 10005
T: (212) 530-4822
E: LROSEN@LHRGB.COM
*Attorneys for defendant*
*Donald J. Trump for President, Inc.*

2