## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JESSICA DENSON, Individually and on
Behalf of All Others Similarly Situated,

*Plaintiffs*,

*v.*

DONALD J. TRUMP FOR PRESIDENT, INC.,

*Defendant*.

No. 20 Civ. 4737 (PGG)

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

David A. Schulz
Joseph Slaughter
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6103
Fax: (212) 223-1942
Email: schulzd@ballardspahr.com
Email: slaughterj@ballardspahr.com

David K. Bowles
BOWLES & JOHNSON PLLC
14 Wall Street, 20th Floor
New York, New York 10005
Tel. (212) 390-8842
Fax (866) 844-8305
Email: David@BoJo.Law

John Langford (JL-2367)
UNITED TO PROTECT DEMOCRACY, INC.
555 W. 5th St.
Los Angeles, CA 90013
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: john.langford@protectdemocracy.org

Brittany Williams
UNITED TO PROTECT DEMOCRACY, INC.
1900 Market St., 8th Fl.
Philadelphia, PA 19103
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: brittany.williams@protectdemocracy.org

Anne Tindall
UNITED TO PROTECT DEMOCRACY, INC.
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: anne.tindall@protectdemocracy.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 1

A.      Ms. Denson's Work for the Trump Campaign in 2016 ............................................. 1

B.      The Form NDA .................................................................................................... 2

     1.      The nondisclosure clause .......................................................................... 2

     2.      The non-disparagement clause.................................................................. 3

     3.      Other relevant provisions ......................................................................... 4

C.      The Trump Campaign's Use and Enforcement of the Form NDA .................................. 4

     1.      Actions against other Campaign workers ................................................... 4

     2.      Actions against Ms. Denson ...................................................................... 6

D.      Procedural History of This Action ........................................................................... 9

LEGAL STANDARD ............................................................................................................ 10

ARGUMENT ...................................................................................................................... 10

I.      THE TRUMP CAMPAIGN'S FORM NDA IS VOID AND UNENFORCEABLE UNDER NEW YORK CONTRACT LAW .................................................................... 10

     A.      The Form NDA Is An Unreasonable Post-Employment Restrictive Covenant .............................................................................................. 10

         1.      The nondisclosure and non-disparagement clauses are not reasonable in time ................................................................................. 11

         2.      The nondisclosure and non-disparagement clauses are not necessary to protect the Trump Campaign's legitimate interests ............ 11

         3.      The nondisclosure and non-disparagement provisions are harmful to the general public and unreasonably burdensome to Campaign workers................................................................................ 13

B.  The Nondisclosure and Non-Disparagement Clauses Are Unenforceably Vague and Indefinite ........................................................................... 14

C.  The Nondisclosure and Non-Disparagement Provisions Are Void As Against Public Policy ........................................................................... 16

D.  The Form NDA Is Unconscionable ................................................... 18

II.  THE FORM NDA VIOLATES BOTH THE FIRST AMENDMENT AND THE NEW YORK STATE CONSTITUTION ......................................................... 20

A.  The Form NDA Prohibits Political Speech Entitled to the Fullest and Most Urgent Constitutional Protection ........................................................ 20

B.  The First Amendment's Protections for Political Speech Apply Fully to the Form NDA ....................................................................................... 21

C.  The Form NDA's Purported Waiver of Free Speech Rights Is Unenforceable ....................................................................................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC*,
   128 N.E.3d 128 (N.Y. 2019) ........................................................................... 16

*Am. Broad. Co. v. Wolf*,
   52 N.Y.2d 394 (1981) ..................................................................................... 11

*Arthur J. Gallagher & Co. v. Marchese*,
   96 A.D.3d 791 (2d Dep't 2012) ....................................................................... 11

*Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*,
   59 A.D.3d 97 (1st Dep't 2008) ........................................................................ 10

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382 (1999) ................................................................................ 10, 11

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................... 19

*Bragg v. Linden Research, Inc.*,
   487 F. Supp. 2d 593 (E.D. Pa. 2007) ............................................................... 19

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ........................................................................................ 17

*Brennan v. Bally Total Fitness*,
   198 F. Supp. 2d 377 (S.D.N.Y. 2002) .............................................................. 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ........................................................................................ 23

*Brower v. Gateway 2000, Inc.*,
   246 A.D. 246 (1st Dep't 1998) ................................................................... 18, 20

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ............................................................................................ 21

*Bus. Networks of N.Y., Inc. v. Complete Network Sols., Inc.*,
   696 N.Y.S.2d 433 (1st Dep't 1999) ................................................................. 10

*Candid Prods., Inc. v. Int'l Skating Union*,
   530 F. Supp. 1330 (S.D.N.Y. 1982) ................................................................. 14

**Page(s)**

**Cases (cont.)**

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) ................................................................ 20, 21

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991) ................................................................ 22

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
    42 N.Y.2d 496 (1977) ........................................................ 10, 11, 13

*Connick v. Myers*,
    461 U.S. 138 (1983) ................................................................ 21, 25

*Cosby v. Am. Media, Inc.*,
    197 F. Supp. 3d 735 (E.D. Pa. 2016) .................................... 17

*Davis-Garett v. Urban Outfitters, Inc.*,
    921 F.3d 30 (2d Cir. 2019) ................................................. 10

*Denson v. Donald J. Trump For President, Inc.*,
    116 N.Y.S.3d 267 (App. Div. 2020) ..................................... 8

*Denson v. Donald J. Trump For President, Inc.*,
    180 A.D.3d 446 (1st Dep't 2020) ........................................ 18

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ............................................................. 21

*Filstein v. Bromberg*,
    944 N.Y.S.2d 692 (Sup. Ct. 2012) ...................................... 16

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) .............................................................. 24

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................ 25

*Garrison v Louisiana*,
    379 U.S. 64 (1964) .............................................................. 20

*Gelder Med. Grp. v. Webber*,
    41 N.Y.2d 680 (1977) ......................................................... 11

**Page(s)**

**Cases (cont.)**

*Gillman v. Chase Manhattan Bank, N.A.*,
  73 N.Y.2d 1 (1988) ................................................................................ 18, 19

*Hanover Ins. Co. v. Losquadro*,
  600 N.Y.S.2d 419 (Sup. Ct. 1993) ................................................................... 20

