# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

JESSICA DENSON, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

> *Plaintiffs,*

> *v.*

DONALD J. TRUMP FOR PRESIDENT, INC.,

> *Defendant.*

Case No. 1:20-cv-04737-PGG

## BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR
## FREEDOM OF THE PRESS AND 16 MEDIA ORGANIZATIONS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Katie Townsend
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: (202) 795.9300
Facsimile: (202) 795.9310
Email: ktownsend@rcfp.org

*Counsel of Record for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

The First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of Gannett Co., Inc.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

The National Press Club Journalism Institute is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The New York News Publishers Association has no parent company and issues no stock.

New York Public Radio is a privately supported, not-for-profit organization that has no parent company and issues no stock.

The News Leaders Association has no parent corporation and does not issue any stock.

The Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ............................................................ i

TABLE OF AUTHORITIES .................................................................................... iv

INTEREST OF AMICI CURIAE ............................................................................. 1

INTRODUCTION .................................................................................................... 2

ARGUMENT ........................................................................................................... 3

      I.      The news media's access to sources within political campaigns is critical to their ability to fairly and accurately report on candidates for public office. ................... 3

      II.     The Form NDA is unenforceable and contrary to public policy because it impedes the public's First Amendment right to receive information. .................................. 7

CONCLUSION ........................................................................................................ 11

APPENDIX A ........................................................................................................... 12

CERTIFICATE OF SERVICE ................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Carey v. Brown*, 447 U.S. 455 (1980)..................................................................................... 9

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 230 F. Supp. 2d 439 (S.D.N.Y. 2002) ........................... 8

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ................................................................. 9

*Connick v. Myers*, 461 U.S. 138 (1983)................................................................................ 9

*Cowles v. Brownell*, 540 N.Y.S.2d 973 (N.Y. 1989)............................................................. 8

*Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390 (9th Cir. 1991) .......................... 8

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ................................ 9

*Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989)................................................. 10

*Figari v. N.Y. Tel. Co.*, 303 N.Y.S.2d 245 (N.Y. App. Div. 1969) ............................................. 9

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...................................................... 9

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .......................................................................... 9

*Holmes v. Winter*, 22 N.Y.3d 300 (N.Y. 2013) ....................................................................... 3

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ................................................................... 7

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971).................................................................... 10

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).......................................................... 3, 7, 10

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ...................................................... 9

*Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019) ............................................. 8, 9

*Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ......................................................... 7

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)................................................... 4

*Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253 (2d Cir. 2018) ...................... 7, 8

*Snyder v. Phelps*, 562 U.S. 443 (2011)................................................................................ 7

*Stanley v. Georgia*, 394 U.S. 557 (1969).............................................................................. 9

*Time v. Hill*, 385 U.S. 374 (1967)........................................................................................ 7

*Town of Newton v. Rumery*, 480 U.S. 386 (1987) .................................................................. 8

*Trump v. Trump*, No. 22020-51585, 2020 WL 4212159 (N.Y. Sup. Ct. July 13, 2020)................ 7

*United States v. Ready*, 82 F.3d 551 (2d. Cir. 1996) .............................................................. 8

**Constitutions**

N.Y. Const. art. I, § 8.......................................................................................................... 3

## Other Authorities

Chris Cillizza, Donald Judd & Daniella Diaz, *What Life Is Like for a Reporter on the Campaign Trail*, CNN (June 3, 2019, 12:33 PM), https://perma.cc/4T6C-K2LX ...................................... 4

Claire Trageser, *Second Campaign Staffer Accuses GOP Congressional Candidate Carl DeMaio of Sexual Harassment*, KPBS (Nov. 2, 2014), https://perma.cc/9FT5-GTEZ .......................... 5

Daniel J. Solove & Neil M. Richards, *Rethinking Free Speech and Civil Liability*, 109 Colum. L. Rev. 1650, 1668 (2009) ............................................................................................ 8

David Gambacorta & Angela Couloumbis, *Ex-Staffers: Sen. Daylin Leach Crossed Line with Sex Talk, Inappropriate Touching*, Phila. Inquirer (Dec. 17, 2017), https://perma.cc/JL3D-EQ5B. 5

David Jackson, *Donald Trump: Aide-Turned-Author Cliff Sims Violated Non-Disclosure Agreement,* USA Today (Jan. 29, 2019), https://perma.cc/5VUA-VQH7 .............................. 10

*Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium/ ................... 2

Jim Rutenberg, Marilyn W. Thompson, David D. Kirkpatrick & Stephen Labaton, *For McCain, Self-Confidence on Ethics Poses Its Own Risk*, N.Y. Times (Feb. 21, 2008), https://perma.cc/8VR9-JNXY ..................................................................................... 4

Ken Klippenstein, *Exclusive: Leaked Bloomberg Campaign NDA Protects Abusive Bosses*, The Nation (Feb. 19, 2020), https://tinyurl.com/t4dvnmk. ....................................................... 6

*Memo to White House Staff: Keep Talking*, The Economist (Mar. 22, 2018), https://perma.cc/9XPW-RV6E ...................................................................................... 5

Reid J. Epstein, *How People of Color Inside the Buttigieg Campaign Sought to Be Heard*, N.Y. Times (Jan. 28, 2020), https://perma.cc/3ZBU-9EQ5 ............................................................ 5

Restatement (Second) of Contracts (1981) ............................................................................ 8

Scott Horsley, *Trump Campaign Targets Omarosa Manigault Newman Over Tell-All Book*, NPR (Aug. 14, 2018), https://perma.cc/F955-T429 ........................................................... 10

Susan K. Livio, *Angry Murphy Official Threw Chair During Campaign, Sources Say. Workplace Had 'Toxic' Issues.*, NJ.com (Oct. 19, 2018), https://perma.cc/JL2J-ZXSX ........................... 6

Ted Sherman, *Why Murphy Campaign Workers Still Must Keep Their Mouths Shut*, NJ.com (Feb. 11, 2019), https://perma.cc/NSP6-ZL6W ........................................................................ 6

The Essentials of Reuters Sourcing, Reuters, https://perma.cc/97B6-JBZS .................................. 4

Veronica Stracqualursi, *Former Trump Campaign Staffer Drops Lawsuit But Stands by Claims He Forcibly Kissed Her,* CNN (Sept. 5, 2019), https://perma.cc/TV7S-MKMB..................... 10

## INTEREST OF AMICI CURIAE[1]

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), The E.W. Scripps Company, the First Amendment Coalition, Gannett Co., Inc., the International Documentary Assn., The Media Institute, MediaNews Group Inc., the National Press Club Journalism Institute, The National Press Club, the National Press Photographers Association, the New York News Publishers Association, New York Public Radio, The News Leaders Association, the Online News Association, the Society of Environmental Journalists, the Society of Professional Journalists, and the Tully Center for Free Speech.

Lead amicus the Reporters Committee is an unincorporated nonprofit association, founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.[2]

Amici respectfully submit this brief in support of Plaintiffs' Motion for Summary Judgment.  Plaintiffs challenge under the First Amendment, Article 1, Section 8 of the New York Constitution, and on other grounds the exceedingly broad nondisclosure agreement ("NDA") that Defendant Donald J. Trump For President, Inc. routinely required employees, contractors, and volunteers to sign during the 2016 election campaign (the "Form NDA").  *See* Pls.' Mem. of Law in Supp. of Pls.' Mot. for Summ. J. 2 ("Ms. Denson was not alone—at least two other Campaign employees, and likely dozens, if not hundreds, more, were required to sign the same

---

[1]     No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.  Plaintiffs and Defendant consent to the filing of this brief.

[2]     Full descriptions of the other amici are included below as Appendix A.

Form NDA.").  The Form NDA prohibits Plaintiffs from disclosing any information "that Mr. Trump insists remain private" and from "demean[ing] or disparag[ing] publicly" President Trump, any member of his family, and any of his or his family's companies. *Id.* at 2–3.  The Form NDA contains no temporal or geographical limitations.  *See id.*

Sources from within political campaigns are critical to political reporting.  Journalists rely on interviews with current and former campaign sources, like Plaintiffs, to gather news and report on candidates for public office and elected officials.  Journalists therefore depend upon the constitutional and common-law protections guaranteed under federal and state law to ensure that campaign sources can speak freely about matters of the utmost importance in a democracy: elections and the candidates who participate in them.  Overly broad nondisclosure agreements like the Form NDA interfere with the First Amendment rights of the press and public to receive such information.

