UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSICA DENSON, individually and on
behalf of all others similarly situated,

                           Plaintiff,

           - against -

DONALD J. TRUMP FOR PRESIDENT,
INC.,

                     Defendant.

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 4737 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Jessica Denson brings this putative class action against Defendant

Donald J. Trump for President, Inc. (the "Campaign"), seeking a declaratory judgment that an

agreement she entered into with the Campaign (the "Employment Agreement") – which contains

non-disclosure and non-disparagement clauses – is void, as well as an injunction prohibiting

enforcement of the non-disclosure and non-disparagement clauses.  Pending before the Court are

the Campaign's motion to dismiss (Dkt. No. 23) and Denson's motion for summary judgment

(Dkt. No. 19).

        For the reasons stated below, the Campaign's motion to dismiss will be denied,

and Denson's motion for summary judgment will be granted to the extent that the Employment

Agreement's non-disclosure and non-disparagement provisions (Employment Agreement (Dkt.

No. 22-1) ¶¶ 1-2) will be declared invalid and unenforceable as to Denson.

## BACKGROUND

I.  **FACTS**[1]

    A.  **Denson's Employment and the Agreement**

In August 2016 – soon after Donald J. Trump was selected as the Republican Party's nominee for the office of President of the United States – Denson applied to work for the Campaign, and was hired as a national phone bank administrator.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶¶ 6-7, 9; Def. R. 56.1 Cntrstmt. (Dkt. No. 35) at 3-4)  Prior to beginning work, the Campaign required Denson – along with other Campaign employees – to sign the Employment Agreement, a form contract that contains non-disclosure and non-disparagement clauses.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶¶ 10-11)  Denson remained an employee of the Campaign until November 10, 2016.  (Id. ¶ 12)

The Employment Agreement provides as follows:

During the term of your service and at all times thereafter you hereby promise and agree:

a. not to disclose, disseminate or publish, or cause to be disclosed, disseminated or published, any Confidential Information;

b. not to assist others in obtaining, disclosing, disseminating, or publishing Confidential Information;

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where the Campaign disputes Denson's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the Campaign's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

c. not to use any Confidential Information in any way detrimental to the Company, Mr. Trump, any Family Member, any Trump Company or any Family Member Company;

d. not to save, store or memorialize any Confidential Information (including, without limitation, incorporating it into any storage device, server, Internet site or retrieval system, whether electronic, cloud based, mechanical or otherwise) except as may be expressly required in connection with the performance of services to the Company;

e. to (i) provide the Company with written notice of any legal obligation to disclose any Confidential Information as soon as you become aware of such obligation, (ii) not make any disclosure notwithstanding such obligation until the Company (or the appropriate Trump Person) has had a reasonable opportunity to seek an appropriate protective order or similar relief, (iii) fully cooperate and join with the Company (and the appropriate Trump Person) in any request for a protective order or similar relief, (iv) exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information in the event no such protective order or similar relief is obtained, whether because it has been denied or because the Company (or the appropriate Trump Person) has elected not to seek it, and [(v)] under all circumstances, not furnish any greater portion of the Confidential Information than you are advised by counsel is absolutely legally required to be disclosed by you or furnish any Confidential Information to any individual, company or governmental entity other than the one to whom or to which you are absolutely legally required to disclose it; and

f. promptly upon the request, whenever made, of the Company, (i) return to the Company all Confidential Information furnished to you, together with all copies, abstracts, notes, reports, or other materials furnished to, or otherwise obtained by, you or prepared by you or on your behalf, without retaining copies, extracts or other reproductions, whether physical, electronic, cloud based or otherwise, in whole or in part, (ii) destroy all documents, memoranda, notes or other writings prepared by you or anyone on your behalf that are based upon the Confidential Information, and (iii) acknowledge such destruction in writing to Company.

The foregoing provisions each apply to Confidential Information and disclosure, dissemination, publication, use and effort to help others obtain, saving, storing and memorializing of Confidential Information, as applicable, (i) by any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized,

(iv) in any language, or (v) in any country or other jurisdiction (collectively, the "**Restricted Means and Contexts**").

(Employment Agreement (Dkt. No. 22-1) ¶ 1) (emphasis in original).[2]

The Employment Agreement defines "Confidential Information" as

all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

(Id. ¶ 6(a))

The Employment Agreement defines "Family Member" as

any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

(Id. ¶ 6(b))

The Employment Agreement defines "Family Member Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member."  (Id. ¶ 6(c))  The Agreement defines "Trump Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump." (Id. ¶ 6(f))  And the Agreement defines "Trump Person" as "each of Mr. Trump, each Family

---

[2]  As used in the Employment Agreement, the term "Company" refers to the Campaign.  (See Employment Agreement (Dkt. No. 22-1) at 1, 6)

Member, each Trump Company (including but not limited to the Company) and each Family

Member Company."  (<u>Id.</u> ¶ 6(g))

      As to non-disparagement, the Employment Agreement provides as follows:

> During the term of your service and at all times thereafter you hereby promise and
> agree not to demean or disparage publicly the Company, Mr. Trump, any Trump
> Company, any Family Member, or any Family Member Company or any asset
> any of the foregoing own, or product or service any of the foregoing offer, in each
> case by or in any of the Restricted Means and Contexts and to prevent your
> employees from doing so.

(<u>Id.</u> ¶ 2)

      As to remedies for breach of the Employment Agreement, the Agreement

provides as follows:

    a.  <u>Consent to Injunction</u>.  A breach of any of your promises or agreements under this
agreement will cause the Company, Mr. Trump and each other Trump Person
irreparable harm.  Accordingly, to the extent permitted by law, and without waiving
any other rights or remedies against you at law or in equity, you hereby consent to the
entry of any order, without prior notice to you, temporarily or permanently enjoining
you form violating any of the terms, covenants, agreements or provisions of this
agreement on your part to be performed or observed.  Such consent is intended to
apply to an injunction of any breach or threatened breach.

    b.  <u>Agreement to Indemnify</u>.  You hereby agree to indemnify, defend (with counsel
acceptable to the Trump Person you are defending) and hold harmless each Trump
Person from and against any claim, demand, suit, proceeding, damages, cost, loss or
expense of any kind or nature, including but not limited to reasonable attorneys' fees
and disbursements, incurred by any Trump Person as a consequence of your breach of
any of your promises or agreements in this agreement.

    c.  <u>Damages and Other Remedies</u>.  Notwithstanding anything to the contrary, each
Trump Person will be entitled to all remedies available at law and equity, including
but not limited to monetary damages, in the event of your breach of this agreement.
Nothing contained in this agreement will constitute a waiver of any Trump Person's
remedies at law or in equity, all of which are expressly reserved.

    d.  <u>Third Party Beneficiaries</u>.  Mr. Trump and each Family Member, Trump Company
and Family Member Company is an intended third party beneficiary of this
agreement.  Without limiting the preceding sentence, Mr. Trump, each Family
Member, Trump Company and Family Member Company, in addition to the
Company, will be entitled to the benefit of this agreement and to enforce this
agreement.

