## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSICA DENSON, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC.,<br><br>                         Defendant. | No. 20 Civ. 4737 (PGG)<br><br><br><br><br>**FIRST AMENDED CLASS-ACTION COMPLAINT** |

Plaintiff, by and through her undersigned counsel, in support of this class action alleges as follows:

### INTRODUCTION

1.      Plaintiff Jessica Denson, on behalf of herself and all others similarly situated, brings this class-action complaint against Defendant Donald J. Trump for President, Inc. (the "Campaign"). This class action seeks a judgment declaring a form contract the Campaign routinely required employees, contractors, and volunteers to sign during the 2016 election cycle (the "Form NDA") to be null, void, and unenforceable. The Form NDA contains two ill-defined and vastly overreaching provisions. One provision, the non-disclosure clause, prohibits individuals like Ms. Denson from ever disclosing any information "that Mr. Trump insists remain private." The second provision, the non-disparagement clause, prevents them from ever "demean[ing] or disparag[ing] publicly" former President Trump, any member of his family, and any of his or his family's companies. These provisions, taken together, constitute the main objective of the Form NDA and render it unlawful under both state and federal law.

2.      Many private employers ask employees to sign NDAs, and there is nothing unlawful in the abstract about the use of NDAs, including by political campaigns.

3.      The Form NDA drafted and imposed by the Campaign, however, is wildly broad, prohibiting a vast array of speech about a candidate for the highest office and a President of the United States—*forever*. And the Campaign has repeatedly invoked its prohibitions in an effort to chill truthful political speech it dislikes.

4.      New York has never condoned such extraordinary restrictions on the speech of former employees, let alone independent contractors or third-party volunteers.

5.      NDAs that indefinitely and broadly ban speech about candidates for office and public officials violate both the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. These constitutional protections of speech and press reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government,'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)), and "occupies the highest rung of the hierarchy of First Amendment values," *id.* (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Unlimited nondisclosure and non-disparagement clauses like those in the Form NDA are anathema to our constitutionally protected rights of free speech and press and to the functioning of our democracy.

6.      Candidates for public office and public officials cannot silence former campaign workers forever. Former campaign workers have a right to criticize public officials and to

contribute to the public debate. That right can be limited only to protect truly sensitive information for reasonable time periods; it cannot be stripped away entirely by contract.

## PARTIES

7.      Plaintiff Jessica Denson, the class representative, is a *summa cum laude* graduate of The George Washington University, an award-winning journalist, and a member of the Screen Actors Guild – American Federation of Television and Radio Artists with film and TV credits.

8.      As a journalism undergraduate in Washington, D.C., Ms. Denson was highly involved in political reporting. She created, anchored, and produced a weekly newsmagazine from the White House, interned at CNN's "The Situation Room" and the D.C. bureau for Cox Communications, and interviewed numerous political figures.

9.      Ms. Denson is a resident of California.

10.     Defendant (referred to herein as the "Campaign," as defined above) is the campaign organization that worked successfully for the election of Donald J. Trump as President of the United States in 2016, and on information and belief is the same organization that campaigned for the reelection of former President Trump in 2020.

11.     The Campaign is incorporated in the Commonwealth of Virginia, and has its principal place of business at 725 Fifth Avenue, New York, New York.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

13.     Venue is proper in this county pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

14.     On June 16, 2015, Donald Trump announced that he would run for President of the United States.

15.     The Campaign formally launched a little less than two weeks later, filing its

Statement of Organization with the Federal Election Commission on June 29, 2015.

16.     The Campaign successfully navigated the Republican primaries and, on July 16,

2016, the Republican National Convention nominated Trump for President.

**A.      The Campaign Hired Ms. Denson As A National Phone Bank Administrator**

17.     In the summer of 2016, Ms. Denson was working as an actress, a career that

predated her college education and which continued after college. She was a registered

Republican who had supported Mitt Romney for President in 2012.

18.     After Donald Trump was nominated as the GOP's candidate for President,

Ms. Denson applied to work for the Campaign.

19.     On August 18, 2016, she was hired by the Campaign as a national phone bank

administrator.

20.     Ms. Denson's initial role was to manage the national phone bank via its online

platform; draft voter surveys; support and coordinate with local field offices and volunteers; and

manage other tasks in the data department.

21.     As a national phone bank administrator, Ms. Denson had no direct access to

candidate Trump, strategic campaign documents, or generally to any other sensitive campaign

information, other than a national supporter database.

22.     On September 16, 2016, Ms. Denson was promoted to the role of Hispanic

Engagement Director. In that role, she developed the Campaign's Spanish-language digital ad

campaign, advocated for certain human rights stances, created the Campaign's Spanish

campaign slogan, developed bilingual campaign literature, launched an official Spanish-

language Twitter account, supported Hispanic engagement events in target states, and liaised between the national campaign and ground efforts for Hispanic engagement.