*Heartland Sec. Corp. v. Gerstenblatt*,
  No. 99 Civ 3694 (WHP), No. 99 Civ. 3858 (WHP),
  2000 WL 303274 (S.D.N.Y. Mar. 22, 2000) ........................................................ 10

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) ...................................................................................... 22

*Immuno AG v. Moor-Jankowski*,
  77 N.Y.2d 235 (1991) ............................................................................ 17, 20

*In re Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*,
  93 N.Y.2d 584 (1999) ................................................................................. 14

*IVI Envtl., Inc. v. McGovern*,
  269 A.D.2d 497 (2d Dep't 2000) ..................................................................... 12

*Johnson v. Zerbst*,
  304 U.S. 458 (1938) ..................................................................................... 24

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  52 N.Y.2d 105 (1981) ................................................................................... 14

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ..................................................................................... 17

*L.I. City Ventures v. Urban Compass, Inc.*,
  No. 18 Civ. 5853 (PGG), 2019 WL 234030 (S.D.N.Y. Jan. 16, 2019) ............... 10, 11, 12, 13

*Mills v. Alabama*,
  384 U.S. 214 (1966) ..................................................................................... 21

*Morris v. N.Y.C. Emps.' Ret. Sys.*,
  129 F. Supp. 2d 599 (S.D.N.Y. 2001) ............................................................... 24

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .............................................................................. *passim*

**Page(s)**

**Cases (cont.)**

*New York v. McQueen*,
    67 Misc. 3d 1206(A) (N.Y. Sup. Ct. 2020) ............................................................... 17

*O'Neill v. Oakgrove Const., Inc.*,
    71 N.Y.2d 521 (1988) ................................................................................................ 17

*Overbey v. Mayor of Baltimore*,
    930 F.3d 215 (4th Cir. 2019) ......................................................................... 23, 24, 25

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) .................................................................................................. 22

*Ragone v. Atl. Video*,
    595 F.3d 115 (2d Cir. 2010) ...................................................................................... 18

*Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*,
    906 F.3d 253 (2d Cir. 2018) ...................................................................................... 22

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...................................................................................... 20, 21, 22

*Xie v. Citibank, N.A.*,
    No. 717579/2018, 2019 WL 3531636 (N.Y. Sup. Ct. June 14, 2019) ...................... 18

**Constitutional Provisions**

N.Y. Const. art. I, § 8 ...................................................................................................... 16, 20

U.S. Const. amend. I ........................................................................................................ 16, 20

**Statutes**

15 U.S.C. § 45b ..................................................................................................................... 13

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 10

**Other Authorities**

Daniel J. Solove & Neil M. Richards, *Rethinking Free Speech and Civil Liability*,
   109 Colum. L. Rev. 1650 (2009) ............................................................................. 23

*Restatement (Second) of Contracts* § 178 (1981) ........................................................ 16

## INTRODUCTION

Through this lawsuit, lead plaintiff Jessica Denson seeks a declaratory judgment that a form contract the Campaign of Donald J. Trump required its workers to sign during the 2016 presidential campaign is void and unenforceable and an injunction prohibiting its enforcement. The contract ostensibly bars Ms. Denson and anyone who signed it from criticizing Mr. Trump—the sitting President of the United States—forever. It also purports to bar signers from disclosing any information that Mr. Trump unilaterally deems "private" forever.

The contract was plainly conceived as tool to silence critics of the President, and it has repeatedly been used to that end. The Trump Campaign regularly takes steps to enforce the contract against former workers who criticize the President or his Campaign, including Ms. Denson, from whom the Campaign sought $1,500,000.00 in damages because she filed a lawsuit alleging sex discrimination by the Campaign, and later criticized the Campaign and the President on social media. The Trump Campaign claims another former Campaign worker violated the contract just by saying she would never vote for President Trump again.

The contract, on its face, violates basic principles of New York contract law. More importantly, the contract prohibits truthful political speech and expressions of negative opinions about the President of the United States, who is currently running for re-election. This gag on core political speech is anathema to the First Amendment and the New York State Constitution and has no place in our democracy.

## FACTUAL BACKGROUND

### A.    Ms. Denson's Work for the Trump Campaign in 2016

Defendant Donald J. Trump for President, Inc. (the "Campaign"), registered with the Federal Election Commission as the Primary Campaign Committee for then-candidate Donald J. Trump on June 29, 2015. SMF ¶ 5. A year later, on July 16, 2016, the Republican National

Convention voted to make Trump its party's nominee for the office of President of the United States. *Id*. ¶ 6. Shortly after the nomination, lead plaintiff Jessica Denson, a registered Republican who supported Mitt Romney for President in 2012, applied to work for the Campaign. *Id.* ¶ 7–8. On August 18, 2016, the Campaign hired Ms. Denson as a national phone bank administrator. *Id.* ¶ 9.

Before beginning her work, the Campaign required Ms. Denson to sign a pre-drafted form contract containing expansive and perpetual nondisclosure and non-disparagement clauses. *Id.* ¶ 10 & Denson Decl. Ex. A (hereinafter, "the Form NDA"). Ms. Denson was not alone—at least two other Campaign employees, and likely dozens, if not hundreds, more, were required to sign the same Form NDA. SMF ¶ 11.

## B.      The Form NDA

The central provisions of the Form NDA consist of a "nondisclosure" clause and a "non-disparagement" clause. *See* Form NDA ¶¶ 1, 2. Those provisions, and certain defined terms they contain, are described below, as are the Form NDA's "remedies" and "resolution of disputes" clauses. *Id*. ¶¶ 7–8.

### 1.   The nondisclosure clause.

The nondisclosure clause provides that, "[d]uring the time of your service *and at all times thereafter*," a signer may not disclose any "Confidential Information," or use such information in any way detrimental to Mr. Trump, his family, or any of Mr. Trump's or his family's businesses. Form NDA ¶ 1 (emphasis added).

The Form NDA broadly defines "Confidential Information" as follows:

> **"Confidential Information"** means all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump

> or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

*Id.* ¶ 6(a). Without limitation or specificity, the contract then defines "Trump Company" to encompass "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump," and defines "Family Member Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member." *Id.* ¶¶ 6(c), 6(f). "Family Member," in turn, includes:

> any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

*Id.* ¶ 6(b). The terms "Trump Company" and "Family Member Company" encompass over 500 individual companies, only approximately half of which use the "Trump" branded name and none of which are specifically identified in the Form NDA. SMF ¶ 51.