**INTRODUCTION**

NDAs can have a particular and substantial impact on the integrity of the newsgathering process.  Journalists necessarily rely on sources to provide information, and many sources already face potential retaliation, including loss of employment, risk of physical harm, or the threat of criminal or civil liability, for speaking with reporters.  *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium/ (last visited Aug. 5, 2020).  The Form NDA, if permissible, would expose political campaign employees to an intolerable risk of civil liability for speaking publicly about the campaigns and candidates for whom they have worked.

News reports based on information from campaign sources allow the public to properly evaluate the character and fitness of candidates for public office.  Campaign sources can offer

journalists—and therefore, the public—accurate and independent insight beyond a candidate's carefully curated image and messaging.  Campaign sources may also reveal misconduct or wrongdoing.  Over the past several election cycles, journalists have relied on campaign sources to report on, among other topics, the relationships between candidates and lobbyists and accusations of sexual harassment.

NDAs, and their concomitant threat of civil liability, necessarily chill the speech of those bound by them.  In doing so, these agreements interfere with the public's First Amendment right to receive information.  Where they restrict the flow of information about matters of immense public concern, the constitutional ramifications are more acute.  The Form NDA challenged here is overly broad, with almost no limitation on subject-matter, time, or geography, and it interferes with journalists' and the public's First Amendment right to receive information from campaign sources like Plaintiff.  Amici urge the court to hold that the Form NDA is void and unenforceable as against public policy.

## ARGUMENT

I.      **The news media's access to sources within political campaigns is critical to their ability to fairly and accurately report on candidates for public office.**

The First Amendment manifests "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  And the guarantee of Article 1, Section 8 of the New York Constitution that "[e]very citizen may freely speak, write or publish his or her sentiments" enshrines a "long tradition, with roots dating back to the colonial era, of providing the utmost protection of freedom of the press." *Holmes v. Winter*, 22 N.Y.3d 300, 307–08 (N.Y. 2013) (quoting N.Y. Const. art. I, § 8).  These constitutional provisions reflect the recognition that as "surrogates for the public," the press plays a crucial role in ensuring that citizens are informed

3

about matters of national interest and public import.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).  It fulfills that role, in part, by relying on sources within organizations and close to individuals who participate in civic life.

Campaign workers, in particular, are vital sources of information for political correspondents who cover elections at every level of government.  Indeed, reporters often "embed" themselves with specific campaigns to gather information about candidates for public office, including from campaign staff.  *See, e.g.*, Chris Cillizza, Donald Judd & Daniella Diaz, *What Life Is Like for a Reporter on the Campaign Trail*, CNN (June 3, 2019, 12:33 PM), https://perma.cc/4T6C-K2LX (describing how political reporters serving as "campaign embeds" are in constant contact with campaign staff).  Journalists often corroborate news reports about candidates and campaigns by speaking to multiple sources, *see* The Essentials of Reuters Sourcing, Reuters, https://perma.cc/97B6-JBZS (advising that single source stories should be a rare exception) (last visited Aug. 4, 2020), a critical tenet of journalism that is made more difficult when, as is the case here, many members of an organization are subject to an NDA.

Campaign sources may relate instances of a candidate's questionable judgment, misconduct, wrongdoing, or managerial shortcomings—all of which can assist the public in evaluating that candidate's fitness for elected office.  For example, journalists relied on several former campaign advisers to then-presidential candidate John McCain in reporting on his controversial relationships with lobbyists.  Jim Rutenberg, Marilyn W. Thompson, David D. Kirkpatrick & Stephen Labaton, *For McCain, Self-Confidence on Ethics Poses Its Own Risk*, N.Y. Times (Feb. 21, 2008), https://perma.cc/8VR9-JNXY.  Likewise, journalists relied on current and former campaign workers to report on the frustration felt by people of color on the campaign staff of then-2020 presidential candidate Pete Buttigieg.  Reid J. Epstein, *How People*

*of Color Inside the Buttigieg Campaign Sought to Be Heard*, N.Y. Times (Jan. 28, 2020),

https://perma.cc/3ZBU-9EQ5.