(<u>Id.</u> ¶ 7)

As to dispute resolution, the Employment Agreement provides that it is to "be interpreted and construed pursuant to the laws of the State of New York[.]"  (<u>Id.</u> ¶ 8)  The Agreement further provides that

> any dispute arising under or relating to this agreement may, at the sole discretion of each Trump Person, be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association, and you hereby agree to and will not contest such submissions.  Judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction.

(<u>Id.</u>)

### B.    The Campaign's Enforcement of the Employment Agreement's <u>Non-Disclosure and Non-Disparagement Provisions</u>

On November 9, 2017, Denson filed a complaint against the Campaign in Supreme Court of the State of New York, New York County, alleging sex discrimination, harassment, and slander.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 24; Denson Decl. Ex. B. (Dkt. No. 22-2))

On December 20, 2017, the Campaign commenced an arbitration proceeding against Denson, claiming that she had "breached confidentiality and non-disparagement obligations contained in a written agreement she executed during her employment with [the Campaign]."  The Campaign claimed that Denson had "breached her obligations by publishing certain confidential information and disparaging statements in connection with a lawsuit she filed against claimant in New York Supreme Court."  (<u>Id.</u> ¶¶ 25-26; Denson Decl. Ex. C (Dkt. No. 22-3) at 2)

On March 19, 2018, in Supreme Court of the State of New York, New York County, the Campaign filed a motion to compel arbitration of certain of Denson's pending claims.  (<u>Id.</u> ¶ 29; Def. R. 56.1 Cntrstmt. (Dkt. No. 35) at 11)  On September 7, 2018, the court

denied the Campaign's motion to compel arbitration.  (Id. ¶ 30; Denson v. Trump, No.

101616/2017, 2018 WL 4352827, at *5-6 (N.Y. Cty. Sup. Ct. Sep. 7, 2018))

On March 26, 2018, Denson filed a complaint in this District, seeking a

declaration that the Employment Agreement is void and unenforceable.  (Id. ¶ 32; Complaint at

2, Denson v. Donald J. Trump for President, Inc., No. 18-CV-2690 (JMF) (S.D.N.Y. Mar. 26,

2018))  On June 4, 2018, the Campaign moved to compel arbitration of Denson's claims in this

second lawsuit.  (Id. ¶ 33; Motion to Compel at 1, Denson v. Donald J. Trump for President, Inc.,

No. 18-CV-2690 (JMF) (S.D.N.Y. June 4, 2018))

The Campaign's arbitration proceeding against Denson – which had been

commenced in December 2017 – proceeded even though Denson did not "meaningfully"

participate.  (Id. ¶¶ 25, 34)  On July 23, 2018, the Campaign submitted an application for an

arbitration award.  (Id. ¶ 35)  In its application, the Campaign alleged that Denson had

"breache[d] her confidentiality and non-disparagement obligations" by filing the state and

federal lawsuits and by making "numerous public statements on the internet . . ., including

[through her Twitter and GoFundMe accounts]."  (Denson Decl., Ex. G (Dkt. No. 22-7) at 4)

On August 30, 2018, Judge Furman granted the Campaign's motion to compel

arbitration of the claims alleged in the federal action.  Denson v. Trump for President, Inc., No.

18-CV-2690 (JMF), 2018 WL 4568430 at *1 (S.D.N.Y. Aug. 30, 2018).

On October 19, 2018, the arbitrator made a partial award to the Campaign of

$24,808.20, finding that Denson had "breached the [Employment Agreement] by disclosing,

disseminating, and publishing confidential information in the Federal Action, and by making

disparaging statements about [the Campaign] and the [Employment Agreement] on the Internet

on her GoFundMe page and on her Twitter account."  (Denson Decl., Ex. J (Dkt. No. 22-10) at

5)  On December 11, 2018, the arbitrator issued a final award against Denson in the amount of $49,507.64.  (Bowles Decl., Ex. Q (Dkt. No. 26-17) at 3; Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 41)

On December 21, 2018, and June 12, 2019, the Campaign moved to have the December 11, 2018 arbitration award confirmed in the Southern District of New York and in New York Supreme Court, respectively.  (Bowles Decl., Exs. R-S (Dkt. Nos. 26-18, 26-19))

On February 20, 2019, Denson submitted a class-arbitration demand to the Campaign.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 46)  In a June 3, 2019 submission, the Campaign asserted that if Denson "wants to proceed with a class action lawsuit, she must file her purported claims in court, rather than with the [American Arbitration Association]."  Defendant's Memorandum in Response to Plaintiff's Supplemental Memorandum at 4, Denson v. Donald J. Trump for President, Inc., No. 18-CV-2690 (JMF) (S.D.N.Y. June 3, 2019).

On July 8, 2019, the New York Supreme Court confirmed the December 11, 2018 arbitration award.  (Bowles Decl., Ex. T (Dkt. No. 26-20))

In a July 23, 2019 order, Judge Furman ruled "that the state-court judgment has preclusive effect in this litigation and is dispositive of the parties' motions."  Accordingly, Judge Furman denied the Campaign's petition to confirm, and Denson's cross-petition to vacate, the December 11, 2018 arbitration award.  Denson v. Donald J. Trump for President, Inc., No. 18-CV-2690 (JMF), 2019 WL 3302608, at *2 (S.D.N.Y. July 23, 2019).

On August 2, 2019, the Campaign served subpoenas and restraining notices on Denson's counsel's escrow accounts in connection with the New York state court judgment stemming from the December 11, 2018 arbitration award.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 50; Def. R 56.1 Cntrstmt. (Dkt. No. 35) at 18)

On February 6, 2020, the Appellate Division, First Department, reversed the state court decision confirming the December 11, 2018 arbitration award, and vacated the award in its entirety.  Denson v. Donald J. Trump for President, Inc., 180 A.D.3d 446, 446 (1st Dept. 2020).

### C. The Campaign's Enforcement of the Employment Agreement's Non-Disclosure and Non-Disparagement Provisions Against Others

The Campaign has brought claims for arbitration against other former Campaign workers for alleged breaches of the Employment Agreement (or similar non-disclosure agreements).

On August 14, 2018, former Campaign employee Omarosa Manigault Newman published a book entitled Unhinged:  An Insider's Account of the Trump White House.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 14)  That same day, the Campaign commenced an arbitration proceeding against Newman for breaches of a non-disclosure agreement.  (Id. ¶ 15)

On August 31, 2019, President Trump tweeted,

> ...Yes, I am currently suing various people for violating their confidentiality agreements.  Disgusting and foul mouthed Omarosa is one.  I gave her every break, despite the fact that she was despised by everyone, and she went for some cheap money from a book.  Numerous others also!