### B.  The Campaign Required Ms. Denson to Execute an Indefinite and Broad Form NDA

23.  Despite initially hiring Ms. Denson to fill a relatively low-level role, the Campaign required her to execute a form contract (the "Form NDA") containing ill-defined, expansive, and perpetual nondisclosure and non-disparagement clauses on August 18, 2016, four days prior to when she started work on August 22, 2016. A true and correct copy of the contract Ms. Denson was required to sign is attached as exhibit A.

*The Nondisclosure Clause*

24.  The nondisclosure clause provides that, "[d]uring the time of [her] service *and at all times thereafter*," Ms. Denson may not disclose or assist others in disclosing "Confidential Information," or use that information in any way detrimental to Mr. Trump, his family, or any of Mr. Trump's or his family's businesses. Ex. A ¶ 1 (emphasis added).

25.  The nondisclosure clause defines "Confidential Information" to include, without limitation:

> any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

*Id.* ¶ 6(a).

26.     The definition of "Confidential Information" does not stop there. It also includes "*all information . . .* of a private, proprietary or confidential nature that Mr. Trump insists remain private or confidential." *Id.* (emphasis added).

27.     The breadth and open-endedness of the nondisclosure clause leaves Ms. Denson with no way of knowing what qualifies as Confidential Information and what does not.

### *The Non-Disparagement Clause*

28.     The non-disparagement clause provides that "[d]uring the term of [her] service *and at all times thereafter*," Ms. Denson may not "demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer." *Id.* ¶ 2 (emphasis added).

29.     The contract defines "Family Member" as:

> any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

*Id.* ¶ 6(b).

30.     The contract defines "Trump Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump," and "Family Member Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member." *Id.* ¶¶ 6(c), 6(f).

31.     On information and belief, the terms "Trump Company" and "Family Member Company" encompass over 500 individual companies, only approximately half of which use the "Trump" branded name and none of which are specifically identified in the Campaign's form contract.

### *Arbitration and Choice-of-Law Clauses*

32.     The Campaign's Form NDA also provides that "any dispute arising under or relating to this agreement *may, at the sole discretion of each Trump Person*, be submitted to binding arbitration." *Id.* ¶ 8(b) (emphasis added).

33.     "Trump Person" is defined as "each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company." *Id.* ¶ 6(g).

34.     The contract specifies that the "laws of the State of New York" are to govern any disputes related to the contract. *Id.* ¶ 8(a).

### C.     The Campaign Routinely Required Others to Execute the Form NDA

35.     Ms. Denson was not alone in executing a Form NDA.

36.     On information and belief, beginning in or about June 2015, the Campaign required all employees, contractors, and volunteers to sign the Form NDA or a version thereof. A true and correct copy of the Campaign's standard Form NDA containing the nondisclosure and non-disparagement clauses is attached as exhibit B hereto.

37.     On information and belief, the Form NDA contracts required by the Campaign are substantially similar, if not identical, for the majority of the Campaign's employees, contractors, and volunteers during the 2016 election cycle.

38.     During the 2016 campaign, on information and belief, the Campaign had over one hundred employees and contractors on its payroll and hundreds more volunteers who each executed contracts containing the same restrictions as in the Form NDA signed by Ms. Denson.

**D.     The Form NDA Continues to Restrict the Speech of Ms. Denson and Other Former Campaign Employees, Contractors, and Volunteers On Matters of Public Concern**

39.     On November 8, 2016, Donald Trump was elected President of the United States.

40.     Ms. Denson's tenure with the Campaign ended two days later on November 10, 2016.

41.     Although Ms. Denson's employment with the Campaign ended over three years ago, the Campaign's indefinite and broad Form NDA purports to bind her to this day.

42.     Other former employees, contractors, and volunteers from the 2016 campaign likewise remain bound by the Campaign's Form NDA.

43.     Under the non-disparagement clause, Ms. Denson and other former Campaign employees, contractors, and volunteers have been and remain prohibited from criticizing a President of the United States.

44.     They are also prohibited from criticizing the President's daughter and Advisor to the President, Ivanka Trump; the President's son-in-law and Director of the White House Office of American Innovation, Jared Kushner; any of the President's other family members; and any of the over 500 companies affiliated with the President and his family.

45.     Under the nondisclosure clause, Ms. Denson and other former Campaign employees, contractors, and volunteers have been and remain prohibited from disclosing any information former President Trump may unilaterally and retroactively deem private.

E.   **The Campaign Routinely Threatens to Enforce and Takes Steps to Enforce Its Unlawful Form NDA**

46.   The Campaign has routinely threatened to enforce and/or initiated arbitration to enforce its Form NDA to stop former Campaign workers from engaging in speech related to matters of public concern, including their views on the President's time in office.