**2. The non-disparagement clause.**

The non-disparagement clause provides that "[d]uring the term of [their] service and at all times thereafter," a signer may not "demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer." Form NDA ¶ 2.

3

### 3.   Other relevant provisions.

Two other provisions of the Form NDA are relevant here. The first is a "remedies" clause, which specifies that "Mr. Trump and each Family Member, Trump Company and Family Member Company is an intended third party beneficiary of this agreement" and "will be entitled to enforce this agreement." Form NDA ¶ 7(d). The second is a "resolution of disputes" clause, which provides that the "laws of the State of New York" are to govern any disputes related to the contract and that "any dispute arising under or relating to this agreement may, at the sole discretion of each Trump Person, be submitted to binding arbitration." *Id.* ¶ 8(a)–(b). The contract defines "Trump Person" as "each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company." *Id.* ¶ 6(g).

### C.   The Trump Campaign's Use and Enforcement of the Form NDA

President Trump's former attorney, Michael Cohen, testified to Congress that the intent of the Form NDA is to "prevent people from coming forward with claims of wrongdoing," and to "basically try to keep people silent." SMF ¶ 13. True to Mr. Cohen's testimony, the Trump Campaign has repeatedly threatened and initiated legal action to enforce its Form NDA against former Campaign workers who criticized the President or the Campaign, including Ms. Denson.

### 1.   Actions against other Campaign workers.

Not counting Ms. Denson, the Trump Campaign has threatened to sue or actually initiated proceedings against at least three former employees for alleged violations of the nondisclosure and non-disparagement clauses in the Form NDA.

In August 2018, former Campaign staffer and White House aide Omarosa Manigault Newman published *Unhinged: An Insider's Account of the Trump White House*. SMF ¶ 14. After publication, the Campaign, with President Trump's encouragement, initiated an arbitration

proceeding against Ms. Newman to enforce the Form NDA. *Id*. ¶ 15. In its arbitration demand, the Campaign alleged that Ms. Newman violated the Form NDA's non-disparagement clause when a television interviewer asked Ms. Newman, "Would you vote for [Mr. Trump] again [for President]?" and she responded, "God no, never. In a million years, never." *Id.* ¶ 16(g). On July 1, 2020, in a related civil proceeding against Ms. Manigault Newman, her lawyers revealed that the Trump Campaign "recently added nearly ***four hundred*** additional counts to [its] arbitration action [seeking to enforce the Form NDA against her] and is keeping tabs on everything she says and does." *Id.* ¶ 18 (emphasis added).

On January 29, 2019, a former Campaign staffer named Cliff Sims published *Team of Vipers*, a book about his experiences in the Trump White House. *Id.* ¶ 19. That same day, the Campaign's then-Chief Operating Officer, Michael Glassner, publicly stated that the Campaign intended to sue Mr. Sims for violating his NDA. *Id*. ¶ 20.

In September 2019, the Campaign accused former staffer Alva Johnson of breaching her NDA based on Ms. Johnson's filing a lawsuit alleging that President Trump forcibly kissed her. *Id.* ¶ 22. A lawyer for the Trump Campaign stated that it and President Trump were "weighing their legal options against Ms. Johnson at this time, and have demanded that she reimburse them for the attorneys' fees and costs they incurred in her failed lawsuit." *Id*. ¶ 23.

The President has encouraged and taken credit for the Campaign's efforts to enforce the Form NDA. For example, on the day Cliff Sims published his book, the President tweeted:



*Id.* ¶ 21. A few months later, the President tweeted similarly about Ms. Newman and "others":



*Id.* ¶ 17.

### 2. Actions against Ms. Denson.

On November 9, 2017, a year after the 2016 presidential election, Ms. Denson filed a *pro se* lawsuit against the Trump Campaign in New York State Supreme Court, asserting claims of sex discrimination, harassment, and slander. SMF ¶ 24. In response, the Campaign initiated an arbitration proceeding on December 20, 2017, alleging that Ms. Denson violated the terms of the Form NDA by publicly filing the allegations in her lawsuit (the "Campaign's arbitration"). *Id.* ¶ 25. In demanding arbitration, the Campaign alleged that Ms. Denson:

> breached confidentiality and non-disparagement obligations contained in a written agreement she executed during her employment with claimant Donald J. Trump for President, Inc. She breached her obligations *by publishing certain confidential information and disparaging statements in connection with a lawsuit* she filed against claimant in New York Supreme Court.

> Claimant is seeking compensatory damages, punitive damages, and all legal fees and costs incurred in connection with this arbitration.

*Id.* ¶ 26 (emphasis added). The Campaign demanded damages of $1,500,000. *Id.* ¶ 27.

In conjunction with filing its arbitration demand, the Trump Campaign sought to compel arbitration of Ms. Denson's pending state-court claims, but the New York court ultimately ruled that those claims were not covered by the Form NDA. *See* SMF ¶¶ 29–30. Ms. Denson's claims arising out of her employment are still pending in New York Supreme Court. *Id.* ¶ 31.

While awaiting a ruling from state court, on March 26, 2018, Ms. Denson filed a *pro se* lawsuit in this Court seeking a declaration that the Form NDA is void and unenforceable (the "First Federal Action"). *Id.* ¶ 32. The Campaign responded by moving to compel arbitration of the First Federal Action, and its motion was granted on August 30, 2018. *Id.* ¶¶ 33, 38.

Meanwhile, the Campaign's arbitration against Ms. Denson continued, even after the state court rejected the Campaign's effort to compel arbitration of her discrimination, harassment, and slander claims. *Id.* ¶ 34. On July 23, 2018, the Campaign submitted an application for an award to the arbitrator. *Id.* ¶ 35. There, the Campaign alleged that Ms. Denson violated the nondisclosure and non-disparagement clauses by, among other things, filing the state and federal lawsuits and posting critical statements on her Twitter account, including, "Camilo Sandoval rewarded for his slander/sabotage of @DavidShulkin w/TEMP post over our #Vets data/health records.[] 1 mo ago: Congress demands Sandoval's removal. Still there. WHY @POTUS @jaredkushner @AviBerkow?" *Id.* ¶¶ 36–37. Still *pro se*, Ms. Denson did not actively participate in the Campaign's arbitration, which she viewed as improper. *Id.* ¶ 34.