      In addition, campaign sources have been critical to reporting on allegations of sexual

impropriety by candidates or other campaign workers.  *See, e.g.*, Claire Trageser, *Second*

*Campaign Staffer Accuses GOP Congressional Candidate Carl DeMaio of Sexual Harassment*,

KPBS (Nov. 2, 2014), https://perma.cc/9FT5-GTEZ (reporting on accusations of sexual

harassment by two former campaign staff members against a candidate for the House of

Representatives); David Gambacorta & Angela Couloumbis, *Ex-Staffers: Sen. Daylin Leach*

*Crossed Line with Sex Talk, Inappropriate Touching*, Phila. Inquirer (Dec. 17, 2017),

https://perma.cc/JL3D-EQ5B (citing, among others, several former campaign staff members in a

report on sexually inappropriate touching and remarks by a Pennsylvania state senator).  Many of

these stories may never have come to light had the campaign workers involved been required to

sign NDAs.

      Campaign NDAs are a relatively new phenomenon.  *See Memo to White House Staff:*

*Keep Talking*, The Economist (Mar. 22, 2018), https://perma.cc/9XPW-RV6E (explaining that

the first known use of campaign NDAs occurred during the 2008 presidential election).  They

have not necessarily been widely adopted, even by individuals running for president; former

campaign staff members for both Ted Cruz and Marco Rubio during their respective 2016

presidential campaigns reported that they never signed any such agreements.  *Id.*

      When political campaigns require campaign staff to sign NDAs, they chill staff members'

speech and prevent the public from learning vital information about candidates for political

office.  For example, NJ.com reported on complaints by several women of a "toxic" workplace

environment during New Jersey Governor Phil Murphy's 2017 gubernatorial campaign.  Ted

Sherman, *Why Murphy Campaign Workers Still Must Keep Their Mouths Shut*, NJ.com (Feb. 11, 2019), https://perma.cc/NSP6-ZL6W.  While some sources spoke anonymously to journalists, Susan K. Livio, *Angry Murphy Official Threw Chair During Campaign, Sources Say. Workplace Had 'Toxic' Issues.*, NJ.com (Oct. 19, 2018), https://perma.cc/JL2J-ZXSX, they also reported that other others were "afraid to step forward because of the legal restrictions that prohibit them from commenting."  Sherman, *supra.*  In another example, a campaign staff member of former presidential candidate Michael Bloomberg anonymously reported that the NDAs he required all staff members to sign made "people paranoid."  Ken Klippenstein, *Exclusive: Leaked Bloomberg Campaign NDA Protects Abusive Bosses*, The Nation (Feb. 19, 2020), https://tinyurl.com/t4dvnmk.

The Form NDA has a similar chilling effect on newsgathering.  It prohibits Plaintiffs from disclosing any information "that Mr. Trump insists remain private" and from "demean[ing] or disparag[ing] publicly" President Trump, any member of his family, and any of his or his family's companies.  Decl. of Lead-Pl. Jessica Denson in Supp. of Pls.' Mot. for Summ. J. Ex. A, at 3–4 ("Denson Decl.").  The Form NDA also appears to attempt to specifically restrain those who sign it from speaking to journalists, as it prohibits "assist[ing] others in obtaining, disclosing, disseminating, or publishing Confidential Information" and prohibits employees from "saving, storing and memorializing" information that would "disparage" Mr. Trump, his companies, or family members.  *Id.* at 2–3.  In addition, because the Form NDA is not limited in time, it continues to prevent former campaign staff members from speaking negatively about President Trump even now that he holds the highest elected office in the United States.  *See id.*

In short, overly broad campaign NDAs like the Form NDA muzzle campaign employees, who are uniquely situated to provide critical—and timely—insight into political candidates and

their campaigns.  The Form NDA and Campaign NDAs generally thus undermine the ability of journalists to inform the electorate about candidates for public office.

## II.     The Form NDA is unenforceable and contrary to public policy because it impedes the public's First Amendment right to receive information.