(Id. ¶ 17 (ellipsis in original))

On January 29, 2019, former Campaign employee Cliff Sims published a book entitled Team of Vipers.  (Id. ¶ 19)  That same day, the Campaign's then-Chief Operating Officer Michael Glassner tweeted that the Campaign was "preparing to file suit against Cliff Sims for violating our NDA."  (Id. ¶ 20; Bowles Decl., Ex. N (Dkt. No. 26-14))  That same day, President Trump tweeted, "[a] low level staffer that I hardly knew named Cliff Sims wrote yet another boring book based on made up stories and fiction.  He pretended to be an insider when in fact he was nothing more than a gofer.  He signed a non-disclosure agreement.  He is a mess!" (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 21; Bowles Decl., Ex. O (Dkt. No. 26-15))

On February 25, 2019, former Campaign employee Alva Johnson filed a lawsuit against President Trump alleging battery and unequal pay based on gender and race.  Complaint, Johnson v. Trump, 19 Civ. 475 (WFJ) (M.D. Fla. Feb. 25, 2019).  In September 2019, CNN reported that Johnson had dropped her lawsuit, and quoted President Trump's attorney Charles Harder as asserting that Johnson had committed "numerous breaches" of her non-disclosure agreement.  According to CNN, Harder stated that "[t]he President and Campaign are weighing their legal options against Ms. Johnson at this time, and have demanded that she reimburse them for the attorneys' fees and costs they incurred in her failed lawsuit."  (Bowles Decl., Ex. P (Dkt. No. 26-16) at 2)[3]

In an August 21, 2020 letter to this Court, Johnson's attorney – Hassan Zavareei – states that an "arbitration proceeding remains pending" against Johnson in which the "Campaign alleges that Ms. Johnson violated the form NDA – which is identical to the NDA that is at issue in the case before [this Court] – when she and her attorneys made statements about her lawsuit . . . ."  (Aug. 21, 2020 Zavareei Ltr. (Dkt. No. 40))  In an August 25, 2020 letter, the Campaign reports that it is engaged in a confidential arbitration proceeding with Johnson.  The Campaign does not dispute that the arbitration proceeding is premised on a non-disclosure agreement identical to the Employment Agreement.  (Aug. 25, 2020 Def. Ltr. (Dkt. No. 41))

## II.    <u>PROCEDURAL BACKGROUND</u>

The Complaint was filed on June 1, 2020, in Supreme Court of the State of New York, New York County, and was removed to this District on June 19, 2020.  (Not. of Removal (Dkt. No. 1))

---

[3]  The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

In a June 22, 2020 letter, Denson requested permission "to immediately serve targeted interrogatories designed to elicit basic information regarding the nature of the class," including "how many individuals signed the same Form NDA, or a version thereof, and whether those contracts materially differ from one another."  (June 22, 2020 Pltf. Ltr. (Dkt. No. 10) at 4)  On June 25, 2020, this Court denied Denson's motion.  (Dkt. No. 12)

On July 9, 2020, this Court conducted an initial pretrial conference and issued a briefing schedule concerning the instant motions.  (Dkt. No. 18)

On July 30, 2020, Denson moved for summary judgment (Dkt. No. 19), and the Campaign moved to dismiss.  (Dkt. No. 23)

## DISCUSSION

### I.   LEGAL STANDARDS

#### A.   Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.1(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'"  Eviner v. Eng, No. 13-CV-6940-ERK, 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

**B.**     **The Declaratory Judgment Act**

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  28 U.S.C. § 2201(a).  The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'"  Peconic Baykeeper, Inc. v. Suffolk Cty., 600 F.3d 180, 187 (2d Cir. 2010) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

"By its very language, the Declaratory Judgment Act makes clear that a court must have subject matter jurisdiction over a case on some other basis before it may grant declaratory or injunctive relief."  Fraternal Order of Police, Nat'l Labor Council, USPS No. 2 v. U.S. Postal Serv., 988 F. Supp. 701, 705 (S.D.N.Y. 1997) (citing Skelly Oil Co. v. Phillips

Petroleum Co., 339 U.S. 667, 671-72 (1950); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1110 (2d Cir. 1997)).  "The Declaratory Judgment Act is not an independent source of federal subject matter jurisdiction."  Id.

Here, this Court has federal question jurisdiction, because Plaintiff claims that the Employment Agreement violates her First Amendment rights.  (Cmplt. (Dkt. No. 1-1) ¶¶ 156-61)

### C.   **Standing**

Standing is, of course, "an essential component of subject matter jurisdiction," Gosain v. Texplas India Private Ltd., 393 F. Supp. 3d 368, 374 (S.D.N.Y. 2019), and it is well established that "'[a] plaintiff must demonstrate standing for each claim and form of relief sought.'"  Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (quoting Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).  "Because standing is jurisdictional under Article III of the United States Constitution, it is a threshold issue in all cases[,] since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991) (internal citation omitted).

> [T]he "irreducible constitutional minimum" of standing consists of three elements.  Lujan [v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)].  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  Id., at 560-561 . . .; Friends of the Earth, Inc. [v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)].  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.  FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 . . . (1990).

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  "The elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court."  Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1). "'As a general rule,' this means 'plaintiff must have personally suffered.'" In re the Bear Stearns Cos., Inc. Sec., No. 08 MDL 1963 (RWS), 2016 WL 4098385, at *17 (S.D.N.Y. July 25, 2016) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 107 (2d Cir. 2008)). "Concreteness" refers to an injury that is "real, and not abstract." Spokeo, 136 S. Ct. at 1548 (internal quotation marks omitted).

An injury "'fairly can be traced to the challenged action of the defendant'" where "the exercise of the Court's remedial powers would redress the claimed injuries." Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 74 (1978) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41, 43 (1976)).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, (1975). "While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." Baur, 352 F.3d at 636-37.

14

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim. . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.

Lujan, 504 U.S. at 561 (internal quotation marks omitted).

## II.     THE CAMPAIGN'S MOTION TO DISMISS

The Campaign has moved to dismiss, arguing that Denson lacks standing, and that her claims are barred by collateral estoppel.  (Def. MTD Br. (Dkt. No. 25) at 12-19)

### A.     Whether Denson Has Standing

The Campaign contends that Denson lacks standing, because her "vague and subjective assertion that the Agreement is 'preventing her' from exercising her right to speak freely about the Campaign or President Trump is insufficient to create an actual controversy as a matter of law."  (Id. at 14-15)  The Campaign further contends that Denson "has not (and cannot) identify any action or threatened action being taken against her by the Campaign for any alleged speech, which dooms her declaratory judgment claims as a matter of law."  (Id. at 17)

Denson counters that she has "repeatedly demonstrated an intention to continue engaging in a course of conduct arguably affected with a constitutional interest, but proscribed [by the Employment Agreement]:  namely, criticizing the President, his Administration, his family, his businesses, and the Campaign, and otherwise sharing information that the Campaign has argued and could argue is covered by the [Employment Agreement]."  (Pltf. Opp. Br. (Dkt. No. 32) at 19 (emphasis in original))  Denson further argues that she "and class members [] face a credible threat of enforcement," given (1) the Campaign's efforts to enforce the Employment Agreement against Denson and other former Campaign employees; and (2) the Employment

Agreement "allows individuals and companies other than the Campaign to enforce its terms at any time, forever. . . ." (Id. at 19-20)

Because Denson's First Amendment rights are at issue, the standing inquiry is somewhat relaxed; Denson need only show that she "has 'an actual and well-founded fear that the [Employment Agreement] will be enforced against'" her. Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988)).