47.   For example, when former Campaign staffer Omarosa Manigault Newman published a book about her time in the Trump White House (*Unhinged: An Insider's Account of the Trump White House*) in August 2018, the Campaign sought to enforce its Form NDA against Newman in arbitration.[1]

48.   When former Campaign staffer Cliff Sims published a book about his experiences in the Trump White House (*Team of Vipers*) in January 2019, the Campaign's Executive Director Michael Glassner threatened to enforce its Form NDA against Sims.[2]

49.   When former Campaign staffer Alva Johnson dropped her lawsuit alleging that former President Trump forcibly kissed her in September 2019, the Campaign threatened legal action to enforce its Form NDA against Johnson.[3]

---

[1] Scott Horsley, *Trump Campaign Targets Omarosa Manigault Newman Over Tell-All Book*, NPR (Aug. 14, 2018), https://www.npr.org/2018/08/14/638551941/trump-campaign-targets-omarosa-manigault-newman-over-tell-all-book.

[2] Michael Glassner (@michaelglassner), Twitter (Jan. 29, 2019, 9:03 a.m.), https://twitter.com/michaelglassner/status/1090249001746747392; David Jackson, *Donald Trump: Aide-Turned-Author Cliff Sims Violated Non-Disclosure Agreement*, USA Today (Jan. 29, 2019), https://www.usatoday.com/story/news/politics/2019/01/29/donald-trump-cliff-sims-team-of-vipers/2708590002/.

[3] Veronica Stracqualursi, *Former Trump Campaign Staffer Drops Lawsuit but Stands by Claims He Forcibly Kissed Her*, CNN (Sep. 5, 2019), https://www.cnn.com/2019/09/05/politics/alva-johnson-trump-lawsuit-sexual-assault-allegations/index.html.

**F.      The Campaign Attempted to Enforce Its Unlawful Form NDA Against Ms. Denson**

50.      The Campaign also attempted to enforce the Form NDA against Ms. Denson to stop her from speaking about working conditions at the Campaign, and specifically about her experience of sex discrimination as a campaign staffer.

51.      The issue of workplace conditions for political staffers is a matter of public concern that may bear on a candidate's fitness for office. In the 2020 presidential campaign, news organizations covered allegations of harassment and other mistreatment of political staffers by at least four presidential candidates and their campaigns.[4]

52.      On November 9, 2017, Ms. Denson filed a *pro se* lawsuit against the Campaign in the New York Supreme Court, County of New York, captioned *Jessica Denson v Donald J. Trump for President, Inc.*, Index No. 101616-17 (the "State Court Action"). In that still-pending lawsuit, Ms. Denson is asserting (now with counsel) claims of sex-discrimination and slander against the Campaign.

53.      On December 20, 2017, in response to the State Court Action, the Campaign filed an arbitration demand. The Campaign asserted that Ms. Denson breached the Form NDA's "confidentiality and non-disparagement obligations" "by publishing certain confidential information and disparaging statements . . . in connection with [the] lawsuit she filed against [the Campaign] in New York Supreme Court."

---

[4] Matt Flegenheimer & Sydney Ember, *How Amy Klobuchar Treats Her Staff*, N.Y. Times (Feb. 22, 2019), https://www.nytimes.com/2019/02/22/us/politics/amy-klobuchar-staff.html (Klobuchar); Alex Thompson, *Warren Campaign Fires Senior Staffer for 'Inappropriate Behavior'*, Politico (Oct. 4, 2019), https://www.politico.com/news/2019/10/04/warren-staffer-inappropriate-behavior-campaign-2020-028583 (Warren); Michael Cranish, *Mike Bloomberg For Years Has Battled Women's Allegations of Profane, Sexist Comments*, Wash. Post (updated Feb. 15, 2020), https://www.washingtonpost.com/graphics/2020/politics/michael-bloomberg-women/ (Bloomberg); Sydney Ember and Katie Benner, *Sexism Claims From Bernie Sanders's 2016 Run: Paid Less, Treated Worse*, N.Y. Times (Jan. 2, 2019), https://www.nytimes.com/2019/01/02/us/politics/bernie-sanders-campaign-sexism.html (Sanders).

54.     In March 2018, the Campaign moved the state court to compel arbitration of Ms. Denson's claims, citing its unilateral authority to compel arbitration of disputes arising out of the contract.

55.     Ms. Denson did not participate in the arbitration demanded by the Campaign, on the ground that her contract did not govern her claims against the Campaign.

56.     In June 2018, Ms. Denson created a GoFundMe page so that she could find and finance legal representation. On her homepage, Ms. Denson summarized the allegations of her discrimination claim and the Campaign's use of the Form NDA to retaliate against her, and asked for help paying for her legal efforts. She shared the GoFundMe page on a Twitter feed she had created for this purpose.

57.     On August 9, 2018, the state court denied the Campaign's motion to compel arbitration of Ms. Denson's state claims, holding that all of Ms. Denson's claims, including her sex-discrimination, harassment, and common-law claims, were outside the scope of the Form NDA.

58.     In the midst of her State Court Action, Ms. Denson commenced another *pro se* lawsuit, this time in federal court in the Southern District of New York. *Denson v. Donald J. Trump for President, Inc.*, No. 18-CV-2690 (JMF) (S.D.N.Y.). Through the federal lawsuit, Ms. Denson sought to have her contract declared void and unenforceable.