On October 18, 2018, the arbitrator issued an award of $24,808.20 in favor of the Trump Campaign, based on a finding that Ms. Denson "breached the [Form NDA] by disclosing confidential information in the [First] Federal Action, and by making disparaging statements

about Claimant and the [Form NDA] on the Internet on her GoFundMe page and on her Twitter account." *Id.* ¶ 39.[1] Shortly thereafter, Ms. Denson retained counsel. *Id.* ¶ 40. Two months later, on December 12, 2018, the arbitrator issued a final award in favor of the Campaign, increasing the original award to include an additional $4,291.85 in attorneys' fees for work on Ms. Denson's federal lawsuit, $20,286.27 in attorneys fees' for the uncontested arbitration proceeding, and $121.32 in costs, for a total award of $49,507.64 against Ms. Denson. *Id.* ¶ 41.

The Campaign then moved to have the award confirmed by both the state court and this Court. *Id.* ¶ 42.  On July 8, 2019, the state court confirmed the arbitration award; two weeks later, this Court held that the state court's affirmance mooted the Campaign's motion to affirm the award and precluded any further consideration of the issues by this Court. *Id.* ¶¶ 43–44.

On February 6, 2020, the Appellate Division, First Department unanimously reversed the state court decision confirming the arbitration award, and vacated the award in its entirety on the grounds that the arbitrator's decision to penalize Ms. Denson for availing herself of a judicial forum was improper and against public policy. *Id.* ¶ 45; *Denson v. Donald J. Trump For President, Inc.*, 116 N.Y.S.3d 267 (App. Div. 2020).

From the time the Campaign initiated its arbitration in December 2017 until the arbitration award was reversed two years later, Ms. Denson withstood constant financial threat and pressure to withdraw her claims due to the Campaign's incessant pursuit and expansion of the arbitration. Among other things, during Ms. Denson's appeal of the state court's decision affirming the arbitration award, the Campaign aggressively sought to execute the award,

---

[1] Ms. Denson established a GoFundMe account in 2018 in hopes of raising funds to secure legal representation in her cases against the Campaign. SMF ¶ 28.

including by serving subpoenas and restraining notices on Ms. Denson, her bank accounts, and her counsel, even going so far as to restrain her counsels' escrow accounts, SMF ¶ 50.

## D.     Procedural History of This Action

On February 20, 2019, and pursuant to this Court's order in the Federal Action granting the Campaign's motion to compel arbitration of Ms. Denson's claim that the Form NDA is invalid and unenforceable, Ms. Denson submitted a class-action arbitration demand to the Campaign and simultaneously filed it with the American Arbitration Association. SMF ¶ 46. In response, the Campaign sought to have Ms. Denson's arbitration demand submitted to the same arbitrator assigned to its initial arbitration against her. *Id.* ¶ 47. When this request was denied, on May 29, 2019 the Campaign exercised its "sole discretion" under Paragraph 8(b) of the Form NDA and rejected the arbitration demand, insisting instead that Ms. Denson "file her purported claims in court." *Id.* ¶¶ 48–49.

After the First Department vacated the arbitration award, Ms. Denson prepared this class action lawsuit, on behalf of herself and all others bound by the terms of the Form NDA. Once the New York State courts lifted a moratorium on the filing of new actions prompted by the COVID pandemic, Ms. Denson filed this lawsuit in New York Supreme Court on June 1, 2020. *See* ECF No. 1-1 (State Court complaint).

On June 19, 2020, the Campaign removed this action to this Court. ECF No. 1. On June 22, 2020, Ms. Denson's counsel filed a letter informing the Court of the background of the action, requesting early discovery and notifying the Court of the case's relation to the earlier Federal Action. ECF No. 10. On June 25, 2020, the Court denied Plaintiffs' request for early discovery and set a Rule 16 conference for July 9, 2020. ECF No. 12. On July 7, the Trump Campaign filed a pre-motion letter proposing to seek dismissal of this case for lack of federal

jurisdiction and collateral estoppel. ECF No. 15. Plaintiffs responded that such a motion would be frivolous, time was of the essence, and the legal merits of the challenge to the Form NDA could be resolved without discovery. During the July 9 conference, the Court set a schedule for the concurrent briefing of this motion and the Campaign's motion to dismiss. ECF No. 18.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019).

## ARGUMENT

**I.   THE TRUMP CAMPAIGN'S FORM NDA IS VOID AND UNENFORCEABLE UNDER NEW YORK CONTRACT LAW**

The Form NDA is unenforceable under New York contract law for four independent reasons: it is an unreasonable post-employment restrictive covenant, it lacks the definiteness required of an enforceable contract, it is void as against public policy, and it is unconscionable.

### A.   The Form NDA Is An Unreasonable Post-Employment Restrictive Covenant

The nondisclosure and non-disparagement clauses of the Form NDA operate as classic post-employment restrictive covenants. *See, e.g.*, *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 498–99 (1977) (considering nondisclosure agreement to be a restrictive covenant); *L.I. City Ventures v. Urban Compass, Inc.*, No. 18 Civ. 5853 (PGG), 2019 WL 234030, at *14 (S.D.N.Y. Jan. 16, 2019) (Gardephe, J.) (same). New York law takes a dim view of such restrictions, considering them "generally disfavored" and only enforceable "under limited circumstances." *Heartland Sec. Corp. v. Gerstenblatt*, No. 99 Civ. 3694 (WHP), No. 99 Civ. 3858 (WHP), 2000 WL 303274, at *5 (S.D.N.Y. Mar. 22, 2000) (citing *Bus. Networks of N.Y., Inc. v. Complete Network Sols., Inc.*, 696 N.Y.S.2d 433, 435 (1st Dep't 1999)). Restrictive

covenants are valid only if they are "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 101–02 (1st Dep't 2008) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999)). "A violation of any prong renders the covenant invalid." *BDO Seidman*, 93 N.Y.2d at 389. The nondisclosure and non-disparagement provisions in the Form NDA violate *each* prong.