The First Amendment limits the relief a court may grant in disputes between private parties because a court's relief is itself state action triggering First Amendment protection.[3]  *See Sullivan*, 376 U.S. at 265 (holding that the test for whether First Amendment protections apply to state action "is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."); *see also Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) (finding First Amendment violation in private libel suit where burden of proving truth rested on defendant); *Snyder v. Phelps*, 562 U.S. 443, 460 (2011) (barring intentional infliction of emotional distress claim by private figure based on lawful speech on matter of public concern); *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (barring intentional infliction of emotional distress claim by public figure based on non-libelous parody); *Time v. Hill*, 385 U.S. 374, 397 (1967) (limiting ability of private figure plaintiffs to bring claim under New York right to privacy law); *Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253, 257 (2d Cir. 2018) (noting that private contract permitting protected speech to be enjoined "implicates free speech concerns"); *Trump v. Trump*, No. 22020-51585, 2020 WL 4212159, at *14 (N.Y. Sup. Ct. July 13, 2020) (holding that the "circumstance[]" of a private party becoming a public official relevant to whether a contract "would offend public policy")

---

[3]     Amici agree with Plaintiffs that the New York Constitution also applies and that the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution." Pls.' Mem. of Law 20 n.7 (quoting *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991) (internal quotation omitted)).

(internal quotations omitted); *cf. Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability*, 109 Colum. L. Rev. 1650, 1668 (2009) ("[I]t is important to note that sometimes the state can censor just as effectively through legal forms that are private as it can through ones that are public.").

Contractual limitations on speech, particularly speech about public affairs, are therefore "unenforceable and void" if they harm the "strong public interests rooted in the First Amendment." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 222 (4th Cir. 2019); *see also Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1396 (9th Cir. 1991); *cf. Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." (citing Restatement (Second) of Contracts § 178 (1981))); *United States v. Ready*, 82 F.3d 551, 559 (2d. Cir. 1996) (finding ambiguous plea agreement did not waive right to appeal illegal sentence based on Restatement's public policy balancing approach), *superseded on other grounds, United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013); *Cowles v. Brownell*, 540 N.Y.S.2d 973, 975 (N.Y. 1989) (finding release of civil rights claims in return for dismissal similar to release-dismissal agreement in *Rumery* unenforceable as contrary to public policy). Although *Overbey* involved a settlement agreement between a government entity and private party, the Second Circuit has held that private contracts purporting to restrain protected speech also "implicate[] free speech concerns." *Ronnie Van Zant, Inc.*, 906 F.3d at 257; *see also, e.g., Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 230 F. Supp. 2d 439, 451 (S.D.N.Y. 2002) (adopting magistrate judge's report and recommendation holding that contract between private parties was unenforceable as against public policy).

There is a strong public policy interest against enforcement of NDAs, like the Form

NDA, that undermine the transparency necessary for there to be an informed electorate.  Where

speakers have a constitutionally protected interest in communicating with the public—as

Plaintiff and those similarly situated do here—the public has a corresponding constitutional

interest in receiving those communications.  *See Garrison v. Louisiana*, 379 U.S. 64, 74–75

(1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-

government.").  The overly broad Form NDA not only infringes upon the First Amendment

rights of Plaintiffs to speak freely, but it also infringes upon the First Amendment right of the

press and public to receive information.  *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is

now well established that the Constitution protects the right to receive information and ideas.");

*Figari v. N.Y. Tel. Co.*, 303 N.Y.S.2d 245, 253 (N.Y. App. Div. 1969) (holding that both First

Amendment and Article 1, Section 8 of New York Constitution protect right to receive

information); *see also Overbey*, 930 F.3d at 227 (finding standing for news organization when

non-disparagement clauses prevented willing speakers from speaking to the news media).

Importantly, the Form NDA purports to specifically restrain speech of public concern,

which lies "at the heart of the First Amendment," *Dun & Bradstreet, Inc. v. Greenmoss Builders,

Inc.*, 472 U.S. 749, 758–59 (1985) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765,

776 (1978)), and has been said to occupy the "highest rung of the hierarchy of First Amendment

values."  *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982) (quoting *Carey v.

Brown*, 447 U.S. 455, 467 (1980)).  Speech of public concern is speech that can "be fairly

considered as relating to any matter of political, social, or other concern to the community,"

*Connick v. Myers*, 461 U.S. 138, 146 (1983), or that is a "subject of general interest and of value

and concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).  Courts protect

speech on matters of public concern because "freedom to discuss public affairs and public officials is unquestionably . . . the kind of speech the First Amendment was primarily designed to keep within the area of free discussion." *Sullivan*, 376 U.S. at 296–97.