Here, as set forth above, the Campaign has engaged in a pattern of enforcing or threatening to enforce the Employment Agreement's non-disclosure and non-disparagement provisions against former Campaign employees, including Denson, Newman, Sims, and Johnson. (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶¶ 15, 20; Bowles Decl., Ex. P (Dkt. No. 26-16)) And the primary intended beneficiary of the Employment Agreement – President Trump – has tweeted about his efforts to enforce non-disclosure agreements. (Bowles Decl. Exs. K, O (Dkt. Nos. 26-11, 26-15)) Given this record, Denson has demonstrated a "well-founded fear" that the Employment Agreement will be enforced against her, Sorrell, 221 F.3d at 382, and has adequately alleged – under the non-speech standard – that "there is a substantial risk that the harm will occur." Susan B. Anthony List, 573 U.S. at 158.

The cases cited by the Campaign are not on point. (See Def. MTD Br. (Dkt. No. 25) at 13-17) In Hernandez v. Office of Commissioner of Baseball, No. 18-CV-9035 (JPO), 2019 WL 5593056 (S.D.N.Y. Oct. 30, 2019), plaintiff sought a declaration pursuant to the anti-retaliation provisions of Title VII that his employer could not punish him for speaking out. Id. at *2. The case raised a ripeness issue, because "in the absence of actual speech it is impossible to adjudicate whether the proposed speech would be protected under Title VII. . . . The manner in

which that oppositional activity is accomplished is also important to the [Title VII] analysis." Id.
In short, Hernandez has no application here.

In Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394 (S.D.N.Y. 2002), aff'd,
346 F.3d 357 (2d Cir. 2003), plaintiff "ask[ed] the Court to declare unenforceable, not only in the
United States and the United Kingdom but anywhere else in the world, any libel judgment
[defendant] may obtain against [plaintiff] in" a London civil action. Id. at 407-08. The court
rejected plaintiff's application, noting that "the mere prospect that such a ruling may be rendered
at some indefinite point in the future [does not] raise[] a sufficient actual controversy within the
meaning of the [Declaratory Judgment Act]." Id. at 408. The court also rejected plaintiff's First
Amendment arguments, noting that its "allegations of present or future harm are neither
sufficiently concrete, objective or specific to support a finding of an actual controversy justifying
the extraordinary relief [plaintiff] seeks." Id. at 410. In Dow Jones, however, there was no
threat of enforcement of a contract that restricts speech. Instead, plaintiff sought to enjoin
enforcement of a judgment in a libel action that had not yet, and might never be, rendered. Id. at
408-09.

The Campaign also cites a series of cases in which plaintiffs did not show a
substantial risk of future harm. (Def. MTD Br. (Dkt. No. 25) at 15-17.) In Sanger v. Reno, 966
F. Supp. 151 (E.D.N.Y. 1997), for example, the court held that a pre-enforcement challenge to a
statute was unripe, noting that "[w]here . . . the statute has been on the books for decades and has
never been enforced, there is no credible threat of either imminent or delayed enforcement." Id.
at 161. Similarly, in Bordell v. Gen. Elec. Co., 922 F.2d 1057 (2d Cir. 1991), the court found
that plaintiff lacked standing because he "has been extensively quoted in the local media . . . and
has never been punished or threatened with punishment as a result." Id. at 1060. And in Ford v.

Reynolds, 326 F. Supp. 2d 392 (E.D.N.Y. 2004), aff'd, 167 F. App'x 248 (2d Cir. 2006), the court found that while plaintiffs "have identified a specific pecuniary injury that they suffered as a result of Defendants' actions in 1995, . . . there is no allegation that they were deprived at any time thereafter of the right to speak at [defendants' universities], or that they were ever denied honoraria for their speeches." Id. at 407.  Finally, in Nicholas v. Trump, 433 F. Supp. 3d 581 (S.D.N.Y. 2020), plaintiff sued the Trump Administration regarding a test of the Presidential Alert system.  Id. at 585.  The court found that plaintiff lacked standing because "the only evidence supporting a substantial risk of a future test is that [the Federal Emergency Management Agency] tested the system once before.  But this is not enough to entail a substantial risk of future harm."  Id. at 590.

        Here, unlike in the cases cited above, Denson is not relying on a hypothetical risk of enforcement of the Employment Agreement's non-disclosure and non-disparagement provisions, or even a single past instance of enforcement.  Rather, she has pled facts and proffered evidence demonstrating a pattern of conduct on the Campaign's part, in which the Employment Agreement's non-disclosure and non-disparagement provisions have been enforced both against Denson and against other former Campaign employees.  This pattern of conduct plainly demonstrates that there is a substantial risk of a future action if Denson or other Campaign employees speak in a way that the Campaign believes violates the Employment Agreement.  Denson's allegations are sufficient to confer standing.[4]

        The Campaign argues, however, that Denson "fails to identify what statements, opinions, or other speech she is being prevented from saying," despite the fact that "the

---

[4]  Younger v. Harris, 401 U.S. 37, 51 (1971) – also cited by the Campaign (Def. MTD Br. (Dkt. No. 25) at 15) addresses state action, and is plainly inapposite.

Campaign [has] repeatedly asked [her to do so]."  (Def. MTD Br. (Dkt. No. 25) at 11)  The

Campaign notes that Denson "has continually publicly expressed her negative opinions and

views regarding the Campaign and President Trump on social media over the past two years[,]"

and that no action has been taken against her.  The Campaign asserts that it "is likely to have no

objections" to Denson's future speech (id. at 12 & n.5), and "confirm[s] that it does not intend to

enforce the Agreement against her in the future for expressing her opinions and views."  (Def.

Reply Br. (Dkt. No. 39) at 8)  The Campaign contends that, given these circumstances, Denson's

"allegations of a 'subjective chill' on the exercise of free speech rights 'are not an adequate

substitution for a claim of specific present objective harm or a threat of specific future harm.'"

(Def. Reply Br. (Dkt. No. 39) at 9 (quoting Davis v. N.Y. State Bd. of Elections, 689 F. App'x

665, 669 (2d Cir. 2017)) (emphasis omitted).

         The Campaign's representation in briefing that it has no present intention to

enforce the Employment Agreement's non-disclosure and non-disparagement provisions against

Denson is not sufficient, under the circumstances of this case, to defeat Denson's showing of a

substantial risk of a future action to enforce these provisions.  The reasoning of Arakelian v.

Omnicare, Inc., 735 F. Supp. 2d 22 (S.D.N.Y. 2010) – although it addresses non-compete and

non-solicitation provisions – is instructive here.

         In Arakelian, the defendant sought to defeat plaintiff's application for a

declaratory judgment by arguing that plaintiff had not shown that defendant intended to enforce

non-compete and non-solicitation provisions.  735 F. Supp. 2d at 41.  In rejecting this argument,

the court noted that defendant had

> refused to agree not to enforce the Restrictive Covenants Agreement, leaving
> [plaintiff] (and more importantly, any potential employer) uncertain as to whether
> she will be embroiled in a lawsuit if she accepts a position with [a] . . .
> competitor. . . . Resolution of such uncertainty is one of the main purposes of

declaratory judgments. . . . [Defendant] cannot move to dismiss [plaintiff's] claim; refuse to agree not to enforce the Restrictive Covenants Agreement; and at the same time claim that [plaintiff] has not shown that it intends to enforce the agreement.