59.     The Campaign moved to compel arbitration of Ms. Denson's federal claims, and on August 30, 2018, the federal court granted the Campaign's motion. *Denson v. Donald J. Trump for President, Inc.*, No. 18-CV-2690 (JMF), 2018 WL 4568430, at *2 (S.D.N.Y. Aug. 8, 2018). The federal court dismissed Ms. Denson's federal lawsuit and later denied Ms. Denson's Rule 60 motion for reconsideration.

60.     During this time, the Campaign continued to press forward in the arbitration it had

initiated on December 20, 2017, without Ms. Denson's participation.

61.     No party in the arbitration ever argued or put at issue the validity of the

Campaign's Form NDA.

62.     Despite the fact that Ms. Denson never participated in that arbitration, the

arbitrator issued a partial award to the Campaign on October 19, 2018, followed by a final award

on December 12, 2018 (collectively, "the award"), totaling $49,507.64. A true and correct copy

of the October 19, 2018, partial award is attached as exhibit C, and a true and correct copy of the

December 12, 2018, final award is attached as exhibit D.

63.     The arbitrator concluded that Ms. Denson breached the contract "by disclosing,

disseminating and publishing confidential information in the Federal Action, and by making

disparaging statements about Claimant and the Agreement on the Internet on her GoFundMe

page and on her Twitter account." Ex. C at 4.

64.     The Campaign moved to have the award confirmed by the state and federal

courts.

65.     On July 8, 2019, the state court confirmed the award, and on July 23, 2019, the

federal court subsequently held that the state court's affirmance was preclusive on the issue.

*Denson v. Donald J. Trump for President, Inc.*, No. 18-CV-2690 (JMF), 2019 WL 3302608, at

*2 (S.D.N.Y. July 23, 2019).

66.     Ms. Denson promptly appealed the state court's affirmation.

67.     On February 6, 2020, the Appellate Division, First Department ("First

Department") unanimously reversed the decision affirming the Arbitration award and vacated the

Arbitration award in its entirety. It declared the Arbitration award to have been against public

policy and the arbitrator to have exceeded his authority. *Denson v. Donald J. Trump For President, Inc.*, 180 A.D.3d 446, 454 (1st Dep't 2020). The Court further held that, "[b]y concluding that the allegations in the federal action are tantamount to disclosure of confidential information violative of the NDA, the arbitrator improperly punished plaintiff for availing herself of a judicial forum." *Id.*

68.     From the time the Campaign filed its Arbitration in December of 2017, Ms. Denson was forced into a defensive posture for having the temerity to challenge the Campaign's conduct toward her. Until the arbitration award was reversed over two years later, she withstood constant financial threat and pressure to withdraw her claims due to the Campaign's incessant pursuit and expansion of the Arbitration. During Ms. Denson's appeal of the state court's decision affirming the arbitration award, the Campaign attempted to execute on the award, serving subpoenas and restraining notices on Ms. Denson, her bank accounts, and sources of funding for her lawsuit. The Campaign even attempted to restrain Ms. Denson's counsels' escrow account.

69.     During the entire period from December 2017 to February 2020, Ms. Denson perforce avoided or moderated any public comments regarding the Campaign and the President because of the threat caused by the Arbitration award and the Campaign's aggressive efforts to enforce it. The Campaign used its litigation to enforce the Form NDA to restrain Ms. Denson's freedom of speech during a period in which the public could have significantly benefited from her knowledge.[5]

---

[5] For example, the primary subject of Ms. Denson's harassment and sexual discrimination claims in her State Action is Camilo Sandoval, with whom Ms. Denson is all too familiar. Sandoval served as the Director of Data Operations for the Trump Campaign, and he was subsequently appointed as acting Chief Information Officer at the U.S. Department of Veterans Affairs (the "VA") (*see* Letter from Sen. Richard Blumenthal, et al. to Thomas Bowman, Deputy Sec'y U.S. Dep't of Veterans Affairs (May 5, 2018),

### G.    Ms. Denson's Class Arbitration Demand and The Campaign's Consent to this Litigation

70.    On February 20, 2019, after the federal court determined that Ms. Denson was required to challenge the Form NDA in Arbitration and before the state court ruled on the Campaign's motion to affirm the arbitration award, Plaintiff submitted a class action arbitration demand (the "Class Arbitration") before the American Arbitration Association ("AAA") to arbitrate the validity of the Form NDA.

71.    The Campaign sought to delay the Class Arbitration by arguing *res judicata* and collateral estoppel from the Arbitration, and also by reserving decision on whether the claim should be arbitrated or litigated.

72.    On March 29, 2019, the Campaign applied to the original arbitrator, Judge Kehoe, to rule the new class action arbitration invalid on *res judicata* and collateral estoppel grounds, referring to the earlier Arbitration.

73.    The Campaign argued that vacatur of the original arbitration award, which Ms. Denson had not yet obtained, would be the only circumstance under which *res judicata* and collateral estoppel would not apply.