### 1. The nondisclosure and non-disparagement clauses are not reasonable in time.

Neither the nondisclosure nor the non-disparagement clauses contain *any* temporal limit. To the contrary, both purport to bind signatories "[d]uring the term of your service and ***at all times*** thereafter." Form NDA ¶¶ 1, 2 (emphasis added). This alone renders them unenforceable. Even "an otherwise valid (restrictive) covenant will not be enforced if it is unreasonable in time[.]" *Am. Broad. Co. v. Wolf*, 52 N.Y.2d 394, 403–04 (1981); *see also Columbia Ribbon & Carbon Mfg. Co.*, 42 N.Y.2d at 499; *Gelder Med. Grp. v. Webber*, 41 N.Y.2d 680, 683 (1977).

### 2. The nondisclosure and non-disparagement clauses are not necessary to protect the Trump Campaign's legitimate interests.

The only legitimate employer interests that justify a restrictive covenant are "the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *Arthur J. Gallagher & Co. v. Marchese*, 96 A.D.3d 791, 792 (2d Dep't 2012); *accord L.I. City Ventures*, 2019 WL 234030, at *14 (restrictive covenants enforceable to extent necessary to prevent "disclosure or use of trade secrets or confidential customer information") (citation omitted). The nondisclosure and non-disparagement provisions self-evidently fail to meet this standard.

This Court's recent decision in *L.I. City Ventures* illustrates exactly why the Form NDA is unenforceable. In that case, an employer sought to enforce a nondisclosure provision against a former employee that purported to prevent the disclosure of any information the employee gained access to during her employment, "regardless of whether that material constitute[d] a trade secret or [wa]s otherwise proprietary and confidential." 2019 WL 234030, at *14. This Court refused to enforce the provision because it was "overbroad" and "not necessary to protect [the employer's] legitimate interests." *Id.*

So too here. The Form NDA's nondisclosure clause prohibits Trump Campaign employees from disclosing any "Confidential Information"—defined in a non-exhaustive list to include "any information" about such staggeringly broad categories as the "personal life," "political affairs," "business affairs," "alliances," "affiliations," "relationships," and "conversations" of Mr. Trump and any of his family. Form NDA ¶ 6(a). None of these can reasonably be considered a "trade secret" or other category of legally protectible "confidential" business information.[2] And even if the definition of "Confidential Information" were not so impermissibly broad, the nondisclosure clause additionally purports to prohibit disclosure of anything "Mr. Trump insists remain private or confidential." *Id.* ¶¶ 1, 6(a). This open-ended definition bears no relationship to the few narrow categories of information that New York law permits employers to protect for limited periods of time through restrictive covenants. The Form NDA's reservation of unfettered discretion to Mr. Trump to classify anything as confidential far exceeds the bounds of anything enforceable under New York law.

---

[2] To the contrary, the plain language of these categories would cover massive amounts of publicly available information. As a matter of law, no employer has a legitimate interest in protecting information "readily ascertainable from outside sources." *IVI Envtl., Inc. v. McGovern*, 269 A.D.2d 497, 498 (2d Dep't 2000).

The non-disparagement clause is equally defective. It purports broadly to ban Trump Campaign workers from ever "demean[ing] or disparag[ing]" the President, his Campaign, his companies, and his family members, along with any asset he or his family may own and any product or service they may offer, now or in the future. This provision, too, is entirely beyond the limits imposed on restrictive covenants under New York law. Nothing in the language of the non-disparagement clause bears any relationship to the types of confidential, proprietary information properly subject to a carefully drawn restriction.[3] On its face, the non-disparagement clause is not limited to any "legitimate interest" of the Campaign, but rather stifles all criticism about the President of the United States, his family, and his businesses.[4]

The "broad-sweeping language" of each provision, "unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness," renders them unenforceable. *Columbia Ribbon*, 42 N.Y.2d at 498–99.

### 3. The nondisclosure and non-disparagement provisions are harmful to the general public and unreasonably burdensome to Campaign workers.

New York law also dictates that restrictive covenants are unenforceable if they are "harmful to the general public" or "unreasonably burdensome" to the employee. *L.I. City Ventures*, 2019 WL 234030, at *14. The provisions here are both. As discussed in more detail in Sections I.C and II.A, *infra*, the nondisclosure and non-disparagement clauses restrict speech on matters of highest public importance and subject Campaign workers to potentially crippling

---

[3] To the extent the non-disparagement clause purports to bar individuals from commenting on the many products and services peddled by members of the Trump family, it may well run afoul of federal consumer protection laws as well. *See, e.g.*, 15 U.S.C. § 45b (barring non-disparagement provisions in form contracts for consumers).

[4] This conclusion is further buttressed by the fact that the nondisclosure clause covers not only information relating to the Campaign, but to *all* Trump-related activities, whether or not they concern the President himself or have anything to do with the Campaign, as opposed to his private businesses.

financial penalties for exercising basic rights. The provisions both harm the public and unreasonably burden those subject to them.

**B.    The Nondisclosure and Non-Disparagement Clauses Are Unenforceably Vague and Indefinite**

Even if the heightened scrutiny that New York courts apply to restrictive covenants did not apply, the non-disparagement and nondisclosure clauses remain unenforceable under New York contract law because they lack the requisite definiteness required of all valid agreements. New York has long recognized that "definiteness as to material matters is of the very essence in contract law," so "[i]mpenetrable vagueness and uncertainty will not do." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981); *see also In re Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) (for a contract to be enforceable, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"). If contractual terms "are so vague and indefinite that there is no basis or standard for deciding whether the agreement ha[s] been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333–34 (S.D.N.Y. 1982).

Here, because there is no way for an employee to reasonably understand the meaning or scope of the nondisclosure and non-disparagement clauses, and by extension to know whether or not they "had been kept or broken," these indefinite provisions are unenforceable. As noted above, the nondisclosure clause purports to prohibit disclosure of "Confidential Information," defined to include (but not be limited to) a broad swath of "private, proprietary, or information" about the President, his companies, and his family, as well as "all information . . . *that Mr. Trump insists remain private or confidential*." Form NDA ¶ 6(a) (emphasis added). To the extent

the Form NDA suggests what qualifies as "private, proprietary, or confidential" information, it includes everything from "investments" to "decisions;" "financial statements" to "methods;" "affiliations" to "conversations;" and more. *Id*. Terms like these are manifestly too vague and indefinite to provide the requisite certainty required of an enforceable contract. And stating that *anything* can qualify as confidential based on Mr. Trump's unconstrained "insistence," removes any semblance of definiteness. Indeed, contract terms that are changeable on one party's whim and without notice are the antithesis of definite.