Campaign sources have information concerning matters of profound public interest. *See* Section I, *supra*; *see also Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971))). Indeed, sources from within the Trump presidential campaign have repeatedly spoken publicly about alleged misconduct of the President and his aides—matters of clear public concern—often risking civil liability for potentially violating their own NDAs in doing so. *See, e.g.*, Scott Horsley, *Trump Campaign Targets Omarosa Manigault Newman Over Tell-All Book*, NPR (Aug. 14, 2018), https://perma.cc/F955-T429 (reporting that campaign's former director of African-American outreach published book exposing Mr. Trump's use of a "racial slur"); David Jackson, *Donald Trump: Aide-Turned-Author Cliff Sims Violated Non-Disclosure Agreement*, USA Today (Jan. 29, 2019), https://perma.cc/5VUA-VQH7 (reporting that former campaign communications aide's book details "back-stabbing among [Mr. Trump] and his aides"); Veronica Stracqualursi, *Former Trump Campaign Staffer Drops Lawsuit But Stands by Claims He Forcibly Kissed Her*, CNN (Sept. 5, 2019), https://perma.cc/TV7S-MKMB (reporting on statement by former campaign staffer that President Trump "forcibly kissed" her). That Defendant has threatened to invoke or actually invoked the NDAs in all these instances underscores that the threat of civil liability posed by the Form NDA is not edentulous. *See id.*; *see also* Pls.' Memo of Law 4–5, 7 (detailing how Defendant, in separate suits, has claimed Plaintiff breached the Form NDA in part by "posting critical statements on her Twitter account"

and that former campaign staffer Omarosa Manigult-Newman did so by saying she would "never" vote for President Trump again).

In sum, the law in New York and around the country is that a contractual provision contrary to public policy is unenforceable and void unless the interests in enforcement outweigh the interests in nonenforcement.  Where, as here, the contract at issue is both exceedingly broad and, as deployed by Defendant, would be vastly suppressive of newsworthy information central to political discourse that the public has a First Amendment right to receive, the Court should hold it unenforceable.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiff's Motion for Summary Judgment.

Dated: August 6, 2020                          Respectfully submitted,

                                         */s/ Katie Townsend*
                                         Katie Townsend
                                         THE REPORTERS COMMITTEE FOR
                                           FREEDOM OF THE PRESS
                                         1156 15th St. NW, Suite 1020
                                         Washington, DC 20005
                                         Phone: (202) 795.9300
                                         Facsimile: (202) 795.9310
                                         ktownsend@rcfp.org

                                         *Counsel of Record for Amici Curiae*

## APPENDIX A

**The E.W. Scripps Company** serves audiences and businesses through local television, with 60 television stations in 42 markets. Scripps also owns Newsy, the next-generation national news network; national broadcast networks Bounce, Grit, Escape, Laff and Court TV; and Triton, the global leader in digital audio technology and measurement services. Scripps serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

The **First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**Gannett** is the largest local newspaper company in the United States. Our 260 local daily brands in 46 states and Guam — together with the iconic USA TODAY — reach an estimated digital audience of 140 million each month.

The **International Documentary Association** (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program

agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**MediaNews Group Inc.** publishes the Mercury News, the East Bay Times, St. Paul Pioneer Press, The Denver Post, the Boston Herald and the Detroit News and other regional and community papers throughout the United States, as well as numerous related online news sites.

The **National Press Club Journalism Institute** is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The **National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

The **New York News Publishers Association** is a trade association which represents daily, weekly and online newspapers throughout New York State. It was formed in 1927 to advance the freedom of the press and to represent the interests of the newspaper industry.

With an urban vibrancy and a global perspective, **New York Public Radio** produces innovative public radio programs, podcasts, and live events that touch a passionate community of 23.4 million people monthly on air, online and in person. From its state-of-the-art studios in New York City, NYPR is reshaping radio for a new generation of listeners with groundbreaking, award-winning programs including Radiolab, On the Media, The Takeaway, and Carnegie Hall Live, among many others. New York Public Radio includes WNYC, WQXR, WNYC Studios, Gothamist, The Jerome L. Greene Performance Space, and New Jersey Public Radio. Further information about programs, podcasts, and stations may be found at www.nypublicradio.org.

**The News Leaders Association** was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019.  It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs democracy.

The **Online News Association** is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

The **Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

The **Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The **Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

**CERTIFICATE OF SERVICE**

I, Katie Townsend, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of Court for the United States District Court for the Southern District of New York using the CM/ECF system on August 6, 2020.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Katie Townsend</u>
Katie Townsend
*Counsel of Record for Amici Curiae*