Id.

Similarly here, the Campaign has not definitively stated that it will not assert the non-disclosure and non-disparagement provisions against Denson in the future. And given the Campaign's pattern of asserting these provisions against Denson and other former Campaign employees in the past, the Campaign's statements in briefing that it has no current intention to enforce these provisions in the future are not sufficient to demonstrate that there is no live controversy for purposes of standing.

For the reasons stated above, Plaintiff has demonstrated "a substantial risk that the harm will occur." Susan B. Anthony List, 573 U.S. at 158. Accordingly, this Court concludes that Denson has standing to challenge the validity of the Employment Agreement, and the Campaign's motion to dismiss on that basis will be denied.

**B.     Whether Denson's Claims Are Barred By Collateral Estoppel**

The Campaign argues that "plaintiff's assertions in this lawsuit that the Agreement is 'void and unenforceable' are the very same assertions that she unsuccessfully raised in the context of the parties' prior dispute, which issue was conclusively resolved by the . . . First Department, which expressly found, among other things, that there was 'no legal basis' to conclude that the Agreement is 'so broad and over-inclusive' that it is 'void or should be invalidated as against public policy.'"  (Def. MTD Br. (Dkt. No. 25) at 17-18 (quoting Denson, 180 A.D.3d at 452)) (emphasis in Def. MTD Br.)

Denson responds that the First Department, "in evaluating whether the arbitration award should be vacated on public policy grounds[,] . . . engaged in a brief discussion of the

general enforceability of non-disparagement agreements." (Pltf. Opp. Br. (Dkt. No. 32) at 28) (emphasis in original) According to Denson, "[t]he Campaign quotes the opinion out of order to make it appear that, in making this statement, the First Department passed on the specific question of the validity of the [agreement] at issue in this case," when in fact the First Department "did no such thing[.]" (Id.) Indeed, according to Denson, the First Department "expressly declined to speak on the enforceability of the [Employment Agreement] in particular, stating that 'any error by the arbitrator' concerning its enforceability is 'at most, a mistake of law that cannot serve as a predicate basis for vacating these awards.'" (Id. (quoting Denson, 180 A.D.3d at 452))

### 1.   **Applicable Law**

"Under New York law, collateral estoppel," or "issue preclusion," "'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party[,] . . . whether or not the tribunals or causes of action are the same.'" LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002) (quoting Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 500 (1984)). The doctrine applies "'if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.'" Id. (quoting Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349 (1999)). "The burden of proof with respect to whether an issue is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion." Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000). Moreover, under New York law – unlike under federal law – "the issue that was raised previously must be 'decisive of the present action.'" LaFleur v. Whitman,

300 F.3d 256, 271 (2d Cir. 2002) (quoting Schwartz v. Pub. Adm'r of Bronx Cty., 24 N.Y.2d 65, 71 (1969)).

### 2.    Background of the First Department Decision

In November 2017, Denson filed an action in Supreme Court against the Campaign alleging violations of the New York City Human Rights Law, including sex discrimination, hostile work environment, and retaliation, as well as defamation and intentional and negligent infliction of emotional distress.  Denson v. Trump for President, Inc., 180 A.D.3d 446, 446 (1st Dept. 2020).  The Campaign filed a demand to arbitrate with the American Arbitration Association and moved to compel arbitration in the state court proceeding.  The Supreme Court denied that application finding, inter alia, that the arbitration clause in the Employment Agreement did not apply to "employment related dispute[s]."  (Id. at 447-48)

While the motion compel was sub judice, Denson filed a second action against the Campaign in the Southern District of New York, which was assigned to Judge Furman.  In that action, she sought a declaration that the non-disclosure and non-disparagement provisions of the Employment Agreement are void an unenforceable as against public policy.  (Id. at 448)  The Campaign moved to compel arbitration.  As discussed above, Judge Furman granted the Campaign's motion to compel, Denson, 2018 WL 4568430 at *2, and the arbitrator went on to issue partial and final awards in favor of the Campaign.  In issuing the awards, the arbitrator concluded that (1) the issue of the validity of the non-disclosure and non-disparagement provisions was before him; (2) these provisions are neither void nor unenforceable; and (3) Denson had breached these provisions in filing the federal action.  Denson, 180 A.D.3d at 449.

Denson appealed to the First Department, arguing that the arbitrator's awards should be vacated.  In her appeal, Denson "advance[d] wide ranging arguments that the award

violates strong public policy and that the arbitrator otherwise exceeded his authority[.]"  (Id. at 449)

###    3.    The First Department's Analysis and Holding

As to Denson's public policy argument, the First Department noted that non-disclosure and non-disparagement agreements do not per se violate public policy, and that the arbitrator was authorized to determine the scope of these agreements.  (Id. at 452)  The court also ruled that "[t]he "inclusion of a non-disparagement provision in [the Employment Agreement], which when executed, was an agreement between private parties, does not impermissibly intrude on plaintiff's rights of free expression," citing Matter of Lancaster v. Incorporated Vil. of Freeport, 22 N.Y.2d 30, 37 (2013).  (Id.)  In Matter of Lancaster, the New York Court of Appeals held that a "nondisparagement clause was [not] an impermissible prior restraint on free speech[.]"  Matter of Lancaster, 22 N.Y. 2d at 37.  Accordingly, in citing to Matter of Lancaster, the First Department ruled that the non-disparagement provision of the Employment Agreement could not be found void and unenforceable as a prior restraint.  Denson, 180 A.D.3d at 452.  The court declined to consider, however, Denson's other "legal arguments concerning the scope of the [non-disclosure and non-disparagement provisions]," finding that "any error by the arbitrator is, at most, a mistake of law that cannot serve as the predicate for vacating [the arbitrator's] awards."  (Id.)

The First Department further concluded that "[t]he arbitrator did not exceed his enumerated authority by reaching the gateway issue of the validity of the [non-disclosure and non-disparagement provisions].  (Id. at 453)

The court nonetheless went on to vacate the arbitrator's awards, finding that the arbitrator's determination that Denson had breached the non-disclosure and non-disparagement

provisions was premised on "'disparaging statements about [defendant in the Federal action].'" (Id.) (alterations in original).  The court held that the arbitrator's awards "violate[] public policy" because they "punish[] [Denson] for availing herself of a judicial forum."  (Id. at 454)[5]

### 4.    Whether Collateral Estoppel Applies

The applicability of collateral estoppel here turns on whether the legal validity of the Employment Agreement's non-disclosure and non-disparagement provisions was "necessarily decided" in the action before the First Department.  LaFleur, 300 F.3d at 271.  The First Department made no such determination.