74.    On May 20, 2019, Judge Kehoe issued a decision determining that he had no jurisdiction to hear the Campaign's application.

---

https://www.blumenthal.senate.gov/imo/media/doc/05.15.18%20-%20VA%20-%20IT%20Systems.pdf). Sandoval's work on the Campaign raised concerns, when it was revealed that he served as the Director of Data Operations during the period when the Campaign contracted with Cambridge Analytica. *Id.* His stint as CIO at the VA was likewise marked by controversy, as the VA failed to timely deliver electronic housing allowance payments to more than 10,000 veterans and experienced significant delays in digitizing health records. *Id.*; *see also* Christopher Jones, *Farewell to the Trump Political Appointee Who Brought IT Chaos to the Department of Veterans Affairs*, Pacific Standard (Feb. 19, 2019), https://psmag.com/social-justice/farewell-to-the-trump-political-appointee-who-brought-it-chaos-to-the-dept-of-veterans-affairs). Ms. Denson could have contributed significantly to the public debate around Sandoval's work on the Campaign and his time in government.

75.     On May 22, 2019, counsel for the Campaign cited the "sole discretion" clause in paragraph 8B of the Form NDA and "reserved its contractual right to not consent to the AAA's jurisdiction" over the Class Arbitration. A true and correct copy of the email from counsel for the Campaign is attached as exhibit E.

76.     The following week, on May 29, 2019, counsel for the Campaign advised the AAA that "the Campaign d[id] **not** consent to the AAA's jurisdiction over the [Class] Arbitration." A true and correct copy of the email from counsel for the Campaign is included in exhibit E.

77.     On June 3, the Campaign filed a brief in the Federal Court litigation confirming its decision to exercise its unilateral right not to arbitrate Ms. Denson's class claims. A true and correct copy of the Campaign's brief is attached as exhibit F.

78.     Specifically, the Campaign explained,

> Under the terms of the parties' written agreement, . . . the Campaign is afforded the discretionary right to arbitrate (or not arbitrate) that class action before the AAA. The Campaign simply exercised its election rights in this regard and notified the AAA. . . . *[I]f plaintiff wants to proceed with a class action lawsuit, she must file her purported claims in court*, rather than with the AAA.

Ex. F at 2 (emphasis added).

79.     By refusing to consent to arbitrate Ms. Denson's Class Arbitration Demand, the Campaign waived any right to arbitrate the current dispute, and Ms. Denson now proceeds before this Court, seeking a declaration that the Form NDA is invalid as a matter of law.

**H.     The Campaign's Form NDA Violates State and Federal Law**

80.     Despite the Campaign's strenuous efforts to enforce its Form NDA against Ms. Denson and others, the Form NDA's broad and indefinite restrictions on Ms. Denson's and others' speech are unlawful under state and federal law.

***Violation of the Constitutional Protections for Speech and Press***

81.     The First Amendment to the United States Constitution and Article I, Section 8 of the New York Constitution protect the freedoms of speech and the press.

82.     A major purpose of the First Amendment is "to protect the free discussion of governmental affairs," including "discussions of candidates, . . . the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. State of Alabama*, 384 U.S. 214, 218–19 (1966).

83.     Speech concerning such public affairs "is the essence of self-government" and "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964); *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

84.     The constitutional protections of speech and the press accordingly limit states' power to sanction or enforce contracts of silence that restrict speech about public officials and candidates for office. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.").

85.     That is particularly true where, as here, contracts of silence are enforced by the political campaign of a former public official in conjunction with, and for the benefit of, the public official. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 US —, —, 139 S Ct 1921, 1928 (2019) ("Under this Court's cases, a private entity can qualify as a state actor . . . when the government acts jointly with the private entity.").

86.     Although campaign workers may waive their free speech rights by signing contracts containing nondisclosure and non-disparagement clauses, such a waiver is only

enforceable if, under the circumstances, "the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement." *Overbey v. Mayor of Baltimore*, 930 F3d 215, 223 (4th Cir 2019).

87.     Any interest of the Campaign in enforcing its Form NDA is substantially outweighed by the public interest in the speech of Ms. Denson and other Campaign workers on matters of legitimate public concern.

88.     The Campaign has yet to demonstrate *any* legitimate reason for imposing on staff its broad, sweeping Form NDA with ill-defined and unlimited confidentiality and non-disparagement obligations.

89.     By contrast, the benefit to the public in allowing former campaign workers to speak about—and perhaps speak *against*—a candidate for the highest public office in the land is obvious and compelling. The First Amendment and Article I, Section 8 of the New York Constitution render the Form NDA unenforceable.

### The Form NDA Is An Unreasonable Post-Employment Restrictive Covenant

90.     The Form NDA violates New York's prohibition on unreasonable post-employment restrictive covenants.

91.     Post-employment restrictive covenants must be "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 59 A.D.3d 97, 101 (1st Dep't 2008) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999), *aff'd as modified*, 14 N.Y.3d 774 (2010).