The non-disparagement provision is equally flawed because it restricts an undefinable category of speech pertaining to an unascertainable group of entities, products, and services. It prohibits a signer to "demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product of service any of the foregoing offer." Form NDA ¶ 2. This vague and expansive language provides no guidance as to what qualifies as "demeaning" or "disparaging" of the President, his family, or their businesses. Nor does it explain—or provide any means to understand—what qualifies as a "product or service" offered by one of the covered individuals or entities, or provide any means for an employee to know what "assets" may be "owned" by members of the Trump family.[5] Taken at face value, the non-disparagement provision all but ensures that signers will not have any certainty as to whether any given statement might be deemed a violation of the Form NDA.

---

[5] The defined terms cited in the non-disparagement provision only serve to deepen its opacity. "Trump Compan[ies]" and "Family Member Compan[ies]" are defined as "any entity, partnership, trust, or organization that, in whole or in part, was created by or for the benefit of [Mr. Trump/any Family Member] or is controlled or owned by [Mr. Trump/any Family Member]." *Id*. at ¶ 6(c). This language, including because of the modifier "in whole or in part," provides no meaningful guidance as to what is covered under the non-disparagement provision.

C.    **The Nondisclosure and Non-Disparagement Provisions Are Void As Against Public Policy**

An otherwise valid contract is unenforceable under New York law when "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." *Restatement (Second) of Contracts* § 178 (1981); *Filstein v. Bromberg*, 944 N.Y.S.2d 692, 698 (Sup. Ct. 2012); *see also 159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 133 (N.Y. 2019) (deeming a contract provision unenforceable "where the public policy in favor of freedom of contract is overridden by another weighty and countervailing public policy"). As discussed below, the Form NDA is void for the further reason that it contravenes public policy, insofar as it (1) violates the United States' and New York's commitment to public debate on matters of public concern; and (2) violates New York's public policy against contracts that prevent the reporting of misconduct.

The First Amendment enshrines a profound societal judgment in favor of open debate about matters of public concern. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also infra* at pp. 20–21. And the New York State Constitution echoes and extends that judgment—indeed, it would be hard to find a more fundamental and weighty public policy of this State. As the New York Court of Appeals put it:

> This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas. That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that "every citizen may freely speak, write and publish * * * sentiments on all subjects." (NY Const, art I, § 8.) Those words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead to set forth our basic democratic ideal of liberty of the press in strong affirmative terms.

*Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991). The "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution." *Id*. (quoting *O'Neill v. Oakgrove Const., Inc.*, 71 N.Y.2d 521, 528 & n.3 (1988)). Moreover, these constitutional guarantees are not just rights of the speaker; they protect equally "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972).

The Trump Campaign's nondisclosure and non-disparagement clauses operate in direct contravention of the fundamental public policy goal of fostering informed debate on matters of public importance. To be clear, Plaintiffs do not contend that any contract purporting to abrogate an individual's free speech rights is void against public policy. But the contractual prohibitions in this case prohibit a breathtakingly broad amount of speech about the President of the United States and his businesses and do not even attempt to tie those prohibitions to any legitimate interest of the contracting entity. In these novel circumstances, the Form NDA's derogation of this critical public policy clearly outweighs any interest in enforcement of the agreement.

Contracts are also void as against public policy where they prevent individuals from reporting misconduct. *See New York v. McQueen*, 67 Misc. 3d 1206(A) (N.Y. Sup. Ct. 2020); *Cosby v. Am. Media, Inc.*, 197 F. Supp. 3d 735, 741 (E.D. Pa. 2016) (collecting authorities); *cf. Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) (observing that "agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy"). The procedural history of the litigation between Ms. Denson and the Trump Campaign shows that the nondisclosure and non-disparagement provisions have exactly that effect. The Campaign's original arbitration demand against Ms. Denson was

predicated on her alleged violation of the nondisclosure and non-disparagement provisions by filing a sex discrimination lawsuit—and resulted in a $50,000 award against her.[6] SMF ¶¶ 26, 39, 41. Given the Campaign's readiness to enforce the Form NDAs against employees seeking to report misconduct, the contract's lack of any carve-out for employees pursuing statutory remedies for misconduct, and the potentially grievous financial penalties employees can incur, the non-disparagement and nondisclosure provisions are patently void as against public policy.

### D.    The Form NDA Is Unconscionable

Finally, the Form NDA cannot properly be enforced because it is unconscionable on its face. Under New York law, a contract is unconscionable when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988). To void a contract there must generally be a showing that it is "both procedurally and substantially unconscionable." *Ragone v. Atl. Video*, 595 F.3d 115, 121–22 (2d Cir. 2010). However, in some cases, "the substantive element alone may be sufficient to render the terms of the provision at issue unenforceable." *Brower v. Gateway 2000, Inc.*, 246 A.D. 246, 254 (1st Dep't 1998).

The touchstone of procedural unconscionability is the "lack of meaningful choice" for the party seeking to have the contract invalidated. *Gillman*, 73 N.Y.2d at 11. The prototypical example of a contract that is procedurally unconscionable is a non-negotiable, standard-form contract, offered by an entity to an individual. *See, e.g.*, *Xie v. Citibank, N.A.*, No. 717579/2018, 2019 WL 3531636, at *2 (N.Y. Sup. Ct. June 14, 2019). That is precisely what the Form NDA is,

---

[6] That award, of course, was ultimately thrown out as contrary to public policy, but only after years of litigation. *Denson v. Donald J. Trump For President, Inc.*, 180 A.D.3d 446 (1st Dep't 2020).

as evidenced by the fact that every copy of the Form NDA Plaintiffs have been able to identify in public records is *identical* in all material respects. *See* SMF ¶ 11. To work for the Trump Campaign, individuals had to sign the Form NDA—they had no choice.

Even if there were no procedural unconscionability, this is the rare case where a contract is unconscionable on substantive grounds alone. "A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002).