As discussed above, the First Department ruled that non-disclosure and non-disparagement agreements do not per se violate public policy, and – when part of an agreement between private parties – do not constitute a prior restraint.  Denson, 180 A.D.3d at 452.  The court also ruled that the arbitrator had not "exceed[ed] his enumerated authority by reaching the gateway issue of the validity of the [non-disclosure and non-disparagement provisions]."  Id. at 453.  But the First Department did not address "plaintiff['s] . . . legal arguments concerning the scope of the [non-disclosure and non-disparagement provisions]," because "any error by the arbitrator is, at most, a mistake of law that cannot serve as a predicate basis for vacating the[] [arbitrator's] awards."  Id.  Accordingly, collateral estoppel does not apply to Denson's legal arguments regarding the scope of the non-disclosure and non-disparagement provisions, including whether they are unenforceable as lacking a temporal limit, and as vague and

---

[5]  The First Department also vacated the remaining portions of the arbitrator's awards, which were predicated on statements Denson made after the Campaign filed its demand for arbitration. The court concluded that these statements did not fall "within the scope of the Demand to Arbitrate."  (Id. at 454-55)

indefinite.[6]  To the extent that the Campaign argues that the scope issues raised by Denson are

barred by collateral estoppel, the Campaign's motion to dismiss is denied.

## III.      DENSON'S MOTION FOR SUMMARY JUDGMENT

Denson argues that the Employment Agreement's non-disclosure and non-

disparagement provisions are unenforceable under New York law because they (1) do not

"contain any temporal limit"; (2) define "Confidential Information" to include "staggeringly

broad categories" including "anything 'Mr. Trump insists remain private or confidential'"; (3)

restrict speech on matters of highest political importance and subject Campaign workers to

potentially crippling financial penalties for exercising basic rights"; (4) "lack the requisite

definiteness required of all valid agreements"; (5) "contravene[] public policy" by violating "the

United States' and New York's commitment to public debate on matters of public concern . . .

[and] New York's public policy against contracts that prevent the reporting of misconduct"; and

(6) are unconscionable.  (Pltf. Sum. J. Br. (Dkt. No. 20) at 18-27 (emphasis in original))

The Campaign responds that (1) it "has compelling and constitutionally-based

privacy interests"; (2) "there is nothing about the lack of a durational component that makes a

confidentiality or non-disparagement provision 'ipso facto' unenforceable"; (3) "parties are free

to waive their First Amendment rights contractually[,]" and the non-disclosure and non-

disparagement provisions are not "unreasonably burdensome"; (4) the definition of "Confidential

---

[6]  Murphy v. Gallagher, 761 F.2d 878, 882 (2d Cir. 1985) – cited by the Campaign (Def. MTD
Reply Br. (Dkt. No. 39) at 12-13) – provides no support for its arguments.  In Murphy, the court
found that the issues in the relevant proceedings were "identical," and that the issues on which
defendants sought collateral estoppel "were necessary to the court's finding [in the relevant prior
proceeding]."  Murphy, 761 F.2d at 882-83.  Here, unlike in Murphy, the First Department
explicitly stated that it would not address Denson's legal issues concerning the scope of the non-
disclosure and non-disparagement provisions.  Accordingly, the First Department did not rule on
the scope issues that Denson raises here, and there were no determinations concerning scope
issues that "were necessary to the court's finding."

Information" "specifically includes the protected categories of information which the courts have found are intrinsically 'private' for political campaigns[,]" and Denson "does not present <u>any facts or circumstances</u> against which to measure the [Employment] Agreement"; and (5) the Employment Agreement is not unconscionable.  (Def. Opp. Br. (Dkt. No. 34) at 13-23) (emphasis in original)

   "Restrictive covenants, such as . . . confidentiality agreements [], are subject to specific enforcement to the extent that they are '"reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee."'"  <u>Ashland Mgmt. Inc. v. Altair Invs. NA, LLC</u>, 59 A.D.3d 97, 102 (1st Dept. 2008), <u>aff'd as modified</u>, 14 N.Y.3d 774 (2010) (quoting <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 389 (1999) (quoting <u>Reed, Roberts Assocs. v. Strauman</u>, 40 N.Y.2d 303, 307 (1976))).

   Under New York contract law, however, "[i]mpenetrable vagueness and uncertainty will not do[,]" because "definiteness as to material matters is of the very essence in contract law."  <u>Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher</u>, 52 N.Y.2d 105, 109 (1981). Enforceability requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  <u>In re Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.</u>, 93 N.Y.2d 584, 589 (1999) (citing <u>Joseph Martin Jr., Delicatessen, Inc.</u>, 52 N.Y.2d at 109))

  **A. Whether the Non-Disclosure Provision**
    **<u>Is Reasonable and Sufficiently Definite</u>**

   The Employment Agreement's non-disclosure provision does not meet any of the elements of the <u>Ashland</u> test.

As to whether the provision is "reasonable in time," the provision has no time limitation.  It applies "[d]uring the term of your service and at all times thereafter." (Employment Agreement (Dkt. No. 22-1) ¶ 1)

As to the scope of the provision, it is – as a practical matter – unlimited. "Confidential Information" includes thirty-five categories of "private, proprietary, or confidential" information.  Many of the categories – including "personal life," "relationships," and "political and business affairs" – are vague, and none of the categories are further defined or limited.  (Id. at ¶ 6(a))  "Confidential Information" also includes any information that President Trump "insists remain private or confidential."  (Id.)  In short, the categories of "Confidential Information" are sufficiently broad and vague to cover any information about President Trump and his family members.

As to the individuals and entities covered by the non-disclosure provision, the scope is again quite broad.  The provision applies not only to President Trump and his family members – including unnamed spouses, children, and grandchildren – but also to any legal entity "that, in whole or in part, was created by or for the benefit of . . . or is controlled or owned by" President Trump or any of his family members.  (Id. ¶¶ 6(a)-(c), (f))  President Trump himself is affiliated with more than 500 companies, and his family members may be affiliated with yet more.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 51; Bowles Decl., Ex. AA (Dkt. No. 26-27) at 3-13)

Whether the scope of the restrictions in the non-disclosure provision is reasonable must be considered in light of what the Campaign contends are the "legitimate interests" protected by this provision.  The Campaign argues that certain of the specified categories are "intrinsically 'private' for political campaigns," including "political affairs," "decisions," "strategies," and "communications."  (Def. Opp. Br. (Dkt. No. 34) at 19-20 (citing Perry v.

<u>Schwarzenegger</u>, 591 F.3d 1147, 1162 (9th Cir. 2010)))  But even with respect to these categories the terms are not defined, and are thus broad enough to cover any information that relates to the Campaign whatsoever.  For example, terms such as "political affairs," "decisions," "communications," and "strategies" are broad enough to encompass any matter that relates to the Campaign.

The Campaign provides several examples of information that these terms cover, including "private ideas, strategies, decisions, and communications pertaining to targeting and connecting with voter populations; allocating financial and personnel resources; canvassing and polling voter populations; fundraising strategies; media and digital marketing information; and analyses of the strengths and weaknesses of a competing campaign."  (<u>Id.</u> at 20)  The Campaign may well have a legitimate interest in protecting information concerning these matters from disclosure.  But the non-disclosure provision as written goes far beyond these examples.  Indeed, the vagueness and breadth of the provision is such that a Campaign employee would have no way of what may be disclosed, and accordingly Campaign employees are not free to speak about anything concerning the Campaign.  The non-disclosure provision is thus much broader than what the Campaign asserts is necessary to protect its legitimate interests, and therefore is not reasonable.