92.     Neither the nondisclosure clause nor the non-disparagement clause is reasonable in duration, as both purport to last forever. Ex. A ¶¶ 1–2.

93.     Neither the nondisclosure clause or the non-disparagement clause is reasonable in scope. The nondisclosure clause expansively prohibits the disclosure of "all information . . . that Mr. Trump insists remain private or confidential." *Id.* ¶¶ 1, 6(a). The non-disparagement clause prohibits signers in perpetuity from "demean[ing] or disparag[ing] publicly" former President Trump, his family, or any of his and his family's companies and assets. *Id.* ¶ 2.

94.     The Form NDA, as written, is not necessary to protect the Campaign's legitimate interests.

95.     Regarding the nondisclosure clause, the Campaign may have had a legitimate interest in protecting confidential information that is akin to trade secrets, such as confidential "contact lists," "notes," and certain "financial statements." *Id.* ¶ 6(a). It does not have a legitimate interest in protecting "all information" that former President Trump unilaterally "insists remain private or confidential," for any reason or for no reason. *Id.*

96.     Regarding the non-disparagement clause, the Campaign may have a legitimate interest in current employees not disparaging former President Trump. It does not have a legitimate interest in prohibiting former employees from ever "demean[ing] or disparag[ing] publicly" former President Trump, his family, or any of his and his family's companies or assets. *Id.* ¶ 2.

97.     Both the nondisclosure clause and the non-disparagement clause are unreasonably burdensome on former campaign workers, as they severely restrict their ability to contribute to public debate on matters concerning a President of the United States and various family members who served as key advisors.

98.     The Campaign's Form NDA also injures the public, as it prevents those with relevant information and informed opinions about a President of the United States from sharing their experiences and views now, during a  presidential election year, or ever.

### The Form NDA Lacks the Requisite Definiteness Under New York Law

99.     The Form NDA is invalid due to the lack of sufficiently definite terms.

100.     For a contract to be binding, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *E.g.*, *Matter of Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). "Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989).

101.     The nondisclosure clause prohibits signers from disclosing "Confidential Information," defined to include "all information of a private, proprietary or confidential nature that Mr. Trump insists remain private or confidential." Ex. A ¶ 6(a).

102.     The non-disparagement clause, for its part, purports to protect over 500 individual companies, only approximately half of which use the "Trump" branded name and none of which are specifically identified in the Form NDA.

103.     It is impossible for any signatory to know what information may not be disclosed and which companies and persons the non-disparagement clause purports to protect.

104.     The Form NDA lacks the sufficient definiteness required of binding contracts.

### The Form NDA Is Unconscionable Under New York Law

105.     The Form NDA is unconscionable on its face and therefore invalid.

106.    Contracts are unconscionable when there is a lack of a meaningful choice by one party and contractual terms that unreasonably favor the other party.

107.    Campaign workers in this case lacked a meaningful choice: if they wished to work for the Campaign, they were required to sign its Form NDA as written and imposed by the Campaign.

108.    The one-sided terms of the Form NDA unreasonably favor the Campaign.

109.    The worker is forbidden from ever disparaging the Campaign, former President Trump, his family, or any of former President Trump and his family's businesses, but the Campaign and the Trump entities are not forbidden from disparaging the worker. Ex. A ¶ 2.

110.    The worker is forbidden from disclosing "Confidential Information," which includes any information former President Trump unilaterally deems private, but the Campaign is not forbidden from disclosing information about the worker. *Id.* ¶¶ 1, 6(a).

111.    As described above in Paragraphs 50 through 79, the Campaign has gamed this unilateral, discretionary Form NDA by compelling Plaintiff to arbitrate when she sues, and refusing to arbitrate when she demands arbitration.

112.    In sum, the Form NDA is so one-sided in favor of the Campaign as to be unconscionable.

### *The Form NDA Is Otherwise Against Public Policy Under New York Law*

113.    The Form NDA is invalid because it is otherwise against public policy.

114.    An otherwise valid contract is unenforceable when "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." Restatement (Second) of Contracts § 178.

115.     The non-disparagement and nondisclosure clauses are against public policy as

unreasonable restrictions of Class members' speech.

116.     New York maintains a deep and abiding commitment to robust public debate.

> This State, a cultural center for the Nation, has long provided a
> hospitable climate for the free exchange of ideas. That tradition is
> embodied in the free speech guarantee of the New York State
> Constitution, beginning with the ringing declaration that "[e]very
> citizen may freely speak, write and publish . . . sentiments on all
> subjects." (N.Y. Const., art. I, § 8.) Those words, unchanged since
> the adoption of the constitutional provision in 1821, reflect the
> deliberate choice of the New York State Constitutional Convention
> not to follow the language of the First Amendment, ratified 30
> years earlier, but instead to set forth our basic democratic ideal of
> liberty of the press in strong affirmative terms.

*Immuno AG. V. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991).

117.     The non-disparagement and nondisclosure clauses are also against public policy

because the Campaign uses them to threaten to impose and actually to impose significant

retaliatory financial penalties on individuals for asserting their statutory rights and disclosing

wrongdoing.