Here, the Form NDA is rife with provisions that are so prejudicially one-sided and unreasonably favorable to the Trump Campaign as to render it unconscionable. First and foremost are the nondisclosure and non-disparagement clauses, which purport to strip signers of their constitutional rights to criticize the President forever—limitations which are "grossly unreasonable or unconscionable in the light of the mores" of the time and place. *Gillman*, 73 N.Y.2d at 10. To take another obvious example, the Form NDA allows President Trump unilaterally to modify the definition of "Confidential Information" with no advance notice or explanation to the employee. This independently renders the Form NDA unconscionable. *See, e.g.*, *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015) (quoting *Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593, 611 (E.D. Pa. 2007), for the proposition that a unilateral modification clause renders a contract so "severely one-sided in the substantive dimension" that "even moderate procedural unconscionability" renders it unenforceable).

The Form NDA contains many other one-sided provisions. These include: (1) giving the Campaign unilateral discretion over whether to arbitrate claims under the Form NDA; (2) requiring the employee to consent to entry of an *ex parte* injunction barring breach of the contract (*i.e.*, a prior restraint on speech); (3) entitling the Campaign and any "Trump Person" to

enforce the contract and recover damages for its breach; and (4) shifting to the employee all costs incurred for any disputes. Form NDA ¶¶ 7(a), 7(d), 8(b)–(c). Taken together or standing alone, these provisions and more like them render the Form NDA unconscionable. *See, e.g.*, *Hanover Ins. Co. v. Losquadro*, 600 N.Y.S.2d 419, 423 (Sup. Ct. 1993) (non-mutuality of contractual provisions supports finding of unconscionability); *Brower*, 676 N.Y.S.2d at 573–74 (unreasonable imposition of costs renders contract substantively unconscionable).

## II.   THE FORM NDA VIOLATES BOTH THE FIRST AMENDMENT AND THE NEW YORK STATE CONSTITUTION

The Form NDA violates the First Amendment's and Article I, § 8 of the New York State Constitution's protections of the freedom of speech and of the press.[7]

### A.   The Form NDA Prohibits Political Speech Entitled to the Fullest and Most Urgent Constitutional Protection

The Form NDA censors core, constitutionally-protected political speech by prohibiting criticism of the President of the United States. The constitutional protections of speech and the press reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). We protect political speech "because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v Louisiana*, 379 U.S. 64, 74–75 (1964)); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (the right "to inquire, to hear, to speak, and to use information to reach consensus is a precondition to

---

[7] This section focuses on the First Amendment, but, as noted above, the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution." *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991).

enlightened self-government"); *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966) (a major purpose of the First Amendment is "to protect the free discussion of governmental affairs").

The constitutional protections of speech and the press are at their zenith with respect to speech about public officials and candidates for office. "[S]peech on public issues" is generally "entitled to special protection," *Snyder*, 562 U.S. at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)), and the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

Here, the non-disparagement clause acts as a blanket prohibition on speech critical of a public official—speech that lies at the beating heart of the First Amendment. *N.Y. Times Co.*, 376 U.S. at 270; *see* Form NDA ¶ 2. The nondisclosure clause also censors core protected speech, as it prohibits Campaign employees from disclosing any information that President Trump "insists remain private" and "any information with respect to the . . . political affairs . . . of Mr. Trump." Form NDA ¶¶ 1, 6(a).

## B.    The First Amendment's Protections for Political Speech Apply Fully to the Form NDA

Notwithstanding that the Form NDA is ostensibly a contract between private actors, the First Amendment's protections for political speech apply to it with full force for three reasons.

*First*, the Form NDA's restrictions on core protected speech are enforced by the exercise of judicial power. As the Court explained in its landmark decision in *New York Times Co.*, the test for whether there is sufficient state action to trigger the First Amendment's protections "is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." 376 U.S. at 265. Where, as here, limitations on core protected speech

are effectuated by the exercise of judicial power, the Supreme Court has not hesitated to find

state action and interpose First Amendment protections in ostensibly private legal disputes. *See,*

*e.g.*, *Snyder*, 562 U.S. 443; *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988); *Phila.*

*Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); *N.Y. Times Co.*, 376 U.S. at 279–80, 284.

Even outside the context of core political speech, the Second Circuit has held that the

enforcement of a "private contract" that operates to enjoin protected speech "implicates free

speech concerns" and triggers First Amendment protection. *Ronnie Van Zant, Inc. v. Cleopatra*

*Records, Inc.*, 906 F.3d 253, 257 (2d Cir. 2018).[8, 9]

*Second*, the Form NDA is enforced by the President's political campaign with his overt

encouragement and for his political benefit. The Supreme Court has "treated a nominally private

entity as a state actor when it is controlled by an agency of the State," "when government is

entwined in its management or control," "when the State provides significant encouragement,

either overt or covert," or "when a private actor operates as a willful participant in joint activity

---

[8] To hold that there is no state action here would permit candidates and public officials to end-run the protections for core political speech established in *New York Times Co.* Consider the Form NDA. It permits an arbitrator to impose significant financial penalties on any signer who criticizes the current President who is running for reelection, without regard to whether the signer's statement is an opinion, a true statement of fact, or a defamatory remark made with actual malice. *See* Form NDA ¶¶ 1–2, 7–8; SMF ¶¶ 39, 41. Unlike cases in which a plaintiff seeks to use a contract or generally applicable state-law doctrine to obtain damages unrelated to their reputation, the Form NDA allows the Campaign—and the President, *see infra*—to recover damages for the mere utterance of protected speech. *Cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 664 (1991) (generally applicable promissory estoppel doctrine does not violate the First Amendment where a plaintiff does not seek to evade the constitutional standard for libel or defamation); *Ronnie Van Zant, Inc.*, 906 F.3d at 257 (suggesting that the First Amendment would apply to a private contract involving defamation-like claims by public officials).