The non-disclosure provision's vague, overbroad, and undefined terms also render it unduly burdensome.  It is difficult if not impossible for Denson or another Campaign employee to know whether any speech might be covered by one of the broad categories of restricted information; whether that speech might relate to one of the several hundred potential subjects of the non-disclosure provision; or whether that speech may relate to a matter that President Trump will determine is confidential.  Because the effect of these burdens is to chill the speech of

Denson and other former Campaign workers about matters of public interest, the non-disclosure provision is harmful not only to them but also to the general public.

Although the Campaign suggests that the Ashland test should be modified here, because Ashland and its progeny address "'for-profit' business[es] [that] seek[] to enforce a restrictive covenant against an employee" (Def. Opp. Br. (Dkt. No. 34) at 16 & n.4), the Campaign offers no alternative test, advising merely that this Court should "'focus on the particular facts and circumstances giving context to the agreement.'"  (Id. at 12 (quoting Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 179-80 (S.D.N.Y. 2006)))  This Court has considered the facts and circumstances of the non-disclosure provision, however, and has explained why it is overbroad even as to the categories of information for which the Campaign claims a "unique" privacy interest.

Even if this Court were to set aside the Ashland test, the non-disclosure provision is unenforceable under basic principles of contract law.  Because of its vague and indefinite nature, there is no "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms[.]"  Express Indus. & Terminal Corp., 93 N.Y.2d at 589.  As discussed above, the broad categories of information covered by the non-disclosure provision – which in themselves are not exhaustive – could conceivably cover any information related to the Campaign.  It is thus impossible for Denson to know what speech she has agreed to forego, and there is no possibility of mutual assent.

Recognizing the breadth of the categories set forth in the non-disclosure provision, the Campaign does not even attempt to argue that the provision is sufficiently definite. The Campaign instead asserts that Denson "fails to make any allegations or proffer any evidence suggesting that the Campaign, President Trump, or anyone else is now attempting to enforce the

[Employment] Agreement against her in this manner."  (Def. Opp. Br. (Dkt. No. 34) at 20)  But this argument misses the point.  The breadth of the non-disclosure provision is such that Denson would have no way of knowing <u>ex ante</u> what speech will result in enforcement.  Accordingly, the mutual assent that is required for an enforceable contract under New York law is not present.[7]

For these reasons, Denson's motion for summary judgment will be granted as to the Employment Agreement's non-disclosure provision.

**B.**      <u>**Whether the Non-Disparagement Provision Is Sufficiently Definite**</u>

Denson asserts that the non-disparagement clause is, like the non-disclosure provision, a "classic post-employment restrictive covenant[]," and therefore subject to <u>Ashland</u>'s restrictions.  (Pltf. Sum. J. Br. (Dkt. No. 20) at 18-22)  But she offers no support for this proposition.  Indeed, none of the cases Denson cites address non-disparagement clauses, and Plaintiff has not shown that <u>Ashland</u> and its restrictions have any applicability to non-disparagement provisions.  <u>Id.</u>

Denson also argues that the non-disparagement clause is unenforceable because it is vague and indefinite.  (<u>Id.</u> at 22-23)  For example, Denson complains that the non-disparagement clause "provides no guidance as to what qualifies as 'demeaning' or 'disparaging[.]'"  (<u>Id.</u> at 23)  But Denson cites no case in which a New York court has found a non-disparagement clause to be unenforceable on the grounds that the term "disparage" is unduly

---

[7]  Denson's own experience with the non-disclosure provision is illustrative of its indefiniteness. In response to her 2017 lawsuit against the Campaign alleging, <u>inter alia</u>, sex discrimination, hostile work environment, retaliation, and defamation, the Campaign commenced an arbitration proceeding, contending that Denson had breached the non-disclosure provision.  But Denson's allegations in her 2017 lawsuit do not relate to any of the matters in which the Campaign now claims a special privacy interest, such as information concerning strategy, the targeting of various voter populations, financial and personnel resources, polling, fundraising, marketing, and analyses of a competing campaign.  (Def. Opp. Br. (Dkt. No. 34) at 19-20)

vague.  (Id. at 23)  To the contrary, courts have found "disparage" and similar terms in non-disparagement clauses to be unambiguous.  See Grand v. Schwarz, No. 15-CV-8779 (KMW), 2018 WL 1583314, at \*5 (S.D.N.Y. Mar. 27, 2018) ("Section 8 of the Settlement Order prohibits Grand from 'badmouth[ing]' or 'disparag[ing]' Schwarz, orally or in writing. . . . There is nothing ambiguous about that language.") (alterations in original); see also Rain v. Rolls-Royce Corp., No. 1:07-cv-1233-WTL-DML, 2010 WL 107270, at \*4 (S.D. Ind. Jan. 7, 2010), aff'd, 626 F.3d 372 (7th Cir. 2010) ("The non-disparagement clause is clear and unambiguous, providing simply that '[n]one of the Parties will disparage the other.'"); Sohal v. Mich. State Univ. Bd. of Trs., No. 295557, 2011 WL 1879728, at \*3-4 (Mich. Ct. App. May 17, 2011) ("We hold that the term 'disparage' in the non-disparagement clause is not ambiguous.  While plaintiff attempts to ascribe several 'reasonable' meanings to the term 'disparage,' and thus the non-disparagement clause, the term fairly admits of but one interpretation.") (collecting cases).

Denson further contends that the non-disparagement clause is unduly vague as to scope, because it applies to an "unascertainable group of entities, products, and services[,]" given that it does not "explain – or provide any means to understand – what qualifies as a 'product or service' offered by one of the covered individuals or entities," or "what 'assets' may be 'owned' by members of the Trump family."  (Pltf. Sum. J. Br. (Dkt. No. 20) at 23)  As with the non-disclosure provision, the non-disparagement provision is defined to cover President Trump, his family members, many of whom are unnamed, and any legal entity "that, in whole or in part, was created by or for the benefit of . . . or is controlled or owned by" President Trump or any of his family members.  (Employment Agreement (Dkt. No. 22-1) ¶¶ 2, 6(a)-(c), (f))  As noted above, President Trump alone is affiliated with more than 500 companies.  (Pltf. R. 56.1 Stmt. (Dkt. No. 21) ¶ 51; Bowles Decl., Ex. AA (Dkt. No. 26-27) at 3-13).

Recognizing the enormous scope of the non-disparagement provision, the Campaign does not even argue that it is sufficiently definite to be enforceable, and the Campaign has not cited any case that finds enforceable a non-disparagement provision comparable to that at issue here.  (Def. Opp. Br. (Dkt. No. 34) at 18-19)

The Court concludes that there is no "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to [the scope of the non-disparagement provision]."  Express Indus. & Terminal Corp., 93 N.Y.2d at 589.  Accordingly, Plaintiff's motion for summary judgment will be granted as to the Employment Agreement's non-disparagement provision.