118.     Federal, state, and local law prohibit employers from retaliating against

employees for asserting statutory employment claims in court or before an administrative

agency. *See, e.g.*, 42 U.S.C. § 2000e–3(a); N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8–

107(7).

119.     As the First Department held in invalidating the Campaign's arbitration award

against Ms. Denson, "[t]here is a deep-rooted, long-standing public policy in favor of a person's

right to make statements during the course of court proceedings without penalty." *Denson*, 116

N.Y.S.3d at 276.

120.     In addition, contracts prohibiting employees from disclosing misconduct or wrongdoing to authorities are generally unenforceable. *See* Restatement (First) of Contracts § 548; 7 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 15.8 (4th ed 2016); 6A Arthur Linton Corbin, *Corbin on Contracts* § 1430 (1962); *see also* N.Y. Lab. Law § 740; *cf.* Restatement (Third) Of Agency § 8.05, Comment *c* (2006).

121.     The Form NDA, however, contains no exception allowing Campaign workers to vindicate their statutory employment rights in court or disclose misconduct or wrongdoing.

122.     The non-disparagement clause contains no carveout at all. Ex. A ¶ 2.

123.     The non-disclosure clause contains a narrow carveout that permits Campaign workers to disclose Confidential Information only when they have a "legal obligation" to do so and, even then, only after obtaining the Campaign's consent. *Id.* ¶ 1(e).

124.     Instead, the Campaign uses the Form NDA in an effort to prevent former Campaign workers from vindicating their rights or reporting wrongdoing.

125.     On February 27, 2019, Michael Cohen testified before Congress that the Campaign's use of the Form NDA, along with former President Trump's efforts to enforce it, is specifically intended to prevent people from coming forward with claims of wrongdoing.

126.     For example, as set forth above, the Campaign threatened to enforce its Form NDA against former staffer Alva Johnson after she dropped her lawsuit alleging that former President Trump forcibly kissed her in September 2019.

127.     The Campaign has also actually used, and will continue to use, the Form NDA to prevent former Campaign workers from vindicating their rights or reporting wrongdoing.

128.     For example, as set forth above, the Campaign used its Form NDA to retaliate against Ms. Denson for bringing the State Court Action to enforce her rights to be free of a discriminatory and hostile workplace.

129.     The Form NDA is invalid as a matter of law both because it unreasonably burdens Class members' speech, and because it allows the Campaign to threaten to impose and actually impose significant financial penalties on individuals in retaliation for the assertion of their statutory rights and the disclosure of wrongdoing.

## CLASS ACTION ALLEGATIONS

130.     This action meets all of the requirements of a class action under Federal Rule of Civil Procedure 23.

131.     The putative Class consists of all Campaign employees, contractors, and volunteers who executed a Form NDA, or any contract containing similar nondisclosure and non-disparagement clauses, during the 2016 election cycle. This class is too numerous to allow joinder of all Class members to be practicable.

132.     Excluded from the Class is Defendant.

133.     While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes that there are over one hundred members in the Class and likely several hundreds of members.

134.     The legal validity or invalidity of the Form NDA constitutes questions common to the Class, and predominates over any question affecting only individual members.

135.     The claim for a declaration of invalidity by the Plaintiff, as the Class representative, is typical of the claims of members of the Class. Plaintiff and all members of the Class are similarly affected by Defendant's invalid and unlawful Form NDA.

136.    Plaintiff, as a class representative, will fairly and adequately protect the interests of the Class, as demonstrated by her tenacity in fighting this dispute in various forums over the last several years. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of First Amendment and New York constitutional and contract claims.

137.    A class action is superior to any other method for the resolution of this dispute, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

138.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

### FIRST CAUSE OF ACTION

**Declaratory Judgment that the Campaign's
<u>Form NDA Violates New York Contract Law</u>**

139.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

140.     Federal law provides for declaratory judgment of the validity or invalidity of an agreement. 28 U.S.C. § 2201.

141.     The Form NDA is unlawful under New York contract law for several reasons.

142.     The nondisclosure and non-disparagement clauses are unreasonable post-employment restrictive covenants. They are unreasonable in duration and scope. They are not necessary to protect the Campaign's legitimate interests. They are unreasonably burdensome on Class members as they severely restrict their Class members' state and federal constitutional rights to contribute to public debate on matters concerning a President of the United States and various family members who served as key advisors. And the nondisclosure and non-disparagement clauses injure the public, as they prevent Class members with relevant information and informed opinions about a President of the United States from sharing their experiences and views now, during a presidential election year, or ever.

143.     The nondisclosure and non-disparagement clauses lack sufficient definiteness, as it is impossible for any signatory to know what information may not be disclosed and which companies and persons the non-disparagement clause purports to protect.

144.     The nondisclosure and non-disparagement clauses are unconscionable, as Class members had no meaningful choice but to sign the contracts and the nondisclosure and non-disparagement clauses that unreasonably favor the Campaign.