[9] *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), does not hold to the contrary. In *Cohen*, the Supreme Court held that a state court's enforcement of a litigant's quasi-contractual promissory estoppel claim in a manner alleged to restrict First Amendment rights *did* constitute state action; it did not hold that a state court's enforcement of a contract under state law in a manner alleged to violate the First Amendment does not amount to state action. *Cohen*, 501 U.S. at 668.

with the State or its agents." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (internal quotation marks and alterations omitted). Each of those factors are present here. The Trump Campaign is controlled by the President of the United States, who is entwined in its management. *See, e.g.*, Andrew Restuccia & Rebecca Ballhaus, *Trump Replaces Campaign Manager*, Wall St. J. (July 15, 2020), https://www.wsj.com/articles/trump-replaces-campaign-manager-11594861502. And the President offers overt and significant encouragement to the Campaign to enforce the Form NDA, *see* SMF ¶¶ 17, 21, which it willingly does. Indeed, taking the President at his own word, he has stated "*I* am currently suing various people for violating their confidentiality agreements." SMF ¶ 17 (emphasis added).

*Third*, the Form NDA explicitly grants the President the right to enforce the contract himself. The Form NDA's third-party beneficiary clause designates President Trump as a "third party beneficiary" of the agreement and provides that "Mr. Trump . . . will be entitled to the benefit of this agreement and to enforce this agreement." Form NDA ¶ 7(d). Together with the open-ended non-disparagement and nondisclosure clauses, the Form NDA (1) prevents signers from ever criticizing the President or disclosing information he unilaterally deems private, (2) gives the President the unilateral right to determine whether a signer violates the agreement, and (3) empowers the President to sue individuals for violating the agreement. That sort of "government-defined," "government-enforced restriction on government-critical speech" plainly triggers First Amendment protection. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 224 (4th Cir. 2019); *see generally* Daniel J. Solove & Neil M. Richards, *Rethinking Free Speech and Civil Liability*, 109 Colum. L. Rev. 1650, 1668 (2009) ("[T]he state can censor just as effectively through legal forms that are private as it can through ones that are public.").

In sum, First Amendment protections for political speech apply fully to the Form NDA, a contract that purports to limit core political speech about the President of the United States, is effectuated by judicial decree, is enforced by the Campaign at the President's encouragement for his benefit, and which the President himself retains the right to enforce directly.

### C.      The Form NDA's Purported Waiver of Free Speech Rights Is Unenforceable

At their core, the Form NDA provisions at issue in this lawsuit purport to be a waiver of the employee's First Amendment rights. As such, and because the rights at issue implicate core political speech, that waiver must meet an exacting standard in order to be enforceable under the First Amendment and the New York State Constitution. As a matter of law, such a waiver is only enforceable if (1) "it was made knowingly and voluntarily" *and* (2) "the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement." *Overbey*, 930 F.3d at 223. Here, neither condition is met.

First, the waiver was not knowing and voluntary. The Supreme Court has held that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights" and must "not presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). At a minimum, "a waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972); *see also Morris v. N.Y.C. Emps.' Ret. Sys.*, 129 F. Supp. 2d 599, 608–09 (S.D.N.Y. 2001). Here, the Form NDA says nothing of the Constitution or the First Amendment, and it is far too broad, too vague, and too indefinite to constitute a knowing and voluntary waiver. *See supra* at pp. 14–15. Moreover, the Form NDA is unconscionable, *see supra* at pp. 18–20, and therefore does not satisfy the constitutional standard of "voluntary," *see Fuentes*, 407 U.S. at 95.

Second, any interest in enforcing the Form NDA's waiver is outweighed by the harm to public debate about the President of the United States and a candidate for office. Our profound

national commitment to public debate on public issues weighs strongly against enforcing a waiver of speech rights about public officials, *Overbey*, 930 F.3d at 223–24 (citing *New York Times Co.*, 376 U.S. at 270)*.* So does the First Amendment's prohibition on allowing government officials to regulate speech. *Id.* On the other side of the scale, there is no policy interest sufficient to outweigh the harm to speech imposed by the Form NDA. While there are legitimate policy reasons for enforcing contracts generally, and even reasonable nondisclosure and non-disparagement agreements, the Form NDA is beyond the pale, given (1) the importance of the core political speech that the Form NDA seeks to restrict, and (2) the indefensibly broad scope of speech the Form NDA covers. On its face, the Form NDA is a mechanism for muzzling and punishing political dissent. No generalized interest in the enforcement of contracts can justify enforcing such terms.[10]

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court grant their motion for summary judgment, declare the Form NDA void and unenforceable in its entirety, and enter an injunction preventing the Campaign and any other individual and entity entitled to enforce the contract from enforcing, attempting to enforce, and/or threatening to enforce the Form NDA.

---

[10] All apart from the Form NDA's failure to meet the requisite standard for waiver of First Amendment rights, it is likely impermissible for political candidates to legally require campaign workers to forever waive their right to engage in protected speech as a condition of employment. While, to Plaintiffs' knowledge, the issue has not been adjudicated in the context of a campaign for public office, the Supreme Court has held that public officials cannot condition public employment on an individual waiving their First Amendment rights in their capacities as private citizens, citing its "responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). To permit political campaigns to silence speech through contracts like the Form NDA—and particularly to use non-disparagement clauses like the one in the Form NDA—would directly undermine that precedent, allowing future public officials to gag future public employees and a wide swath of former workers in ways the candidate could never do once in office.

Dated: July 30, 2020                                   Respectfully Submitted,

                                                      By: /s/ John Langford

David A. Schulz
Joseph Slaughter
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6103
Fax: (212) 223-1942
Email: schulzd@ballardspahr.com
Email: slaughterj@ballardspahr.com

David K. Bowles
BOWLES & JOHNSON PLLC
14 Wall Street, 20th Floor
New York, New York 10005
Tel. (212) 390-8842
Fax (866) 844-8305
Email: David@BoJo.Law

John Langford (JL-2367)
UNITED TO PROTECT DEMOCRACY, INC.
555 W. 5th St.
Los Angeles, CA 90013
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: john.langford@protectdemocracy.org

Brittany Williams*
UNITED TO PROTECT DEMOCRACY, INC.
1900 Market St., 8th Fl.
Philadelphia, PA 19103
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: brittany.williams@protectdemocracy.org

Anne Tindall*
UNITED TO PROTECT DEMOCRACY, INC.
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Fax: (929) 777-8428
Email: anne.tindall@protectdemocracy.org

*Counsel for Plaintiffs*

\* Motion for admission *pro hac vice* forthcoming