### C.     This Court Cannot "Blue-Pencil" the Non-Disclosure or Non-Disparagement Clauses

The Campaign argues that, "[e]ven where a court finds that a particular restrictive covenant is overbroad as written, the court 'need not employ an all or nothing approach' because 'New York courts have expressly recognized and applied the judicial power to sever and grant partial enforcement for an overbroad restrictive covenant.'"  (Def. Opp. Br. (Dkt. No. 34) at 12 (quoting Batra, 430 F. Supp. 2d at 180))  The Campaign goes on to argues that, because of its "compelling interests in maintaining the confidentiality of certain campaign-related information, there can be no wholesale abolition of the Campaign's confidentiality agreement. . . . [T]he proper remedy would be to blue-pencil the Agreement[]."  (Id. at 21)

Denson counters that such "blue penciling is only appropriate where an employer 'demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but [instead] has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing.'"  (Pltf. Reply Br. (Dkt. No. 37) at 10 (quoting BDO Seidman, 93 N.Y.2d at 394)) (alteration in Pltf. Reply Br.)

32

So-called "blue penciling" by courts typically involves paring down restrictive covenants – generally non-compete provisions – as to their duration and geographical scope. The paring down – simple in nature – takes place in the context of granting injunctive relief. See, e.g., Wrap-N-Pack, Inc. v. Eisenberg, No. 04-cv-4887 (DRH)(JO), 2007 WL 952069, at *7 (E.D.N.Y. Mar. 29, 2007) (citing S. Nassau Control Corp. v. Innovative Control Mgmt. Corp., No. 95-CV-3724 (DRH), 1996 WL 496610, at *5, n.2 (E.D.N.Y. June 20, 1996); Webcraft Techs., Inc. v. McCaw, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987)).

"Blue penciling" is not appropriate here.  As an initial matter, "blue penciling" in this case would involve much more than a paring down of duration and geographical scope.  In order to render the non-disclosure and non-disparagement provisions enforceable, the court would have to engage in a wholesale re-drafting of these provisions.  The Campaign has cited no case law suggesting that this Court may re-write these provisions in that fashion.

Moreover, the Campaign's past efforts to enforce the non-disclosure and non-disparagement provisions demonstrate that it is not operating in good faith to protect what it has identified as legitimate interests.  The evidence before the Court instead demonstrates that the Campaign has repeatedly sought to enforce the non-disclosure and non-disparagement provisions to suppress speech that it finds detrimental to its interests.

None of the cases cited by the Campaign in support of its proposed blue pencil approach (see Def. Opp. Br. (Dkt. No. 34) at 13, 21) involve comparable facts.  Indeed, many of these cases present the issue of whether the enforcement of a subpoena or discovery request

would infringe on the recipient's First Amendment rights.[8]  These cases have no application here.

Moreover, unlike in <u>Batra</u>, 430 F. Supp. 2d at 180, and <u>Poller v. BioScrip, Inc.</u>, 974 F. Supp. 2d 204 (S.D.N.Y. 2013) – cited by Defendant (Def. Opp. Br. (Dkt. No. 34) at 13 – the Campaign is not seeking "partial enforcement for an overbroad restrictive covenant."  <u>Batra</u>, 430 F. Supp. 2d at 180; Poller, 974 F. Supp. 2d at 221.  The Campaign is instead opposing Denson's motion for declaratory relief.  "[W]hile a court has the discretion to pare or 'blue pencil' a restrictive covenant as to its duration and geographic scope in the context of granting injunctive relief, . . . the same is not true in other contexts."  <u>Wrap-N-Pack</u>, 2007 WL 952069, at *7 (internal citations omitted).[9]  As noted above, the Campaign has cited no authority that would authorize this Court to re-write the non-disclosure and non-disparagement clauses to render them enforceable.[10]

---

[8]  For example, in <u>Perry v. Schwarzenegger</u>, 591 F.3d 1147 (9th Cir. 2010), the court held that "[w]here, as here, discovery would have the practical effect of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights."  <u>Perry</u>, 591 F.3d at 1152.  In <u>Wyoming v. U.S. Dep't of Agric.</u>, 208 F.R.D. 449 (D.D.C. 2002), the court addressed "the implication of a First Amendment right in the discovery context" and denied plaintiff's motion to compel production of documents because "the information sought from the non-party witnesses is irrelevant" and could be obtained from other sources.  <u>Id.</u> at 455.  And in <u>Fed. Election Comm'n v. Machinists Non-Partisan Political League</u>, 655 F.2d 380 (D.C. Cir. 1981), the court overturned a district court order enforcing a subpoena issued by the Federal Election Commission to a political committee, noting that "release of such information to the government carries with it a real potential for chilling the free exercise of political speech and association guarded by the [F]irst [A]mendment."  <u>Id.</u> at 382, 388.

[9]  In <u>Marsh USA Inc. v. Schuhriemen</u>, 183 F. Supp. 3d 529 (S.D.N.Y. 2016) – also cited by the Campaign – the court modified non-solicitation provisions set forth in plaintiff's proposed preliminary injunction.  The court did not modify an agreement previously entered into by the parties.  <u>See</u> 183 F. Supp. 3d at 532-33, 537.

[10]  In her moving brief, Plaintiff seeks "an injunction preventing the Campaign and any other individual and entity entitled to enforce the contract from enforcing, attempting to enforce, and/or threatening to enforce the [Employment Agreement]."  (Pltf. Sum. J. Br. (Dkt. No. 20) at

## <u>CONCLUSION</u>

For the reasons stated above, the Campaign's motion to dismiss (Dkt. No. 23) is denied, and Denson's motion for summary judgment (Dkt. No. 19) is granted to the extent that the Employment Agreement's non-disclosure and non-disparagement provisions (Employment Agreement (Dkt. No. 22-1) ¶¶ 1-2) are declared invalid and unenforceable as to Denson.

The motion to file an <u>amicus</u> brief – submitted by The Reporters Committee for Freedom of the Press, The E.W. Scripps Company, the First Amendment Coalition, Gannett Co., Inc., the International Documentary Assn., The Media Institute, MediaNews Group Inc., the National Press Club Journalism Institute, The National Press Club, the National Press Photographers Association, the New York News Publishers Association, New York Public Radio, The News Leaders Association, the Online News Association, the Society of Environmental Journalists, the Society of Professional Journalists, and the Tully Center for Free Speech – is granted on consent.  (<u>See</u> Dkt. No. 28)

The motion to file an <u>amicus</u> brief submitted by Neil Klausner and Marissa Comart is denied as moot.  (Dkt. No. 29)

The parties are directed to submit a joint letter by **April 12, 2021**, stating how they wish to proceed in light of this Opinion.

---

33)  The Complaint does not seek injunctive relief, however.  (Cmplt. (Dkt. No. 1-1))
Accordingly, the application for injunctive relief is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 19, 23, 28, 29).

Dated:  New York, New York
        March 30, 2021

                                    SO ORDERED.

                                    _Pauls sardephe_____

                                    Paul G. Gardephe
                                    United States District Judge