145.     The nondisclosure and non-disparagement clauses are otherwise against public policy under New York contract law both because they unreasonably restrict Class members' speech, and because they allow the Campaign to threaten to impose and actually impose significant financial penalties on individuals in retaliation for the assertion of their statutory rights and the disclosure of wrongdoing.

146.    Ms. Denson and members of the putative class are harmed by the unlawful Form NDA, as they are currently unlawfully prohibited from exercising their free speech rights, as well as from reporting misconduct or asserting employment claims against the Campaign.

147.    Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

## SECOND CAUSE OF ACTION

### Declaratory Judgment that the Campaign's Form NDA
### <u>Violates Article I, Section 8 of the New York Constitution</u>

148.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

149.    Federal law provides for declaratory judgment of the validity or invalidity of an agreement. 28 U.S.C. § 2201.

150.    Article I, Section 8 of the New York Constitution provides that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

151.    The non-disparagement clause of the Campaign's Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining them from ever again criticizing a President of the United States, his family, and any of his and his family's businesses.

152.    The nondisclosure clause of the Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining their ability to share information on matters of legitimate public concern.

153.     The public interest in uninhibited, robust, and wide-open debate on matters of public concern, as well as the prohibition on government-sanctioned censorship of speech, outweighs any legitimate interest the Campaign has in enforcing the Form NDA.

154.     Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

### THIRD CAUSE OF ACTION

**Declaratory Judgment that the Campaign's Form NDA**
**<u>Violates the First Amendment to the U.S. Constitution</u>**

155.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

156.     Federal law provides for declaratory judgment of the validity or invalidity of an agreement. 28 U.S.C. § 2201.

157.     The First Amendment to the United States prohibits abridgments of "the freedom of speech, or of the press."

158.     The non-disparagement clause of the Campaign's Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining them from ever again criticizing a President of the United States, his family, and any of his and his family's businesses.

159.     The nondisclosure clause of the Form NDA violates Ms. Denson's and similarly situated individuals' rights of free speech and of the press by unlawfully restraining their ability to share information on matters of legitimate public concern.

160.     The public interest in uninhibited, robust, and wide-open debate on matters of public concern, as well as the prohibition on government-sanctioned censorship of speech, outweighs any legitimate interest the Campaign has in enforcing the Form NDA.

161.     Ms. Denson and members of the putative class face imminent risk if they disregard the Form NDA, as the Campaign routinely threatens and attempts to enforce its Form NDA.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A.     Designation of this action as a class action;

B.     Designation of Plaintiff as a representative Plaintiff of all employees, independent contractors, and volunteers for the Campaign who have signed the Form NDA or any contract containing similar nondisclosure and non-disparagement clauses;

C.     Declaratory judgment that the Campaign's Form NDA, including the one signed by Plaintiff, and any similar contracts the Campaign required any member of the class to sign, are invalid and therefore unenforceable;

D.     An injunction prohibiting the Campaign and all third parties from attempting to enforce the Campaign's Form NDA, including the one signed by Plaintiff and any similar contracts the Campaign required any member of the class to sign, against Plaintiff and all class members;

E.     Assessment of Plaintiff's reasonable costs and attorneys' fees, along with any notice costs and forum fees against the Campaign in their entirety; and

F.     Such other relief as the Court deems just and equitable.

Dated: New York, New York
        April 5, 2022                         Respectfully Submitted,


                                              By: David K. Bowles
                                              David K. Bowles
                                              BOWLES & JOHNSON PLLC
                                              14 Wall Street, 20th Floor
                                              New York, New York 10005
                                              Tel. (212) 390-8842
                                              Fax (866) 844-8305
                                              Email: David@BoJo.Law

                                              John Langford
                                              UNITED TO PROTECT DEMOCRACY, INC.
                                              555 W. 5th St.
                                              Los Angeles, CA 90013
                                              Telephone: (202) 579-4582
                                              Fax: (929) 777-8428
                                              Email: john.langford@protectdemocracy.org

                                              Brittany Williams
                                              UNITED TO PROTECT DEMOCRACY, INC.
                                              1900 Market St., 8th Fl.
                                              Philadelphia, PA 19103
                                              Telephone: (202) 579-4582
                                              Fax: (929) 777-8428
                                              Email: brittany.williams@protectdemocracy.org

                                              Anne Tindall
                                              UNITED TO PROTECT DEMOCRACY, INC.
                                              2020 Pennsylvania Ave. NW, Suite # 163
                                              Washington, DC 20006
                                              Telephone: (202) 579-4582
                                              Fax: (929) 777-8428
                                              Email: anne.tindall@protectdemocracy.org

                                              David A. Schulz
                                              Joseph Slaughter
                                              BALLARD SPAHR LLP
                                              1675 Broadway, 19th Floor
                                              New York, NY 10019
                                              Telephone: (212) 850-6103
                                              Fax: (212) 223-1942
                                              Email: schulzd@ballardspahr.com
                                              Email: slaughterj@ballardspahr.com